1  LAW OFFICES OF SCOTT L. TEDMON
   A Professional Corporation
2  SCOTT L. TEDMON, CA. BAR # 96171
   717 K Street, Suite 227
3  Sacramento, California 95814
   Telephone: (916) 441-4540
4  Email: tedmonlaw@comcast.net

   E-Filing

5  Attorney for Petitioner
   ANGEL JESUS ALVAREZ

6

7

8             UNITED STATES DISTRICT COURT

9         FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 ANGEL JESUS ALVAREZ,                    )
                                           )
12         Petitioner,                     )    C 06 5027
                                           )
13         v.                              )    Case No. _____ MJJ
                                           )
14 ROBERT AYERS, JR., Warden,              )
                                           )
15         Respondent.                     )
                                           )
16 _____ )

17

18

19         **PETITION FOR WRIT OF HABEAS CORPUS**

20              **PURSUANT TO 28 U.S.C. § 2254**

21

22

23

24

25

26

27

28

1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name  ALVAREZ              Angel              J.
            (Last)           (First)        (Initial)

3

4    Prisoner Number  P-81998

                      S.Q.S.P./North Block, General Delivery
    Institutional Address   San Quentin, CA 94974

5

6    ====================================================================

    **UNITED STATES DISTRICT COURT**
7    **NORTHERN DISTRICT OF CALIFORNIA**

8    ANGEL JESUS ALVAREZ           )
    (Enter the full name of plaintiff in this action.)  )

9                          )

             vs.          )   Case No. _____
10                        )   (To be provided by the clerk of court)
    ROBERT AYERS, JR., Warden   )

11                        )   **PETITION FOR A WRIT**
                        )   **OF HABEAS CORPUS**

12                        )

13                        )

14    (Enter the full name of respondent(s) or jailor in this action) )

15    ====================================================================

16            Read Comments Carefully Before Filling In

17    When and Where to File

18       You should file in the Northern District if you were convicted and sentenced in one of these

19    counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20    San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21    this district if you are challenging the manner in which your sentence is being executed, such as loss of

22    good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23       If you are challenging your conviction or sentence and you were not convicted and sentenced in

24    one of the above-named fifteen counties, your petition will likely be transferred to the United States

25    District Court for the district in which the state court that convicted and sentenced you is located. If

26    you are challenging the execution of your sentence and you are not in prison in one of these counties,

27    your petition will likely be transferred to the district court for the district that includes the institution

28    where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS    - 1 -

1    <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are.  This usually means the Warden or

3    jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5    respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11       1.  What sentence are you challenging in this petition?

12           (a)    Name and location of court that imposed sentence (for example; Alameda

13                  County Superior Court, Oakland):

14           <u>Santa Clara County Superior Court - San Jose, CA</u>

15                  Court                              Location

16           (b)    Case number, if known <u>198084</u>

17           (c)    Date and terms of sentence <u>Date: May 26, 2000</u>
                                              <u>Terms: 17 yrs. to life;</u>
                                                     $10,000 restitution fine

18           (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                  parole or probation, etc.)        Yes <u>X</u>      No _____

20                  Where?  CDC - San Quentin State Prison

21                  Name of Institution: <u>San Quentin State Prison</u>
                                         S.Q.S.P./North Block
22                  Address: <u>San Quentin, CA 94974</u>

23       2. For what crime were you given this sentence?  (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26       <u>Penal Code section 269; Penal Code section 273D(A);</u>

27       <u>Penal Code section 273a(b)</u>

28       _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

    Arraignment:                        Yes __X__    No _____

    Preliminary Hearing:           Yes __X__    No _____

    Motion to Suppress:            Yes _____    No __X__

4. How did you plead?

    Guilty _____    Not Guilty __X__    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury __X__    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?           Yes __X__    No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment               Yes __X__    No _____

    (b)    Preliminary hearing        Yes __X__    No _____

    (c)    Time of plea              Yes __X__    No _____

    (d)    Trial                      Yes __X__    No _____

    (e)    Sentencing               Yes __X__    No _____

    (f)    Appeal                   Yes __X__    No _____

    (g)    Other post-conviction proceeding    Yes __X__    No _____

8. Did you appeal your conviction?        Yes __X__    No _____

    (a)    If you did, to what court(s) did you appeal?

            Court of Appeal           Yes __X__    No _____

            Year: __2000__    Result: Conviction Affirmed - 10/25/02

            Supreme Court of California    Yes __X__    No _____

            Year: __2002__    Result: Pet. for Review Denied - 1/15/03

            Any other court           Yes _____    No __X__

            Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS      - 3 -

petition?                                              Yes __X__     No_____

    (c)    Was there an opinion? (Unpub.)  Yes __X__     No_____

    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

                                                     Yes _____     No __X__

           If you did, give the name of the court and the result:

           _____

           _____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?                    Yes __X__     No_____

    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

    (a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

        I.    Name of Court: California Supreme Court

           Type of Proceeding: Habeas Petition - Petition for Review

           Grounds raised (Be brief but specific):

           a. Ineffective Assistance of Counsel

           b._____

           c._____

           d._____

           Result: Denied _____ Date of Result: 1/15/03

        II.    Name of Court: California Supreme Court

           Type of Proceeding: Habeas Petition

           Grounds raised (Be brief but specific):

1        a. Prosecution's violation of Brady obligation

2        b. Trial court error to admit 3rd party culpability

3        c. Trial court error to instruct on lesser-included

4        d. Denial of defendant's right to be present for
            jury questions and court's answers

5    Result: XXXXXXXXXXXXXXXXXXXXXXXXXX Date of Result: XXXXXXXXXX

6    IV. XXXXX Name of Court: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXX Type of Proceeding: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    Grounds raised (Be brief but specific): CONTINUED FROM "d." above

9        X. e. Ineffective assistance of counsel

10       b.

11       c.

12       d.

13   Result: Denied _____ Date of Result: 6/28/06

14   IV.  Name of Court: _____

15   Type of Proceeding: _____

16   Grounds raised (Be brief but specific):

17       a.

18       b.

19       c.

20       d.

21   Result: _____ Date of Result: _____

22   (b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                     Yes _____    No X

24   Name and location of court: _____

25   B. GROUNDS FOR RELIEF

26       State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1 | need more space.  Answer the same questions for each claim.

2 | [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3 | petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4 | 499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5 | Claim One: See "ATTACHMENT RE: SECTION B.  GROUNDS FOR RELIEF"

6 | for all claims presented in this habeas petition.

7 | Supporting Facts:_____

8 | _____

9 | _____

10 | _____

11 | Claim Two:_____

12 | _____

13 | Supporting Facts:_____

14 | _____

15 | _____

16 | _____

17 | Claim Three:_____

18 | _____

19 | Supporting Facts:_____

20 | _____

21 | _____

22 | _____

23 | If any of these grounds was not previously presented to any other court, state briefly which

24 | grounds were not presented and why:

25 | _____

26 | _____

27 | _____

28 | _____

PET. FOR WRIT OF HAB. CORPUS          - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3  of these cases:

4    See "ATTACHMENT RE: SECTION B.  GROUNDS FOR RELIEF" for all

5    cases that are close factually to Petitioner's.

6

7  Do you have an attorney for this petition?                    Yes  X          No____

8  If you do, give the name and address of your attorney: SCOTT L.  TEDMON,
    717 K Street, Suite 227, Sacramento, CA  95814

9

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on __8|10|06__                    _____

14                Date                              Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

## ATTACHMENT RE:  SECTION B.  GROUNDS FOR RELIEF

### I

## STATEMENT OF THE CASE

On August 4, 1997, a seven-count Information was filed by the Santa Clara County District Attorney charging petitioner Alvarez in Count One with a violation of Penal Code § 288.5(A), continuous sexual abuse; in Count Two with a violation of Penal Code § 269, aggravated sexual assault of a child in that there was a violation of Penal Code § 288a with a minor under 14 years of age; in Count Three with a violation of Penal Code § 288(B)(1), lewd and lascivious act upon a child by means of force; in Count Four with a violation of Penal Code § 273A(A), cause/permit pain and suffering or endanger/injure a child; in Count Five with a violation of Penal Code § 273D(A), inflicting corporal injury upon a child; in Count Six with a violation of Penal Code § 273D(A), inflicting corporal injury upon a child; and in Count Seven with a violation of Penal Code § 273A(A)(1), endangering the health of a child.  The charging Information is attached hereto as Exhibit A.

The case proceeded to jury trial.  On June 18, 1999, the jury rendered its verdict.  Petitioner was acquitted of Counts One and Three.  Petitioner was convicted as charged in Counts Two, Five and Six.  Petitioner was convicted in Counts Four and Seven of the lesser included misdemeanor offense of Penal Code § 273a(b), cause/permit pain and suffering or endanger/injure a child.

On May 26, 2000, petitioner was sentenced to state prison for a term of 17 years to life.

On June 16, 2000, petitioner timely filed a notice of appeal.  Petitioner filed both an appeal and a habeas petition with the Sixth District Court of Appeal.  Petitioner's direct appeal and habeas petition were consolidated for hearing and decision by the Sixth District Court of Appeal.

On October 25, 2002, the Sixth District Court of Appeal affirmed petitioner's conviction and denied petitioner's habeas petition.

On December 3, 2002, petitioner filed a petition for review in the California Supreme Court alleging the conviction violated his federal constitutional rights as follows:

1. The evidence was legally insufficient to support that the molest was committed by means of "duress."

**PET. FOR WRIT OF HAB. CORPUS**    - 1 -

1    2. The trial court prejudicially erred in precluding the defense from exploring if

2    Amanda had been molested by her natural father and had witnessed adult sexual

3    activity.

4    3. The trial court prejudicially erred to petitioner's prejudice in excluding the

5    negative results of petitioner's penile swab sample.

6    4. The trial court wrongly defined "duress" to include "hardship" to petitioner's

7    prejudice.

8    5. Petitioner's sentence did not comply with California Penal Code § 654 and

9    Apprendi v. New Jersey.

10   6. There were multiple instances of trial counsel's deficient representation which

11   undermined confidence in the verdict.

12   On January 15, 2003, the California Supreme Court denied petitioner's petition for review.

13   On December 17, 2003, petitioner filed a habeas petition with the Santa Clara County

14   Superior Court.

15   On January 14, 2004, the Santa Clara County Superior Court denied petitioner's habeas

16   petition.

17   On March 11, 2005, petitioner filed a habeas petition with the Sixth District Court of Appeal.

18   On March 23, 2005, the Sixth District Court of Appeal denied petitioner's habeas petition,

19   without comment.

20   On January 12, 2006, petitioner filed a habeas petition with the California Supreme Court

21   alleging the conviction violated his federal constitutional rights as follows:

22   1. Violation by the prosecution of their discovery obligation under Brady;

23   2. Failure of the trial court to admit evidence of third party culpability;

24   3. Failure of the trial court on Count Two to instruct on the lesser included charge

25   of non- forcible oral copulation;

26   4. Violation by the trial court regarding petitioner's right to be personally present at

27   a critical stage of the proceeding. During jury deliberations the trial court answered

28   questions posed by the jury without petitioner or his defense counsel being present

**PET. FOR WRIT OF HAB. CORPUS    - 2 -**

1  and without a stipulation from petitioner that the trial Court could answer jury
2  questions without the presence of petitioner or his trial counsel.

3  5. Petitioner did not receive effective assistance of counsel as guaranteed by the Sixth
4  Amendment.

5  On June 28, 2006, the California Supreme Court denied petitioner's habeas petition,
6  commenting as follows: "(See *In re Clark* (1993) 5 Cal.4th 750.)"

## II

## STATEMENT OF FACTS

### A. PROSECUTION VERSION

10  Ruby Rubio was the mother of Amanda and Anthony. Ruby Rubio became acquainted with
11  petitioner and sometimes allowed him to care for Amanda and Anthony. Petitioner occasionally kept
12  Amanda and Anthony overnight. They either stayed at a friend's house or at a motel.

13  In November 1996, petitioner agreed to care for the children and ended up caring for them
14  for several nights. When petitioner returned the children to Ruby, she noticed that Anthony's eyes
15  were irritated. Anthony said that petitioner had put chili in his eyes. That evening, while Ruby
16  bathed the children, she noticed bruises. When Ruby told Amanda to wash her private area,
17  Amanda complained that it burned and irritated her. Amanda told Ruby that when petitioner gave
18  her a bath or a shower, he sometimes stuck his finger inside her. Ruby called the police.

19  After talking to the children, the police officer left and Ruby got the children ready for bed.
20  Ruby asked them why they had not previously told her what petitioner had done. Amanda said that
21  she was scared. Amanda said that petitioner had warned her that if she told anyone about the
22  spanking "or anything," it would be her fault if she and Anthony were taken away from their mother.
23  Amanda told Ruby that here was something that she had not revealed, saying that petitioner had
24  made her drink his "pee-pee milk." When Ruby did not understand, Amanda said, "you know, that
25  it's the white stuff that comes out of his pee-pee."

26  Ruby again called the police. They arrived and spoke with the children. At around 2:00 or
27  3:00 a.m., Amanda was examined at the Santa Clara Valley Medical Center. Amanda, who weighed
28  56 pounds and was 47 inches tall, had bruises and abrasions on her face, legs, and the front area of

**PET. FOR WRIT OF HAB. CORPUS    - 3 -**

1   her body. According to the nurse practitioner who examined Amanda, these injuries were not
2   consistent with normal childhood play. Amanda's genital examination was relatively normal.
3   Anthony, who weighed 44 pounds and was 41 inches tall, was also examined. It was alleged
4   Anthony had bruises and abrasions.

5       Amanda and Anthony were interviewed the next day, November 20, 1996. Amanda said that
6   petitioner put chili in Anthony's eyes. Amanda said petitioner put his "pee-pee" in her mouth while
7   she was lying down in petitioner's van, that "nasty milk" came out, and that she threw up because
8   of the "nasty milk." Amanda said that petitioner became angry when she threw up. Amanda also
9   said that petitioner had given her "milk" from his "pee-pee" before. Amanda said that on that same
10  occasion, petitioner had touched his "pee-pee" to her "pee" and had touched her "pee" with his
11  finger. Amanda said petitioner had threatened to hurt her and to hit her.

12      Anthony was interviewed. Anthony said that petitioner had put chili in Anthony's eyes,
13  pretended to cut off his "pee-pee" with scissors, pulled his "pee-pee" back too much and had hit
14  Anthony.

15      On December 5, 1996, Amanda returned to the hospital to have additional photographs taken.
16  Ruby reported that Amanda had developed a vaginal discharge. The discharge was cultured and the
17  results demonstrated that Amanda had chlamydia organism growing in her vagina. The November
18  20, 1996 baseline culture had been negative. Based upon this information, and the known incubation
19  period for chlamydia, the physician's assistant opined that Amanda had been infected seven to
20  fourteen days before December 5, 1996, and less than three days before November 20, 1996.

21      At trial, Anthony testified that he was seven years old and in the first grade. Anthony told
22  the jury that petitioner put chili in his eyes, and that petitioner had done that more than once.
23  Anthony said that petitioner spanked Amanda with his shoe. Anthony also said that petitioner put
24  chili on Anthony's penis.

25      Amanda testified that she was eight years old and in the third grade. Amanda said that
26  petitioner had put his "private" into her mouth, and that something "like water" came out of
27  petitioner's "private" and went into her mouth. Amanda said this happened several times and took
28  place in petitioner's van and in the house. Amanda said that petitioner put his "private" near her

**PET. FOR WRIT OF HAB. CORPUS    - 4 -**

1   "private," put his tongue on her "private," and put his finger in her "private." Amanda said that

2   petitioner told her she would get into trouble if she told her mother.

3   **B. DEFENSE VERSION**

4           Petitioner testified and denied committing the charged crimes. Testifying about his activities

5   the weekend before his arrest, petitioner stated that he has purchased some items at the grocery store,

6   including fresh serrano chilis and green and yellow gummy worms. While he was driving in the van

7   with the children, petitioner heard the grocery bag rustling. As they were preparing to go to lunch,

8   petitioner discovered that Anthony had been hiding the chilis in his pocket. Inside the restaurant,

9   Anthony kept rubbing his eyes and complaining of pain. Petitioner took Anthony to the restroom

10  and splashed water into his eyes. Anthony continued to rub his eyes. Petitioner believed that the

11  chilis had caused the problem with Anthony's eyes.

12          Petitioner testified that Ruby had told him to use his belt to "whup their asses" if Amanda

13  and Anthony got out of control. Petitioner used his belt to spank Amanda for spitting in her soup.

14  Petitioner spanked Anthony twice that weekend for playing with scissors. Anthony was using

15  scissors to cut threads from his jeans, and the petitioner said, "Do you want to cut yourself down

16  there?"

17          Petitioner and the children spent Saturday night in the van. Petitioner said that there was an

18  unrefrigerated carton of milk in the van. Petitioner testified that he and the children spent Sunday

19  at his family's flower shop. Anthony's eyes were red and the skin had broken. Petitioner applied

20  hydrogen peroxide under Anthony's eyes, not realizing that hydrogen peroxide should not be used

21  near the eyes. Anthony felt a stinging sensation and said, "Don't put chili in my eyes." Petitioner

22  told Anthony it was not chili.

23          Petitioner spent Monday night with the children at a Motel 6. Petitioner delivered the

24  children to Ruby at about 8:20 a.m. on Tuesday morning. Petitioner argued with Ruby, saying that

25  he had been forced to miss a class because he had to care for Ruby's children. Petitioner told Ruby

26  that he spanked the children, that Anthony grabbed some chili and touched his eyes, and that

27  Petitioner had tried to wash out Anthony's eyes.

28          Fifteen hours after he dropped off the children, petitioner was arrested. According to

**PET. FOR WRIT OF HAB. CORPUS**    - 5 -

1   petitioner, he told the police that he had not molested Amanda, and had not put chilis in Anthony's
2   eyes or on his penis. Petitioner said that while he was in jail he spoke with Ruby. When petitioner
3   asked Ruby why she was making the accusations, Ruby responded, "You shouldn't have fucked with
4   me, this is what you get for fucking with me."

5         Petitioner testified that he had never experienced symptoms of chlamydia. Petitioner
6   normally had severe bronchitis once a year and that was sometimes treated with antibiotics. When
7   arrested, police used a swab to wipe the outside of petitioner's penis. Petitioner independently took
8   a test in which the inside of his urethra was tested.

9         Ramon Quintanilla testified that petitioner lived in his house while petitioner was going to
10  school. Quintanilla said that petitioner brought Amanda and Anthony to the house every other
11  weekend.

12        An employee of a restaurant testified that he recalled an occasion where one of the children
13  with petitioner got something in his eye and was rubbing it and crying. The employee did not see
14  how the irritant got in the child's eye.

15        Leslie Hernandez testified that she had helped petitioner watch the children during the
16  weekend before petitioner's arrest.

17        Ejaz Anam testified that on the Monday before petitioner's arrest, Anam had loaned
18  petitioner money to pay for a motel.

19        Dr. Amy Portmore, qualified as an expert in sexually transmitted disease, testified about
20  chlamydia. Dr. Portmore stated that two categories of chlamydia were pertinent. These were (1)
21  chlamydia trachomatis, which is a sexually transmitted disease; and (2) chlamydia pneumoniae,
22  which is a respiratory infection that causes pneumonia and bronchitis. Dr. Portmore examined a
23  blood analysis performed on petitioner for chlamydia. Based upon the results, Dr. Portmore
24  surmised that petitioner had had chlamydia but could not say which type that petitioner had had. Dr.
25  Portmore stated there was very little data on whether chlamydia could be transmitted by digital
26  penetration but stated that such transmission was possible. Dr. Portmore estimated that the
27  incubation period for chlamydia is one to three weeks for genital transmission.

28

**PET. FOR WRIT OF HAB. CORPUS**    – 6 –

1    **C. STIPULATIONS/TRIAL COURT RECORD**

2    **Stipulations -** The parties stipulated that while petitioner was in jail he was seen by the jail

3    medical staff nine times.  The medical reports contain no indication that petitioner had physical

4    symptoms of any kind.  The parties also stipulated that the police seized various items from

5    petitioner's van. These items included underwear and a sleeping bag which tested negative for the

6    presence of semen.

7    **Trial Court Record -** The Reporter's Transcript is identified herein as "RT" and the

8    Supplemental Reporter's Transcript as "Supp. RT."  Both RT and Supp. RT are attached hereto in

9    Exhibit B.

10    The Clerk's Transcript is identified herein as "CT", the Supplemental Clerk's Transcript 1

11    as "Supp. CT 1" and the Supplemental Clerk's Transcript 2 as "Supp. CT 2."  CT, Supp. CT 1 and

12    Supp. CT 2 are attached hereto in Exhibit C.

13    **III**

14    **GROUNDS FOR RELIEF**

15    **GROUND ONE**

16    THE PROSECUTION VIOLATED <u>BRADY</u> BY: 1) FAILING TO DISCLOSE TO
PETITIONER THAT THE ALLEGED VICTIM, AMANDA, WAS INFECTED
17    WITH CHLAMYDIA UNTIL IT WAS TOO LATE TO EXCLUDE PETITIONER
AS THE ALLEGED PERPETRATOR; 2) FAILING TO PROVIDE TO
18    PETITIONER THE RESULTS OF THE TESTS CONDUCTED ON THE
BLANKET FOUND IN PETITIONER'S VAN; AND; 3) FAILING TO DISCLOSE
19    TO PETITIONER THAT RUBY RUBIO WAS UNDER INVESTIGATION FOR
WELFARE FRAUD AND WAS CONVICTED OF WELFARE FRAUD AFTER
20    THE VERDICT BUT BEFORE SENTENCING.

21    The United States Supreme Court held in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), that

22    suppression of material evidence by the prosecution which is favorable to the defendant violates the

23    right to due process guaranteed by the Fifth Amendment.  Whether the prosecution acted in good

24    faith or bad faith is immaterial to the inquiry under <u>Brady</u>.  In subsequent cases, the U.S. Supreme

25    Court has placed an ever-increasing duty upon the government to disclose favorable evidence to the

26    defense.  Pursuant to <u>United States v. Agurs</u>, 427 U.S. 97, 107, 110 (1976), the prosecution has a

27    duty to disclose evidence favorable to the defense even if no such request was made by the

28    defendant.  Additionally, the Supreme Court in <u>Agurs</u> held that even an inadvertent failure by the

**PET. FOR WRIT OF HAB. CORPUS**    – 7 –

1  government to disclose material exculpatory evidence may constitute a violation of the defendant's
2  Fifth Amendment right to due process under Brady.

3  In United States v. Bagley, 473 U.S. 667, 682 (1985), the Supreme Court addressed the issue
4  of materiality when it stated, "if there is a reasonable probability that, had the evidence been
5  disclosed to the defense, the result of the proceeding would have been different." The Court held
6  that a reasonable probability is , "a probability sufficient to undermine confidence in the outcome."
7  The high court further defined this issue in Kyles v. Whitley, 514 U.S. 419, 433-35 (1995) as
8  follows, "the question is not whether the defendant would have more likely than not received a
9  different verdict with the evidence, but whether in its absence he received a fair trial, understood as
10 a trial resulting in a verdict worthy of confidence." (Emphasis added.)

11 The Ninth Circuit stated its position on the matter in Carriger v. Stewart, 132 F.3d 463, 479
12 (9th Cir. 1997) when the court held, "A reasonable probability does not require showing by a
13 preponderance of the evidence that the outcome would have been different."

14 In evaluating a Brady violation by the government, the critical point of analysis turns on
15 whether such violation denied the defendant his Fifth Amendment right to due process right and a
16 fair trial.

17 ## BRADY VIOLATION NUMBER ONE

18 As stated previously, the government failed to disclose that the alleged victim, Amanda, was
19 infected with chlamydia until it was too late for petitioner to be excluded as the alleged perpetrator.
20 The record reveals the petitioner was tested for a sexually transmitted disease on June 18, 1997. The
21 results revealed petitioner did not have chlamydia, which was the sexually transmitted disease that
22 Amanda was found to have in a test administered in December of 1996. Relating the Supreme Court
23 holding in Brady and its progeny to the case at bar, it would be wholly disingenuous for the
24 government to argue that Amanda's physical condition in December of 1996 regarding her having
25 a sexually transmitted disease was not material to the ultimate issue of guilt or innocence. Further,
26 the government would know that a negative test result by petitioner for chlamydia administered
27 during the same time frame as when Amanda was tested would be very powerful exculpatory
28 evidence. However, the government did not disclose Amanda's positive test results to the defense

**PET. FOR WRIT OF HAB. CORPUS    - 8 -**

1   until months after the fact. As such, the government's failure to provide this critical evidence denied

2   petitioner the opportunity to prove he did not have chlamydia at the time of the alleged criminal

3   conduct. There could not have been a more material and exculpatory piece of evidence for petitioner

4   to present to the jury at trial. The government's failure to disclose this critical evidence to petitioner

5   in a timely manner not only violated their discovery obligation under Brady but in its' absence,

6   undermined any confidence in the verdict thereby denying petitioner of his right to a fair trial.

7                              BRADY VIOLATION NUMBER TWO

8          The record reveals that the red plaid blanket found in petitioner's van was seized by law

9   enforcement at the time of arrest. However, from the point of seizure, the record is very convoluted

10  and confusing. At trial, testimony was adduced that the blanket had not been tested for semen

11  because it was mislabeled or misplaced. However, this testimony runs contrary to how the blanket

12  was handled when reviewing its' chain-of-evidence. Attached hereto as Exhibit D is the declaration

13  of Frank Saunders. As of the date of his declaration in 2005, Mr. Saunders either served in law

14  enforcement or dealt with law enforcement matters for some 40 years. Over that period of time, Mr.

15  Saunders qualified as an expert witness well in excess of some 400 cases. In his review of the

16  petitioner's case, Mr. Saunders states in paragraph 7 of his declaration that, "dating back to 1965,

17  it is at this time my firm professional opinion that I can never recall a more confusing and convoluted

18  "chain-of-evidence" series of violations, then is clearly demonstrated during this specific instance

19  presently under review."

20         Mr. Saunders observes that according to the San Jose PD evidence log, on March 28, 1997,

21  the red plaid blanket was released by San Jose PD to the Santa Clara County Crime Laboratory for

22  supposed testing along with other evidentiary items relevant to petitioner's case. However, there is

23  no indication of the result of any such testing of the blanket in the April 15, 1997 crime lab report

24  of criminalist Kathy Benjamin. Mr. Saunders notes that approximately two months later, specifically

25  June 10, 1998, the blanket was sent from San Jose PD to the Sexual Assault Investigation Unit

26  (SAIU), where it stayed for one day. The San Jose PD records reflect the blanket was logged back

27  into the San Jose PD property room the next day, that being June 11, 1998.

28         It is undisputed in the record that the San Jose PD released the red plaid blanket to not one,

**PET. FOR WRIT OF HAB. CORPUS**    - 9 -

but two different investigative agencies. It defies logic to believe that the blanket was not tested by the Santa Clara County Crime Lab and/or by SAIU. If the blanket was tested, as petitioner believes, the government's failure to disclose the results constitutes a clear violation of <u>Brady</u>. If the test result of the blanket was negative for petitioner's semen, that result would have served to materially corroborate petitioner's claim of innocence. This is especially true given the fact that when the government tested petitioner's underwear and sleeping bag, which were seized from his van along with the blanket, the results came back negative for the presence of semen.

The government's failure to produce the test results of the red plaid blanket to the defense violated the mandate of <u>Brady</u> and served to further undermine any confidence in the jury's verdict.

BRADY VIOLATION NUMBER THREE

Ruby Rubio, who is the mother of Amanda and Anthony, was a key witness in the government's case. During the pendency of petitioner's case at the trial court level, the government failed to disclose to the defense that Ruby Rubio was under a current investigation for welfare fraud. In point of fact, Ruby Rubio was convicted of welfare fraud approximately one month after petitioner's verdict but prior to his sentencing and motion for a new trial. In January of 2002, some two and one-half years after the verdict, petitioner's state court appellate counsel discovered that Ruby Rubio was convicted of welfare fraud during the time period when petitioner's case was still being litigated at the trial court level.

As set forth previously, the government has an affirmative duty under <u>Brady</u> to disclose exculpatory evidence to the defense. In the case at bar, Ruby Rubio, a key witness for the government, was under investigation for a crime of moral turpitude, i.e. welfare fraud, during the same time period that petitioner was being prosecuted. Pursuant to <u>Brady</u>, the government had an affirmative duty to disclose this critically important and materially relevant Ruby Rubio impeachment information to the defense.

Beyond their <u>Brady</u> disclosure requirements, the government has an additional affirmative duty to disclose any favored treatment or potential benefits rendered by the government to any of their witness under <u>Giglio v. U.S.</u>, 405 U.S. 150 (1972). If Ruby Rubio anticipated receiving or in fact did receive any benefit in her welfare fraud case as a result of cooperating with the government

**PET. FOR WRIT OF HAB. CORPUS    - 10 -**

1  in petitioner's case, the government had a duty to disclose those facts.  On this <u>Giglio</u> issue,

2  petitioner will be moving this Court under Federal Rules of Civil Procedure Rule 7, to expand the

3  record to determine what benefit, if any, that Ruby Rubio received in her welfare fraud case as a

4  result of her cooperation with the government in petitioner's case.

5  CONCLUSION RE: BRADY VIOLATIONS

6  Each of the <u>Brady</u> violations enumerated above are significant in nature, probative on the

7  issue of guilt or innocence, and material to the outcome such that petitioner was prejudiced by the

8  government's failure to disclose this information.  Had this information been disclosed to the

9  defense, there is more than a reasonable probability the result of the trial would have been different.

10  See <u>Strickler v. Green</u>, 527 U.S. 263, 281 (1999).  The government's failure to produce exculpatory

11  <u>Brady</u> material to the defense in a timely manner served to defeat petitioner's right to fair trial and

12  undermines any confidence in the verdict.  Based on the foregoing <u>Brady</u> analysis, petitioner's

13  conviction must be reversed.

14  **GROUND TWO**

15  COUNT TWO MUST BE REVERSED BECAUSE THE TRIAL COURT ERRED
IN PRECLUDING PETITIONER FROM EXPLORING IF AMANDA HAD BEEN,
16  1) MOLESTED BY HER NATURAL FATHER TO ESTABLISH AN
ALTERNATIVE SOURCE FOR AMANDA'S CHLAMYDIA AND; 2) THAT SHE
17  HAD WITNESSED ADULT SEXUAL ACTIVITY THEREBY OBTAINING HER
SEXUAL KNOWLEDGE.

18

19  Pursuant to the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution, a

20  defendant is entitled to due process, compulsory process and confrontation and cross-examination

21  of accusing witnesses.  See <u>Brecht v. Abrahamson</u> 507 U.S. 619 (1993); and <u>Washington v. Texas</u>,

22  388 U.S. 14, 19 (1967).   At trial, petitioner sought to cross-examine Amanda if she had ever told

23  petitioner that Ivan Acosta, Amanda's natural father, had molested her.  The prosecution objected.

24  After an unreported sidebar conference, defense counsel moved to a different topic of questioning.

25  Subsequently, the defense filed a motion under California Evidence Code § 782 requesting

26  permission to question Amanda about her prior molest and her having observed her parents having

27  sex.  Trial counsel's Evidence Code § 782 motion is attached hereto as Exhibit E.  See also Exhibit

28  C - CT 206-212.  Given that § 782 applies in child molest cases, the defense motion correctly stated

**PET. FOR WRIT OF HAB. CORPUS    -  11  -**

1   the offer of proof of Amanda's "prior sexual contact is relevant and material to the determination

2   of the credibility of the complaining witness." A further point of significance for the defense was

3   to establish an alternative sexual contact from that of petitioner as a source of Amanda contracting

4   chlamydia. Finally, this evidence of an alternative sexual contact would serve to explain Amanda's

5   sexual knowledge. The trial court denied the motion without a hearing stating the defense motion

6   was untimely as Amanda was off the stand and it lacked merit.

7       Later in the trial, the court held a hearing outside the jury's presence wherein Ruby Rubio

8   was questioned about the same matters specifically, her knowledge of Amanda being molested on

9   a prior occasion as well as Amanda having observed her parents having sex. At the hearing, Rubio

10  denied such knowledge. Rather than allowing the jury to hear both petitioner and Rubio's testimony

11  on the matter, the trial court denied the defense's § 782 motion.

12      Federal constitutional law mandates that a defendant be given the right to effectively cross-

13  examine his accuser. In the case at bar, the defense had a legitimate right to question Amanda on

14  her past sexual conduct and knowledge. This is particularly true given the fact that the case turned

15  on the credibility of Amanda versus that of the petitioner. The case of People v. Daggett 225

16  Cal.App.3d 751, 757 (1990) held that a prior molest was relevant in casting doubt on the credibility

17  of the complaining witness's accusations as follows: "A child's testimony in a molestation case

18  involving oral copulation and sodomy can be given an aura of veracity by his accurate description

19  of the acts. This is because knowledge of such acts may be unexpected in a child who had not been

20  subject to them. **In such a case <u>it is relevant</u> for the defendant to show that the complaining**

21  **witness <u>had been subjected to similar acts by others</u> in order to cast doubt upon the conclusion**

22  **that the child must have learned these acts through the defendant.**" (Emphasis added.)

23      At trial, the government itself argued that children frequently do not disclose all the first time

24  they describe sexual contact out of fear and/or embarrassment. (Exhibit B - RT 717, 736.) There

25  is every reason to believe that Amanda's statement to petitioner regarding her past sexual contacts

26  and observations of her parents sexual activities was only the starting point for more significant and

27  relevant facts to be produced upon examination of Amanda. The trial court's denial of such an

28  examination violated petitioner's federal rights to due process, confrontation and a fair trial. As

**PET. FOR WRIT OF HAB. CORPUS**    - 12 -

1  such, petitioner's conviction must be reversed.

2  **GROUND THREE**

3  THE TRIAL COURT PREJUDICIALLY ERRED IN EXCLUDING EVIDENCE OF
   PETITIONER'S   NEGATIVE   PENILE   SWAB   CULTURE   TEST   FOR
4  CHLAMYDIA.

5      Pursuant to the Fifth and Fourteenth Amendments, the defendant in a criminal case has a

6  fundamental right to introduce evidence in his defense. See Taylor v. Illinois, 484 U.S. 400 (1988)

7  and Chambers v. Mississippi, 410 U.S. 284 (1973). In this case, the only physical evidence produced

8  at trial was Amanda's chlamydia infection and was linked to petitioner only through Amanda's

9  identification of him.  At trial, petitioner contested the chlamydia evidence by presenting the

10  testimony of Dr. Portmore, who stated it was impossible to determine from sophisticated blood

11  analysis that petitioner ever had the disease (Exhibit B - RT 752-759) and evidence that petitioner

12  never experienced symptoms while in custody. (Exhibit B - RT 678-679.)

13      While Dr. Portmore's testimony was important on the issue of chlamydia, there was a

14  separate and critical set of facts that petitioner attempted to introduce at trial to establish his

15  innocence. On or after June 6, 1997 and prior to trial, petitioner learned from the prosecution that

16  Amanda had contracted chlamydia trachomatis.  Soon after obtaining this information, petitioner

17  took a penile swab exam on June 16, 1997 in order to detect if he had the disease.  The results of

18  petitioner's test were negative.  In order to further prove his innocence of the charges, petitioner

19  sought to introduce the fact that he took a penile swab exam on June 16, 1997 to detect if he had

20  chlamydia and the results were negative.  The trial court ruled the negative results of petitioner's

21  penile swab exam be excluded as evidence for the jury's consideration. The trial court's exclusion

22  of this evidence was fundamentally unfair, prejudiced petitioner's case and violated his federal

23  constitutional right to introduce evidence in his defense.  This violation of petitioner's right to due

24  process and a fair trial mandates a reversal of his conviction.

25  **GROUND FOUR**

26  PETITIONER'S CONVICTION ON COUNT TWO MUST BE REVERSED SINCE
   THE JURY WAS ERRONEOUSLY INSTRUCTED THAT "DURESS" INCLUDES
27  "HARDSHIP."

28      A defendant's Fifth Amendment right to due process at trial includes the critically important

**PET. FOR WRIT OF HAB. CORPUS**    - 13 -

1  standard of having the jury properly instructed on every essential element of the crime charged. See

2  Sandstrom v. Montana, 442 U.S. 510, 521 (1979); Sullivan v. Louisiana, 508 U.S. 275, 277-278

3  (1993); Griffin v. U.S., 502 U.S. 46, 59 (1991); and Keating v. Hood, 191 F.3d 1053, 1062-1063 (9th

4  Cir. 1999). In petitioner's case, the trial judge committed clear and prejudicial instructional error.

5  As to Count Two, aggravated sexual assault, the trial judge instructed the jury with CALJIC No.

6  10.55, which did not define duress. CALJIC No. 10.42 was used by the trial court to instruct the jury

7  on Count Three, lewd and lascivious conduct upon a child under 14 by means of force, violence,

8  duress, etc. These two jury instructions are attached hereto in Exhibit F. CALJIC No. 10.42

9  contained a definition for duress and stated that duress could be proved, inter alia, by a "direct or

10 implied threat of hardship . . . ." (Emphasis added.) (Exhibit C - CT 273-274; Exhibit B - RT 700.)

11 While this instruction pertained to an alternative charge for Count Two, that being lewd and

12 lascivious conduct as alleged in Count Three, no other definition of duress was given. By virtue of

13 the manner in which the trial court instructed the jury, the jurors would have considered CALJIC No.

14 10.42's definition with respect to Count Two in that the jury was informed that Counts One, Two and

15 Three were alternative charges for the same criminal conduct. Further to the point and importantly,

16 the jury was instructed that it could convict petitioner of no more than one of these offenses, those

17 being Count One, Two or Three.

18       The trial court's instruction of "hardship" being included in the jury's consideration of the

19 element of "duress" violated both legislative and judicial dicta. In 1990, the California Legislature

20 enacted a definition of "duress" for rape which included the threat of "hardship." See Penal Code

21 § 261(b), §262( c); Stats. 1990, ch. 630, §pp.2701-2702. In 1993, the Legislature deleted "hardship"

22 from the definition. See Stats. 1993, ch. 595, §1, pp. 2575-2577. Given this change, the appellate

23 court in People v. Valentine, 93 Cal.App. 4th 1241, 1247-1254 (2001) held that the inclusion of

24 "hardship" within the definition of "duress" was error given the substantial changes to the law of

25 rape, which is closely related to the major sex crime of oral copulation by means of force, violence,

26 duress, etc.

27       This instructional error was highly relevant to the jury's deliberations as the government

28 pointedly argued hardship. Specifically, the prosecutor argued to the jury that Amanda was

**PET. FOR WRIT OF HAB. CORPUS**   - 14 -

1  powerless to do anything other than to obey petitioner since, as a young child, she would otherwise

2  have endured the hardship of being stranded as follows, "What is she supposed to do, hitchhike

3  home? She is far from home. She is with this guy and her options are none." (Exhibit B - RT 722.)

4  The fact is that the trial court's instructional error was prejudicial to petitioner as the government

5  was able to secure a conviction pursuant to an erroneous legal theory for an offense that does not

6  exist under California state law. Such an egregious error violates petitioner's Fifth Amendment right

7  to due process and Sixth Amendment right to a fair trial. Based on this substantive constitutional

8  violation, petitioner's conviction must be reversed.

9  **GROUND FIVE**

10  THE TRIAL COURT'S FAILURE TO INSTRUCT ON THE LESSER INCLUDED
OFFENSE OF NON-FORCIBLE ORAL COPULATION VIOLATED
11  PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS

12  Petitioner was charged in Count Two with a violation of Penal Code § 269. Pursuant to

13  Penal Code § 269, if the alleged act is an oral copulation of a child under the age of fourteen years,

14  which is a violation of Penal Code § 288a(c)(1), the oral copulation must be forceful. Non-forcible

15  oral copulation is a lesser included offense to a violation of Penal Code § 269. The jury was not

16  instructed on this lesser included offense.

17  While petitioner's trial counsel did not request this lesser included instruction, the trial court

18  should have instructed the jury on this lesser included offense, sua sponte. Pursuant to both federal

19  and state law, the trial court has a sua sponte duty to instruct on a lesser included offense.

20  The U.S. Supreme Court announced in Mathews v. United States, 485 U.S. 58, 63 (1988)

21  that, "As a general proposition a defendant is entitled to an instruction as to any recognized defense

22  for which there exists evidence sufficient for a reasonable jury to find in his favor. A parallel rule

23  has been applied in the context of a lesser included offense instruction." In Beck v. Alabama, 447

24  U.S. 625 (1980), the U.S. Supreme Court reversed a murder conviction stating, "When the evidence

25  unquestionably establishes that the defendant is guilty of a serious, violent offense, but leaves doubt

26  with respect to an element that would justify conviction of a capital offense the failure to give the

27  jury the third option of convicting on a lesser included offense would seem inevitable to enhance the

28  risk of an unwarranted conviction." The Court in Beck supported its' decision by citing the Supreme

**PET. FOR WRIT OF HAB. CORPUS**    - 15 -

1   Court case of <u>Keeble v. U.S.</u>, 412 U.S. 205 (1977), where the Court stated that failure to instruct on

2   a lesser charge, "would raise difficult constitutional questions." A review of California case law

3   reveals parallel decisions as to the trial court's duty to instruct on lesser included charges, sua

4   sponte.. See <u>People v. Hardy</u>, 2 Cal.4th 86, 184 (1992); <u>People v. Clark</u>, 50 Cal.3d 583, 636 (1990);

5   <u>People v. Lagunas</u>, 8 Cal.4th 1030, 1034 (1994); <u>People v. Russell</u>, 45 Cal.App. 4th 1083, 1088

6   (1996); and <u>People v. Breverman</u>, 19 Cal. 4th 142 (1998).

7       In petitioner's case as to Count Two, the trial court had a duty, sua sponte, to instruct on the

8   lesser included offense of non-forcible oral copulation. The trial court's failure to do so was error

9   and had a substantial and injurious effect on the trial thereby violating petitioner's Fifth Amendment

10  right to due process. This is particularly true given that the jury acquitted petitioner of Count One,

11  which alleged a violation of Penal Code § 288.5, a charge which was predicated on a finding there

12  was forcible oral copulation, which the jury did not find true. Based on the trial court's instructional

13  error, petitioner's conviction must be reversed.

14  **GROUND SIX**

15  THE TRIAL COURT'S ANSWERING OF QUESTIONS FROM THE JURY
    WITHOUT HAVING DEFENSE COUNSEL OR PETITIONER PRESENT
16  VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE
    PROCESS.

17
        A fundamental tenant of our criminal jury trial system is that a defendant has an absolute
18
    right to be present at every critical stage of the proceedings. The Confrontation Clause of the Sixth
19
    Amendment and the due process clause of the Fifth Amendment and Fourteenth Amendment are the
20
    foundations for this right. In addressing this right, the U.S. Supreme Court in <u>Illinois v. Allen</u>, 397
21
    U.S. 337, 338 (1970) held that a defendant charged with a felony has the fundamental right to be
22
    present at every stage of the trial. See also <u>United States v. Gagnon</u>, 470 U.S. 522, 526 (1985).
23
        In California, Penal Code § 1138 codifies the defendant's federal constitutional rights
24
    regarding jury deliberation by setting forth the legal requirement as follows: "After the jury have
25
    retired for deliberation,....if they desire to be informed on any point of law arising in the case,....the
26
    information required must be given in the present of, or after notice to, the prosecuting attorney, and
27
    the defendant or his counsel."
28

**PET. FOR WRIT OF HAB. CORPUS**    - 16 -

1    A review of the clerk's transcripts shows that the jury provided several written questions for
2    the trial court's consideration. These jury questions and the Court's corresponding answers are
3    attached hereto as Exhibit G. Four of these jury questions, specifically questions 3, 4, 5 and 7
4    pertained to the elements of the various charges. Further, the clerk's transcript, as contained in
5    Exhibit G, contains no record or reference that defense counsel was advised of the questions, or that
6    trial counsel and/or petitioner were present when the court answered the jury questions. If called to
7    testify, petitioner would state that he was present on one occasion, relating to one question, when the
8    court answered the jurors questions. As such, petitioner's federal due process right to be present at
9    every critical stage of the proceeding was violated. Based on the trial court's violation of petitioner's
10   fundamental constitutional right as enumerated above, petitioner's conviction must be reversed.

11   **GROUND SEVEN**

12   PETITIONER'S CONVICTION ON COUNT TWO MUST BE REVERSED DUE
     TO LEGAL INSUFFICIENCY OF THE EVIDENCE THAT PETITIONER
13   COMMITTED ORAL COPULATION BY MEANS OF DURESS.

14   It is well-established that a criminal conviction based on evidence which is inadequate to
15   persuade a rational trier of fact of the existence of each element necessary to support the conviction
16   violates the defendant's Fifth Amendment right to due process. See Jackson v. Virginia, 443 U.S.
17   307, 319 (1979). In the case at bar, petitioner's Fifth Amendment right to due process was violated
18   because the evidence produced at trial was legally insufficient to persuade a rational trier of fact that
19   he committed the oral copulation by means of "force, violence, duress, menace, or fear of immediate
20   and unlawful bodily injury on the victim or another person," which is an essential element for
21   conviction of Penal Code § 269, subd.(a)(4), § 288a, as alleged in Count Two. The jury instruction
22   on Count Two is attached hereto as Exhibit H.

23   At trial and on appeal, the government's sole theory was that petitioner committed the sexual
24   act by means of duress. At petitioner's trial, duress was defined as a "direct or implied threat of
25   force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary
26   susceptibilities to (1) perform an act which otherwise would not have been performed or, (2)
27   acquiesce in an act to which one otherwise would not have submitted." (Exhibit H.) See People v.
28   Pitmon, 170 Cal.App.3d 38, 50 (1985). Regarding this issue, petitioner acknowledges that evidence

**PET. FOR WRIT OF HAB. CORPUS**    - 17 -

1  was presented at trial from which a rational trier of fact could infer the existence of an implied threat

2  which communicated a message to Amanda that her resistance would be futile as follows:

3      1.      Petitioner spanked Amanda.

4      2.      Petitioner engaged in other sex acts with Amanda besides the oral

5              copulation for which he was convicted.

6      3.      Petitioner told Amanda not to tell her mother or she would be taken

7              from her custody.

8  However, there is a significant problem with the government's proof at trial. As to each of

9  the implied threats petitioner allegedly made, there was a complete absence of evidence

10  demonstrating that any of these implied threats **preceded** the oral copulation which formed the basis

11  of petitioner's conviction. A review of the record reveals the following testimony.

12  Petitioner babysat Amanda for a long weekend. At its conclusion, Amanda accused

13  petitioner of making her drink his "pee-pee" milk in his van (Exhibit B - RT 116-118, 121-122) and

14  engaging in other sex acts. (Exhibit B - RT 122, 125, 124-126; Exhibit C - Supp.CT 1: 17, 20-23.)

15  Amanda could not state if the sex acts occurred on different occasions or if they all occurred during

16  a single encounter. (Exhibit B - RT 127.)

17  Although petitioner spanked Amanda during the weekend, the only evidence about when he

18  did so was that it was on either Saturday or Sunday (Exhibit B - RT 507-509, 517, 584-585; Exhibit

19  C - Supp. CT 1: 96). This nondescript type of evidence is clearly too vague in nature to warrant an

20  inference that petitioner applied physical force to Amanda **before** the oral copulation or, indeed,

21  **before** any of the sex acts she described. Likewise, there is no way to rationally determine that

22  petitioner's directive not to tell occurred **before** the oral copulation or any of the other alleged sex

23  acts.

24  As a common sense matter, in order for a direct or implied threat to have any effect on

25  someone's decision-making ability and thus carry probative value, the threat must **precede** the illegal

26  conduct for which the victim was coerced under duress. From a legal perspective, California

27  appellate law has similarly held that the threat must precede the commission of the act. See People

28  v. Bergschneider, 211 Cal.App.3d 144, 154, fn. 8 (1989); People v. Hecker, 219 Cal.App.3d 1238

**PET. FOR WRIT OF HAB. CORPUS**   - 18 -

1  (1990); People v. Reyes, 153 Cal.App.3d 803, 811 (1984); People v. Young, 190 Cal.App.3d 248,

2  259 (1987); and People v. Pitmon, 170 Cal.App.3d 38, 51 (1985).

3      As stated previously, the government in this case did not specifically establish that the

4  implied threats testified to by Amanda **preceded** the oral copulation charged in Count Two.  It is

5  important to note that California case law has consistently held that speculative inferences cannot

6  pass for substantial evidence.  See People v. Rayley, 2 Cal.4th 870, 890 (1992); People v. Morris,

7  46 Cal.3d 1, 21 (1988); and People v. Redmond, 71 Cal.2d 745, 755 (1969).

8      The record in this case clearly demonstrates that petitioner was denied his Fifth Amendment

9  right to due process in that the evidence produced at trial was inadequate for a rational trier of fact

10  to support the element of duress necessary to convict petitioner of Count Two.  This is a critical issue

11  as the prejudice to petitioner that stems from this due process violation is extremely significant.

12  Specifically, pursuant to Penal Code § 269, § 288a, but for the jury's finding that petitioner

13  committed oral copulation by means of duress, petitioner would not be serving a term of life

14  imprisonment.

15      Based on the foregoing, petitioner's conviction must be reversed.

16                    **GROUND EIGHT**

17  PETITIONER'S CONCURRENT TERMS FOR COUNTS FOUR AND SEVEN
    MUST BE STAYED UNDER PENAL CODE § 654 AND APPRENDI.

18
19      California Penal Code § 654 specifically prohibits multiple punishments, including the

20  imposition of concurrent terms, for a single act and for multiple acts based on an indivisible course

21  of conduct committed pursuant to a single objective.  See People v. Pearson, 42 Cal.3d 351, 359,

22  361-362 (1986) and People v. Harrison, 48 Cal.3d 321, 335 (1989).  In the case at bar, the trial court

23  imposed concurrent terms for petitioner's convictions regarding Anthony in Count Six, felony child

24  beating pursuant to Penal Code § 273d(a) and Count Seven, misdemeanor child abuse pursuant to

25  Penal Code § 273a(b).  Petitioner contends the trial court erred as it failed to identify two distinct

26  objectives underlying these acts.  Petitioner argues the acts for which he was found guilty were

27  ostensibly committed pursuant to a single objective, i.e. harming Anthony.

28      With respect to Amanda, petitioner contends the consecutive and concurrent terms for Count

**PET. FOR WRIT OF HAB. CORPUS**    - 19 -

Two, aggravated sexual assault based on oral copulation pursuant to Penal Code § 269, § 288a; Count Five, felony child beating pursuant to Penal Code § 273d(a); and Count Four, misdemeanor child abuse pursuant to Penal Code § 273a(b) were imposed in violation of <u>Apprendi v. New Jersey</u> 530 U.S. 466, 476-490 (2000). The U.S. Supreme Court in <u>Apprendi</u> held that any fact, other than a prior conviction, which increases the maximum penalty for a crime must be formally charged, submitted to the factfinder, treated a criminal element, and proven beyond a reasonable doubt.

In petitioner's case, it is unclear whether the conviction on Count Four rests upon a molest other than oral copulation. Count Four could have been based on petitioner hitting Amanda with a shoe, in which case it would be part of an indivisible course of conduct committed pursuant to a single objective with Count Five, i.e. infliction of physical harm. See <u>People v. Loflink</u>, 206 Cal.App. 3d 161, 166-168 (1988) for the proposition that multiple punishment for Penal Code § 273a and 273d convictions during a single course of conduct is impermissible. Count Four could have also been based on the overall inadequate care petitioner provided Amanda the babysitting weekend, in which case it would be part of an indivisible course of conduct along with Count Two in that both resulted in mental suffering. See <u>People v. Thompson</u>, 50 Cal.3d 134, 173 (1990) where the court held a defendant may not be punished for both lewd conduct with a minor and child abuse based on the same course of conduct.

Pursuant to <u>Apprendi</u>, petitioner's jury should have determined if Count Four was part of a continuous course of conduct committed pursuant to a single objective, along with Count Two, Count Five or both. The trial court's failure to have petitioner's jury make such a decision violated his Fifth Amendment right to due process. As such, this Court must vacate petitioner's sentence and remand it to the trial court for a jury determination.

### GROUND NINE

IN MULTIPLE INSTANCES, TRIAL COUNSEL WAS INEFFECTIVE IN HIS REPRESENTATION OF PETITIONER WHICH SERVED TO UNDERMINE CONFIDENCE IN THE VERDICT.

### I. INTRODUCTION

The legal standard regarding counsel's obligation to defend a client charged with a serious crime is well-established. In preparing and presenting a defense, a criminal defense attorney must

**PET. FOR WRIT OF HAB. CORPUS**    – 20 –

1  perform several separate, but interrelated tasks. In the benchmark case of <u>Strickland v. Washington</u>,

2  466 U.S. 668, 686 (1984), the United States Supreme Court held that a person's right to counsel in

3  a criminal case must produce **effective assistance**, "That a person who happens to be a lawyer is

4  present at trial alongside the accused, however, is not enough to satisfy the constitutional command.

5  The Sixth Amendment recognizes the right to the assistance of counsel because it envisions

6  counsel's role that is critical to the ability of the adversary system to produce just results."

7  In a pre-<u>Strickland</u> case, the United States Supreme Court held in <u>Cuyler v. Sullivan</u>, 466

8  U.S. 335 (1980) that a defendant is entitled to the reasonably competent assistance of an attorney

9  acting as his loyal, diligent and conscientious advocate. In all cases dealing with the issue ineffective

10  assistance of counsel, the penultimate function of the Sixth Amendment is to guarantee and protect

11  the accused's fundamental right to a trial that is both fair in its conduct and reliable in its result.

12  In petitioner's case, trial counsel's pre-trial and trial representation fell substantially below

13  any reasonable standard of competent representation. Further, and as will be clearly demonstrated

14  herein, trial counsel's performance was objectively deficient, such that there is a reasonable

15  probability that, but for trial counsel's unprofessional errors, the result of the petitioner's case would

16  have been different. <u>Strickland</u>, supra, at pages 687-688; <u>Woodford v. Visciotti</u>, 537 U.S. 19 (2002).

17  The United States Supreme Court pronounced in <u>Strickland</u> that when trial counsel's ineffectiveness

18  so undermines the proper functioning of the adversarial process that the trial cannot be relied on as

19  having produced a just result, the conviction must be reversed. This is precisely what occurred in

20  petitioner's case and as such, petitioner's conviction must likewise be reversed.

21
22
                    1.    DEFENSE COUNSEL FAILED TO INVESTIGATE
                          AND PRESENT EVIDENCE OF RUBY RUBIO'S
                          WELFARE FRAUD.

23  Before counsel can make an informed strategy decision as to what evidence to ultimately

24  present at trial, counsel must conduct a reasonable investigation. "At the heart of effective

25  representation is the independent duty to investigate and prepare." *Goodwin v. Balcom*, 684 F.2d

26  794, 805 (11th Cir. 1982) *cert. denied* 460 U.S. 1098 (1983); *Rummel v. Estelle*, 590 F.2d 103, 104

27  (5th Cir. 1979). As the Court recognized in <u>Strickland v. Washington</u>, counsel must, at a minimum,

28  conduct a reasonable investigation enabling him to make informed decisions about how best to

**PET. FOR WRIT OF HAB. CORPUS**    -  21  -

1   represent his client. "Counsel has a duty to make reasonable investigations or make a reasonable

2   decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. The right

3   to reasonably competent counsel imposes a correlative duty on defense counsel to undertake

4   reasonable steps to investigate all avenues of defense. Wood v. Zahradnick, 578 F.2d 980, 982 (4th

5   Cir. 1978). This principle is so fundamental that the failure to conduct reasonable pretrial

6   investigation may in itself amount to ineffective assistance of counsel. United States v. Tucker, 716

7   F.2d 576, 594 (9th Cir. 1983); citing McCain v. Swenson, 498 F.2d 207, 217-218 (8th Cir. 1974).

8   A review of the record in this case reveals that petitioner's trial counsel was unprepared on all

9   multitude of levels to present an adequate and meaningful defense to the charges brought by the

10  government.

11      In preparing for trial, petitioner's trial counsel knew that a key witness for the government

12  was the mother of Amanda and Anthony, Ruby Rubio. Specifically, Rubio stated that the children's

13  accusations against petitioner first came to the surface during bath and bed time, at time at which

14  they would be more apt to confide in their mother. (Exhibit C - CT 6-8, 10, 20, 23-26; Exhibit B -

15  RT 222-229, 235-238.) Rubio also testified that Amanda made "fresh complaints" to her when she

16  demonstrated with Barbie and Ken dolls the lewd conduct to which petitioner subjected her.

17  (Exhibit B - RT 240-241.)

18      A key part of petitioner's defense necessitated a full impeachment of Ruby Rubio's

19  credibility. At trial, in an effort to counter Rubio's testimony, petitioner's trial counsel suggested

20  that Rubio influenced Amanda and Anthony to fabricate their accusations in order to cast Rubio in

21  a mean and vindictive light. (Exhibit B - 6/9/99 Supp. RT 9-11; RT 536-537, 644, 646-648, 650-

22  652, 654.) The defense presented evidence that when petitioner asked her why she had brought the

23  charges against him in a three-way phone call involving Ejaz Anam, Rubio stated that was what

24  petitioner got for "messing" with her and said, "you should not have fucked with me." In short,

25  defense counsel attempted to portray Ruby Rubio as an unfit mother who harbored animosity against

26  petitioner, thereby hoping to create reasonable doubt about the source and veracity of Rubio's

27  children's accusations against petitioner.

28      While this effort to impeach Rubio was appropriate, defense counsel did nothing to

**PET. FOR WRIT OF HAB. CORPUS**    - 22 -

1   independently investigate the critical fact that Rubio had engaged in welfare fraud despite the fact

2   that petitioner advised defense counsel **prior to trial** that he suspected Rubio of committing welfare

3   fraud. Defense counsel merely relied on the government's duty to run a criminal records check on

4   their witnesses and then disclose material impeaching their witnesses. While the government

5   informed defense counsel there was no such information to disclose, the government's disclosure

6   did not include or contemplate any on-going welfare fraud investigation of Rubio.

7       In California, the Supreme Court in People v. Wheeler, 4 Cal.4th 284 (1992) held that where

8   there is evidence that a witness has engaged in conduct involving "moral turpitude," it is admissible

9   for impeachment purposes, subject to discretionary exclusion under California Evidence Code 352,

10  even though it has not actually resulted in an actual criminal conviction. After being advised by

11  petitioner of Rubio's welfare fraud problems, defense counsel had an affirmative duty to subpoena

12  Rubio's welfare files. Ruby Rubio's relevant welfare-related documents are attached hereto as

13  Exhibit I, containing pages numbered and circled as 12 through 64. As part of petitioner's Fifth

14  Amendment right to due process, the trial court must review Rubio's welfare files in camera and then

15  release to the defense any discovered material relevant to the impeachment of Rubio. Importantly,

16  Rubio's moral turpitude conduct was documented in Rubio's welfare file **prior** to trial. Welfare

17  authorities determined that Rubio underreported her earning under oath despite being repeatedly told

18  she had to report any and all earnings before receiving welfare aid. Rubio's underreporting resulted

19  in thousands of dollars of overpayment to her. (Exhibit I, pp. 37-64.)

20      Had defense counsel acted competently, this relevant evidence would have been admitted to

21  show that Rubio had engaged in conduct amounting to welfare fraud and perjury **prior** to testifying

22  at petitioner's trial.[1] Petitioner was severely harmed by counsel's ineffectiveness. Rubio was a key

23  witness and the government's case rested in no small part on her credibility. Without Rubio, the jury

24  would have certainly questioned whether Amanda's claims of molest by petitioner were the product

25  of fantasy and/or coaching by Rubio. The government emphasized that Rubio corroborated Amanda

26

27

28  [1]   At a minimum, the trial court would have entered an "adverse order" jury instruction concerning the assessment of Rubio's credibility. (Evid. Code Section 1042.)

**PET. FOR WRIT OF HAB. CORPUS    - 23 -**

1   and pointed out there was no reason to believe Rubio had coached her children to frame petitioner.

2   However, had defense counsel acted competently, the defense would have presented welfare fraud

3   evidence to show that Rubio had no problem committing perjury to advance her own interests. This

4   Rubio "perjury evidence" would have served to significantly undermine the government's case by

5   stripping Amanda's testimony of necessary corroboration. As importantly, this Rubio "perjury

6   testimony" would have served to support petitioner's claim that the charges against him had been

7   orchestrated by Ruby Rubio, who is nothing more than a self-interested and self-serving perjurer.

8   It is probative to note that shortly after petitioner was convicted, Rubio was confronted regarding her

9   welfare fraud and confessed. (Exh. I, pp 29-33.) Rubio was subsequently convicted of welfare

10  fraud.

11      Defense counsel's failure to independently investigate Rubio's background for conduct

12  involving moral turpitude and utilizing it for impeachment purposes at trial fell below the objective

13  standard of reasonable professional conduct required under Strickland and mandates a reversal of

14  his conviction.

15          2.    PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE BY
               FAILING TO INVESTIGATE, PREPARE WITNESSES AND
16             PRESENT EXCULPATORY EVIDENCE AT TRIAL

17      In addition to the welfare fraud evidence that defense counsel failed to investigate and present

18  regarding Ruby Rubio, counsel also failed to present evidence that Rubio abandoned Amanda and

19  Anthony on many occasions, leaving petitioner to solely care for them. See the declaration of Ejaz

20  Anam, which is attached hereto as Exhibit J. Mr. Anam's testimony, if presented at trial as set forth

21  in his declaration, would have supported petitioner's contention that Rubio was an unfit, vindictive

22  mother who simply turned on petitioner and used the children as her vehicle for retribution.

23  Additionally, Anam's testimony would have shown petitioner to possess a genuine caring influence

24  in Amanda and Anthony's lives versus the criminal conduct which the government sought to portray.

25      In addition to Anam, defense witnesses Leslie Hernandez and Ramon Quintanilla testified

26  at trial but were wholly unprepared for their testimony by petitioner's trial counsel. Additionally,

27  exculpatory testimony relating to how petitioner compassionately cared for both Amanda and

28  Anthony could have been provided by these two witnesses but was not presented due to trial

**PET. FOR WRIT OF HAB. CORPUS** - 24 -

counsel's failure to adequately investigate and prepare for petitioner's trial. Leslie Hernandez's declaration is attached hereto as Exhibit K. Ramon Quintanilla's declaration is attached hereto as Exhibit L.

Beyond the witnesses who testified at trial for petitioner, there were two other witnesses who could have presented exculpatory evidence on behalf of petitioner but were never contacted and/or called by petitioner's trial counsel. Attached hereto as Exhibit M is the declaration of Mayra-Alicia Quintanilla. Attached hereto as Exhibit N is the declaration of Amelia Guerrero. Both Mayra-Alicia Quintanilla and Amelia Guerrero were available as witnesses in petitioner's case to testify as to how he took care of Amanda and Anthony but were never contacted and/or called as witnesses. As to Ms. Guerrero, she states in her declaration that Amanda told her that "Angel is my Mom's boyfriend and he protects me from my Dad." This testimony, if presented at trial, would have served to directly impeach the accusatory testimony of Ruby Rubio and her daughter, Amanda.

Defense counsel's failure to investigate and present this powerful evidence to the jury violated petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment and his right to due process under the Fifth Amendment. As such, petitioner's conviction must be reversed.

3.  PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO INVESTIGATE AND PRESENT EVIDENCE THAT THE ALLEGED VICTIM, AMANDA, WAS NOT PHYSICALLY ABUSED BY PETITIONER, BUT IN FACT THE CHILDREN WERE WELL TAKEN CARE OF BY PETITIONER.

As set forth in the preceding section 2, defense counsel failed to investigate and present witness testimony that both Amanda and Anthony were well-taken care of by petitioner.

However, beyond the fact that several witnesses were available to testify for petitioner and were not contacted and/or called by defense counsel, Leslie Hernandez observed Amanda completely naked in mid-November of 1996 and did not observe any bruises, abrasions, cuts, scratches welts or marks on Amanda's body. See the attached declaration of Leslie Hernandez (Exhibit K).

As with Leslie Hernandez, Ramon Quintanilla had an opportunity to observe Amanda's body in the time period in which the alleged sexual abuse took place. According to Mr. Quintanilla, on the night before petitioner was arrested, which would have been **after** the alleged abuse by petitioner

**PET. FOR WRIT OF HAB. CORPUS**    – 25 –

1 occurred, Quintanilla had an opportunity to observe both Amanda and Anthony. Ramon Quintanilla

2 did not observe any bruises, scarring, abrasions, cuts or anything Quintanilla would have considered

3 abuse. See the attached declaration of Ramon Quintanilla (Exhibit L).

4      Defense counsel's failure to investigate and present this evidence at trial severely crippled

5 petitioner's case, particularly as it related to the critically important issue of petitioner's credibility

6 versus that of Amanda and her mother, Ruby Rubio. Once again, defense counsel's failure to

7 adequately represent petitioner resulted in a denial of his Sixth Amendment right to effective

8 representation and his Fifth Amendment right to due process. Based on these asserted and proven

9 denial of his constitutional rights, petitioner's conviction must be reversed.

10     4.    PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE BY
FAILING TO PRESENT EVIDENCE THAT AMANDA STATED
11         TO AMELIA GUERRERO THAT PETITIONER PROTECTED
HER FROM HER FATHER.
12

13      Had defense counsel conducted proper pretrial investigation of petitioner's case, he would

14 have discovered that Amelia Guerrero was told by Amanda that petitioner actually protected Amanda

15 from her father. Ms. Guerrero states that at petitioner's mother's 50th birthday party held in

16 November of 1996, **which is prior in time to the alleged incident for which petitioner was**

17 **charged in this case,** Amanda told Amelia Guerrero that, "Angel is my Mom's boyfriend and he

18 protects me from my Dad." See Exhibit N. As stated previously, Amanda's dad is Ivan Acosta,

19 whom petitioner understood was the person who, in truth and in fact, was the one that molested

20 Amanda.

21      Defense counsel's failure to investigate and present this evidence at trial served to

22 significantly prejudice petitioner's defense. The battle for credibility between petitioner and his

23 accusers, Ruby Rubio and Amanda, was **the** critical factor in determining whether petitioner would

24 be acquitted. The absolute and total failure of defense counsel to investigate and present defense

25 witnesses who could have lent great weight and credibility to petitioner's testimony and defense was

26 inexcusable. Defense counsel's failure in this regard removed any semblance of effective

27 representation. Based on this clear violation of both his Sixth Amendment right to competent

28 counsel and Fifth Amendment right to due process of law, this Court is mandated to reverse

**PET. FOR WRIT OF HAB. CORPUS**   - 26 -

1  petitioner's conviction.

2      5.   DEFENSE COUNSEL FAILED TO INVESTIGATE AND
           PRESENT EVIDENCE THAT RUBIO HAD A MOTIVE TO
3          FALSELY ACCUSE PETITIONER OUT OF FEAR OF HER
           PARAMOUR'S JEALOUSY OVER HER CLOSE RELATIONSHIP
4          WITH PETITIONER.

5          On this issue, the declaration of petitioner's appellate counsel Kat Kozik is attached hereto

6  as Exhibit O.   The court record reflects that defense counsel intended to present evidence that

7  petitioner had threatened to report Rubio for harboring Deltoro when he was a fugitive. See Exhibit

8  O, pp. 4-5; Exhibit B - Supp. RT, 11; Exhibit C - Supp. CT 2: 53. However, defense counsel failed

9  to investigate whether there was any independent proof of the matter.   In point of fact, independent

10 proof did exist. Included herewith as Exhibit P are law enforcement records regarding Ruby Rubio's

11 boyfriend, Onorato Deltoro.   The pages in Exhibit P are numbered as pages 65 through 78.

12 Specifically, these records document an incident where Deltoro was arrested after severely beating

13 Rubio while she was pregnant with their child, in front of several witnesses, because Rubio merely

14 spoke to a male neighbor. See Exhibit P, pp. 65-78. Additionally according to the Hayward Police

15 Department incident report, Ruby Rubio stated to police that, "She provided me with Deltoro's real

16 name & said he had used "Lopez" to avoid detection of a warrant out of Oakland."  See Exhibit P,

17 page 69.

18         In the case at bar, it was clear that petitioner's close relationship with Rubio presented a

19 threat to Rubio's safety and relationship with Deltoro, whom she married after the domestic violence

20 incident.  (Exhibit B - RT 214, 246, 616.) Based on Deltoro's past conduct, Rubio had cause to fear

21 physical harm if Deltoro found out that she and petitioner were as she put it, "best friends." (Exhibit

22 B - RT 271.) Any reasonably competent defense attorney would have cross-examined Rubio about

23 these matters to establish a basis for the jury to infer that Rubio had a motive to coach her children

24 to fabricate charges against petitioner to get him out of her life.  The failure by defense counsel to

25 investigate Deltoro's criminal background and present this evidence at trial not only falls below the

26 objective standard of reasonableness required by the Sixth Amendment and Strickland, but

27 additionally serves to further undermine confidence in the verdict. As such, petitioner's conviction

28 must be reversed.

**PET. FOR WRIT OF HAB. CORPUS   – 27 –**

1

2

3

6.   DEFENSE COUNSEL FAILED TO PRESENT EVIDENCE PROMISED IN OPENING STATEMENT THAT THE PETITIONER THREATENED TO REPORT RUBIO FOR HER ILLEGAL ACTIVITIES JUST BEFORE RUBIO REPORTED PETITIONER TO THE POLICE.

4    In his opening statement, defense counsel told the jury to expect evidence that petitioner and

5  Rubio had argued when petitioner returned Amanda and Anthony to her and during that argument,

6  petitioner threatened to report Rubio, "for certain things that she had done that he thought were

7  illegal related to [Onorato Deltoro]." (Exhibit B - 6/9/99 Supp. RT 11.) It was established at trial

8  that Onorato Deltoro was the boyfriend of Ruby Rubio during the period of time that petitioner

9  babysat Amanda and Anthony. The evidence promised by defense counsel on this point would have

10  permitted the jury to conclude that Rubio falsely reported petitioner for abusing her children as a

11  preemptive strike against petitioner's promised action against Rubio. Additionally, such evidence

12  would have allowed the jury to understand the level of hostility Rubio carried against petitioner such

13  that Rubio would misinterpret any statement made by Amanda or Anthony. Clearly, this was

14  defense counsel's tactic as he argued Rubio's hostility and misinterpretation in closing argument.

15  (Exhibit B - RT 755, 758, 767, 771, 774, 783, 785.)

16    However, during the trial, defense counsel failed to deliver the promised "threat evidence."

17  On direct examination of the petitioner, defense counsel did not ask petitioner any question to elicit

18  this "threat evidence." When defense counsel, in opening statement, promises the jury he is going

19  to deliver certain evidence but then fails to do so, the entire defense lacks credibility to the jury.

20  Additionally, the jury has the right to infer that if the promised evidence comes from the defendant

21  and then is not delivered, the defendant may be lying about the asserted evidence and decided not

22  to testify to such facts under oath. Such an inference is devastating to the defendant. In this case,

23  petitioner never recanted his statement. Rather, his trial counsel failed to produce the evidence for

24  the jury due to his own incompetence and only served to prejudice petitioner's defense.

25    It was imperative for the jury to hear some reason why Amanda would falsely accuse

26  petitioner of molesting her. Evidence suggesting that Amanda's mother, Ruby Rubio, heard

27  petitioner's threat and feared being turned into the police permitted the reasonable inference that

28  Rubio coached Amanda to lie against petitioner, either in retaliation or as a preemptive strike against

**PET. FOR WRIT OF HAB. CORPUS**   - 28 -

1  him. Either way, defense counsel's failure to produce the promised "threat evidence" deprived the

2  jury of a compelling basis for finding reasonable doubt to convict. Finally, in a case where the

3  believability of the petitioner was paramount to a successful defense, it gave the jury reason to

4  discount petitioner's testimony and to generally mistrust petitioner's entire defense. Counsel's

5  omission of this evidence rendered his representation ineffective and served to prejudice petitioner

6  such that his conviction must be reversed.

7      7.    DEFENSE COUNSEL FAILED TO BRING TIMELY AN
             EVIDENCE CODE § 782 MOTION.

8      An important component of the defense strategy in petitioner's case was to bring to light

9  evidence that Amanda had been molested by her natural father, Ivan Acosta, prior in time to the

10  allegations against petitioner. At trial, and without having previously filed a motion under Evidence

11  Code § 782, defense counsel asked Amanda if she had ever complained to petitioner that Ivan had

12  touched her in a way she didn't like. Before the trial court could rule on an objection lodged by the

13  government, Amanda responded by stating, "My dad or my uncle - -" (Exhibit B - RT 153, lines 6-

14  10). Petitioner argues that if Amanda had not been previously touched in an inappropriate manner

15  by either her dad Ivan, or her uncle, she would have simply responded, "No." Further, Petitioner

16  contends that Amanda's response opened the door to a relevant inquiry regarding whether she had

17  been molested by someone other than and to the exclusion of petitioner. The government objected

18  and after an unreported bench conference, defense counsel simply moved on to a different topic of

19  questioning.

20      Two days later, defense counsel did file an Evidence Code § 782 motion, attached hereto as

21  Exhibit E, seeking the right to question Amanda regarding her prior molest by Acosta as well as

22  asking Amanda about her observing her mother having sex with other men. The trial court denied

23  the motion holding it to be untimely as it was brought after Amanda was off the stand as a

24  prosecution witness and the trial court did not want to subject her to the inconvenience of having to

25  testify again. (Exhibit B - RT 471, 473-474.)

26      Defense counsel's failure to bring the Evidence Code § 782 motion pretrial constituted

27  ineffective assistance and prejudiced petitioner's defense. As noted previously, an important part

28

**PET. FOR WRIT OF HAB. CORPUS**    - 29 -

of petitioner's defense was to show that Amanda had prior knowledge of sexual matters due to her molest by Ivan Acosta along with her observations of her mother having sex with other men. However, due to defense counsel's failure to timely bring an Evidence Code § 782 motion, this "prior sex evidence" relating to Amanda was excluded. The exclusion of this evidence prejudiced petitioner's case in that it would have raised a reasonable doubt about Amanda's accusations against petitioner. See LaJoie v. Thompson, 217 F.3d 663 (9th Cir. 2000); People v. Daggett, 225 Cal.App3d 751, 757 (1990). As such, petitioner was denied his Sixth Amendment right to effective assistance of counsel as well as his Fifth Amendment right to due process. Based on these constitutional violations, petitioner's conviction must be reversed.

8.   DEFENSE COUNSEL FAILED TO PRESERVE THE RECORD AS TO WHY COUNSEL DROPPED QUESTIONING THE COMPLAINING WITNESS ABOUT HER PRIOR SEXUAL ACTIVITY.

As set forth in the previous issue, as a result of the unreported bench conference, petitioner's defense counsel did not preserve the trial record regarding the court's denial of his right to question Amanda about past sexual activities. (Exhibit B - RT 152-153) Consequently, it is unclear as to whether defense counsel moved on to another topic voluntarily or whether it was as a result of the trial court's directive to follow the proper procedure for Evidence Code § 782. Given the fact that defense counsel filed an Evidence Code § 782 motion two days later, it appears the trial court instructed counsel to file a formal Evidence Code § 782 motion if he sought to explore Amanda's involvement in sexual activity.

A trial attorney has a duty to properly preserve the record for appeal and in this case, defense counsel's failure to preserve the record constituted ineffective assistance. In this instance, petitioner's case was prejudiced by his defense counsel's failure to preserve the trial court record. It is important to note that the proper analysis of petitioner's claim that the trial court erred in refusing to permit him to directly cross examine Amanda about her prior molest and viewing of her parents sexual activity, **without resorting to Evidence Code § 782**, requires reversal. Delaware v. Van Arsdall, 475 U.S. 673, 685 (1986).

1  Assuming the damaging potential of Amanda's cross-examination was fully realized

2 regarding her prior sexual activity and knowledge, defense counsel's error was not harmless. The

3 verdict in petitioner's case hinged in large part on the source of Amanda's chlamydia infection and

4 her past sexual knowledge. These facts directly bore on the credibility as between petitioner, who

5 testified at trial, and Amanda. The denial of effective cross-examination by defense counsel of

6 Amanda was extremely prejudicial to petitioner's case. Such a denial violated petitioner's Sixth

7 Amendment right to effective assistance of counsel, his Fifth Amendment right to due process, and

8 mandates a reversal of his conviction.

9        9.    PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE BY
              FAILING TO REQUEST AN INSTRUCTION ON THE LESSER
10             INCLUDED  OFFENSE  OF  NON-FORCIBLE  ORAL
              COPULATION.

11     Beyond the fact the trial court erred in not instructing the lesser included offense of oral

12 copulation, trial counsel was ineffective in failing to affirmatively request such an instruction. The

13 prejudice to petitioner for such failure by trial counsel is set forth in GROUND FIVE, and is

14 incorporated herein by reference. This failure to request the lesser included instruction violated

15 petitioner's Sixth Amendment right to effective assistance of counsel, his Fifth Amendment right

16 to due process and must result in his conviction being reversed.

17       10.   PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE BY
              FAILING TO OBJECT THAT WHERE THE PENAL CODE IS
18             AMBIGUOUS, THE PETITIONER MUST BE GIVEN THE
              BENEFIT OF A MORE LENIENT INTERPRETATION.
19

20     The doctrine of lenity provides that a defendant be given the benefit of every reasonable

21 doubt, whether it arises from a question of fact or by way of the proper interpretation of a statute.

22 United States v. Bass, 404 U.S. 336, 347 (1971). In petitioner's case, Penal Code § 269(a)(4) states

23 that where a defendant commits a violation of Penal Code § 288a by force, or fear of immediate and

24 unlawful bodily injury, he must be imprisoned for 15 years to life. However, a review of Penal Code

25 § 288a(c)(2) indicates that for the exact illegal conduct proscribed by Penal Code § 269, the

26 punishment provided is three, six or eight years. Petitioner contends that Penal Code § 269 and

27 Penal Code § 288a equally apply to the misconduct in his case. Further, there is ambiguity between

28 the statutes as there is no basis for determining which statute should control. Additionally, defense

**PET. FOR WRIT OF HAB. CORPUS**   - 31 -

1  counsel was ineffective in not arguing under the doctrine of lenity that petitioner should be sentenced

2  under the less severe proscriptions of Penal Code § 288a rather than the much more severe mandates

3  of Penal Code § 269.

4       Based on the foregoing, petitioner should be given the benefit of the doctrine of lenity and

5  this Court vacate the original sentence of 15 years to life and remand the case for resentencing under

6  Penal Code § 288a.

## II. <u>CONCLUSION RE: IAC CLAIMS</u>

The substantive errors committed by defense counsel in his representation of petitioner, as

set forth above, resulted in a complete and total denial of petitioner's Sixth Amendment right to

effective representation enough to require this Court to reverse his conviction. Further, petitioner

asserts that had a competent attorney utilized the evidence that could and should have been

presented in his defense, there is more than a reasonable probability that petitioner would have

been acquitted.

## **GROUND TEN**

THE OVERALL EFFECT OF THE ACCUMULATION OF ERRORS SET
FORTH ABOVE RESULTED IN A DENIAL OF PETITIONER'S FIFTH
AMENDMENT RIGHT TO DUE PROCESS, HIS SIXTH AMENDMENT RIGHT
TO A FAIR TRIAL AND MANDATES REVERSAL OF HIS CONVICTION.

The Ninth Circuit has considered this claim in a number of cases. In the case of <u>United</u>

<u>States v. Frederick</u>, 78 F.3d 1370 (9th Cir. 1996), the Court stated:

> "In some cases, although no single trial error examined in isolation
> is sufficiently prejudicial to warrant reversal, the cumulative effect
> of multiple errors may still prejudice a defendant. See *United States
> v. Green*, 648 F.2d 587 (9th Cir. 1981). Where, as here, there are a
> number of errors at trial, "a balkanized, issue-by-issue harmless
> errors review" is far less effective than analyzing the overall effect
> of all the errors in the context of the evidence introduced at trial
> against the defendant. *United States v. Wallace*, 848 F.2d 1464,
> 1476 (9th Cir. 1988). In those cases where the government's case is
> weak, the defendant is more likely to be prejudiced by the effect of
> cumulative errors. *United States v. Berry*, 627 F.2d 193 (9th Cir.
> 1980), cert, denied, 449 U.S. 1113, 66 L.Ed. 843, 101 S.Ct. 925
> (1981). This is simply the logical corollary of the harmless error
> doctrine which requires us to affirm a conviction if there is
> overwhelming evidence of guilt."

In <u>Derden v. McNeel</u>, 938 F.2d 605 (5th Cir. 1991), a state case in a 2-1 decision, but

**PET. FOR WRIT OF HAB. CORPUS**   – 32 –

1    unanimous on this point wrote:

2          "The United States Constitution sets a floor which the state may not
         go below," at 609 (footnote omitted); " This is a Fourteenth
3          Amendment Due Process inquiry. . . Several errors taken together
         can also violate a petitioner's right to due process and cause the trial
4          to be fundamentally unfair," at 610 (Citing and quoting cases); " - - -
         - - the fundamentally unfair trial which violates due process is rare,
5          but when it does occur [cumulative error] analysis should be
         available to [habeas] petitioners," at 610 (reh'g en banc, *Derden v.*
6          *McNeel,* 978 F.2d 1453 (5th Cir. 1992)(11-2 decision)([We now hold
         that federal habeas corpus relief may only be granted for cumulative
7          errors....... (3) the errors 'so infested the entire trial that the resulting
         conviction violates due process," at 1454 (citing *Cupp v. Naughten*; -
8          - - - Fourth, the federal court must review the record as a whole to
         determine whether the errors more likely than not caused a suspect
9          verdict." at 1458 - - - - "

10        In Mak v. Blodgett, 970 F.2d 614 (9th Cir.1992), the Court evaluated that case in its entirety

11   finding that it met the first prong of Strickland.  The Court then followed with a prejudice analysis

12   looking at all of the errors by counsel.  In looking at the prejudice aspects as enunciated in

13   Strickland, the Ninth Circuit held,

14        "Nothing in Strickland suggests that a proportionality review is
         inappropriate when considering prejudicial effect, and the State cites
15        to no case law that supports such a notion.

16        On the whole, we cannot find fault with the district court's prejudice
         analysis. Although the present case differs from previous cases in
17        which no prejudice was found, because in this case the proffered
         evidence would not have opened the door to damaging
18        evidence,*fn10 it also differs from cases in which prejudice was
         found because here, the proffered evidence was far less
19        exculpatory.*fn11 These cases demonstrate that this case falls
         somewhere in the middle of a typical Strickland prejudice analysis.
20
         We do not need to decide whether these deficiencies alone meet the
21        prejudice standard because other significant errors occurred that,
         considered cumulatively, compel affirmance of the district court's
22        grant of habeas corpus as to the sentence of death.*fn12 See United
         States v. Tucker, 716 F.2d 576, 595 (9th Cir. 1983) ("a court may
23        find unfairness - and thus prejudice - from the totality of counsel's
         errors and omissions"); Ewing v. Williams, 596 F.2d 391, 395 (9th
24        Cir. 1979) ("prejudice may result from the cumulative impact of
         multiple deficiencies") (quoting Cooper v. Fitzharris, 586 F.2d 1325,
25        1333 (9th Cir. 1978) (en banc), cert. denied, 440 U.S. 974, 59 L. Ed.
         2d 793 , 99 S. Ct. 1542 (1979))"
26
27        In summary, there are nine separate and distinct grounds set forth herein which contain

28   significant violations of petitioner's constitutional rights as follows:

**PET. FOR WRIT OF HAB. CORPUS**   – 33 –

1. The government committed multiple violations of their discovery obligation under <u>Brady</u> by failing to disclose and/or provide exculpatory evidence to the defense.

2. The trial court erred in precluding petitioner from exploring if, 1) Amanda had been molested by her natural father to establish an alternate source for Amanda's chlamydia and; 2) that she had witnessed adult sexual conduct thereby obtaining her sexual knowledge.

3. The trial court erred in excluding evidence of petitioner's negative penile swab culture test for chlamydia.

4. Petitioner's conviction on Count Two must be reversed since the jury was erroneously instructed that "duress" includes "hardship."

5. The trial court failed to instruct on the lesser included offense of non-forcible oral copulation.

6. During jury deliberations, the trial court answered questions from the jury without the petitioner or his defense counsel being personally present.

7. The evidence was legally insufficient to support the conviction on Count Two that petitioner committed the oral copulation by means of duress.

8. Petitioner's concurrent terms for Counts Four and Seven must be stayed as they do not comply with Penal Code § 654 and <u>Apprendi</u>.

9. The numerous and significant errors of trial counsel prejudiced petitioner's defense at trial thereby violating his Fifth Amendment right to due process and his Sixth Amendment right to effective assistance of counsel and a fair trial.

In the case at bar, even if each of the nine separate grounds asserted herein did not result in sufficient prejudice to warrant relief, a point which petitioner does not concede, this tenth ground of the cumulative prejudice, which joins all of these nine grounds together, certainly warrants reversal of petitioner's conviction.

## V

## CONCLUSION

Based on the facts, law and arguments presented herein, defendant Angel Jesus Alvarez was denied his federal constitutional rights to due process, his right to effective assistance of counsel and his right to a fair trial mandating reversal of his conviction by this Court.

## VI

## PRAYER FOR RELIEF

WHEREFORE, Petitioner Angel Jesus Alvarez prays that this Court:

1. Issue a writ of habeas corpus to have Petitioner brought before it to the end that he might be discharged from his unconstitutional confinement and restraint;

2. Order Respondent to answer why Petitioner is not entitled to the relief sought;

3. Grant Petitioner the authority to obtain subpoenas for witnesses and documents which are not obtainable by other means;

4. Grant Petitioner the right to conduct discovery, including depositions, request for admissions and interrogatories and the means to preserve the testimony of witnesses;

5. Order an evidentiary hearing at which Petitioner will offer this and further proof in support of the allegations herein;

6. Permit Petitioner an opportunity to supplement this petition to include claims that become known as the result of further investigation and information that comes to light;

7. After full consideration of the issues raised in this petition, vacate the judgment and sentence imposed upon Petitioner in Santa Clara County Superior Court Case Number 198084.

8. Grant Petitioner such further relief as is appropriate in the interests of justice.

DATED: August _10_, 2006

Respectfully submitted,
LAW OFFICES OF SCOTT L. TEDMON

SCOTT L. TEDMON
Attorney for Petitioner Angel Jesus Alvarez

**PET. FOR WRIT OF HAB. CORPUS**    – 35 –

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VII

## VERIFICATION

    I, ANGEL JESUS ALVAREZ, declare under penalty of perjury that I have reviewed the foregoing Petition for Writ of Habeas Corpus and the facts contained therein are true and correct to the best of my recollection. Signed and dated this 10TH day of August, 2006, at San Quentin, California.

ANGEL JESUS ALVAREZ, Petitioner

**PET. FOR WRIT OF HAB. CORPUS**   – 36 –

EXHIBIT  A

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs.

ANGEL JESUS ALVAREZ,
   aka ANGELO JESUS FALCONI

Defendant(s).

August 4, 1997

DA NO    CEN
961130672 96040691  AA

INFORMATION NO. 198084

I N F O R M A T I O N
S U M M A R Y

| Ct. No. | Charge | Charge Range | Defendant | Special Allegation | Alleg. Effect |
|---------|--------|--------------|-----------|--------------------|---------------|
| 1 | PC288.5(A) | 6-12-16 | ALVAREZ, ANGEL JESUS | | |
| 2 | PC269 | | ALVAREZ, ANGEL JESUS | | |
| 3 | PC288(B)(1) | 3-6-8 | ALVAREZ, ANGEL JESUS | PC 12022.8 | 5 YRS |
| 4 | PC273A(A) | 2-4-6 | ALVAREZ, ANGEL JESUS | | |
| 5 | PC273D(A) | 2-4-6 | ALVAREZ, ANGEL JESUS | | |
| 6 | PC273D(A) | 2-4-6 | ALVAREZ, ANGEL JESUS | | |
| 7 | PC273A(A)(1) | 2-4-6 | ALVAREZ, ANGEL JESUS | | |
| | Prior(s): | | ALVAREZ, ANGEL JESUS | | |

Page 1

01

)

The District Attorney of the County of Santa Clara, by this Information alleges that:

COUNT  1

On and between January 1, 1994 and November 22, 1996, in the County of Santa Clara, State of California. the crime of CONTINUOUS SEXUAL ABUSE, in violation of PENAL CODE SECTION 288.5(A). a FELONY, was committed by ANGEL JESUS ALVAREZ, who did while residing in the same home with and having recurring access to a minor child. to wit: JANE DOE, under the age of fourteen years. to wit: 3, 4. 5 YEARS OF AGE years of age, did, over a period of not less than three months in duration. engage in three and more acts of substantial sexual conduct with said child.

\* \* \* \* \*

COUNT  2

On and between January 1, 1994 and November 22. 1996, in the County of Santa Clara, State of California. the crime of AGGRAVATED SEXUAL ASSAULT OF A CHILD, in violation of PENAL CODE SECTION 269. a FELONY, was committed by ANGEL JESUS ALVAREZ, who did commit a violation of Penal Code Section 288a by force. violence, duress. menace, and fear of immediate and unlawful bodily injury upon JANE DOE. a child under 14 years of age, to wit: 3, 4, 5 YEARS OF AGE years of age, and 10 and more years younger than the defendant.

It is further alleged that the defendant(s) is/are not eligible for probation and the suspension of sentence, within the meaning of Section 1203.065(a) of the Penal Code.

\* \* \* \* \*

02

}

COUNT 3

On and between January 1, 1994 and November 22, 1996, in the County of
Santa Clara, State of California, the crime of LEWD/LASCIVIOUS
ACT-CHILD-FORCE/VIOLENCE/DURESS/MENACE/FEAR, in violation of PENAL CODE SECTION
288(B)(1), a FELONY, was committed by ANGEL JESUS ALVAREZ, who did willfully
and lewdly commit a lewd and lascivious act upon and with the body and certain
parts and members thereof of JANE DOE, a child under the age of 14 years, to
wit: 3, 4, 5 YEARS OF AGE years of age, by use of force, violence, duress,
menace, and fear of immediate and unlawful bodily injury on said child and
another person and with the intent of arousing, appealing to and gratifying the
lust, passions, and sexual desires of the said defendant and of said child.

It is further alleged that the defendant(s) is/are not eligible for
probation and the suspension of sentence, within the meaning of Section
1203.066(a)(1) of the Penal Code.

(GBI)  It is further alleged that in the commission of the foregoing
offense, the said defendant, ANGEL JESUS ALVAREZ, personally inflicted great
bodily injury upon the victim of said offense, to wit: JANE DOE, within the
meaning of Section 12022.8 of the Penal Code.

* * * * *

03

)

## COUNT 4

On and between November 15, 1996 and November 22, 1996, in the County of Santa Clara, State of California, the crime of CAUSE/PERMIT PAIN SUFFERING OR ENDANGER/INJURE CHILD, in violation of PENAL CODE SECTION 273A(A), a FELONY, was committed by ANGEL JESÚS ALVAREZ, who under circumstances and conditions likely to produce great bodily harm and death, did willfully cause and permit a child, to wit: JANE DOE to suffer, and did inflict on that child unjustifiable physical pain and mental suffering, and while having the care and custody of the child, did willfully cause and permit the person and health of that child to be injured, and did willfully cause and permit that child to be placed in a situation where his or her person and health were endangered.

\* \* \* \* \*

## COUNT 5

On and between November 15, 1996 and November 22, 1996, in the County of Santa Clara, State of California, the crime of INFLICTING CORPORAL INJURY UPON A CHILD, in violation of PENAL CODE SECTION 273D(A), a FELONY, was committed by ANGEL JESUS ALVAREZ, who did willfully inflict upon a child, to wit: JANE DOE, cruel and inhuman corporal punishment and injury resulting in a traumatic condition.

\* \* \* \* \*

**04**

COUNT 6

On and between November 15, 1996 and November 22, 1996, in the County of Santa Clara, State of California, the crime of INFLICTING CORPORAL INJURY UPON A CHILD, in violation of PENAL CODE SECTION 273D(A), a FELONY, was committed by ANGEL JESUS ALVAREZ, who did willfully inflict upon a child, to wit: JOHN DOE, cruel and inhuman corporal punishment and injury resulting in a traumatic condition.

* * * * *

COUNT 7

On and between November 15, 1996 and November 22, 1996, in the County of Santa Clara, State of California, the crime of ENDANGERING THE HEALTH OF A CHILD, in violation of PENAL CODE SECTION 273A(A)(1), a FELONY, was committed by ANGEL JESUS ALVAREZ, who under circumstances and conditions likely to produce great bodily harm and death, and while having the care and custody of a child, to wit: JOHN DOE, did willfully cause and permit the person and health of said child to be injured, and did willfully cause and permit said child to be placed in such a situation that its person and health were endangered.

* * * * *

05

Pursuant to Penal Code Sections 1054 through 1054.7, the People request that, within 15 days, the defendant and/or his/her attorney disclose:  (A)  The names and addresses of persons, other than the defendant, he/she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements of those persons, including any reports or statements of experts made in connection with the case, and including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the defendant intends to offer in evidence at the trial;  (B)  Any real evidence which the defendant intends to offer in evidence at the trial.  This request is a continuing request, to cover not only all such material currently in existence, but all material which comes into existence to the conclusion of this case.

George W. Kennedy
District Attorney

By _____
VICTORIA C. BROWN
Deputy District Attorney

YMP    SJPD/470

Page 6

**06**

EXHIBIT  B

REPORTER'S TRANSCRIPT
"RT"

1    Is there something about him and his pee-pee that made

2    you feel bad?

3              MR. SCHROEDER:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  I guess so, yeah.

6    Q    (BY MS. McKAY-McCOY) I'm sorry?

7    A    I guess so.

8    Q    Will you tell us about what it is, his pee-pee that

9    made you feel bad?

10   A    I don't know what it is.

11   Q    Can you remember what it is?

12   A    Like water, something.

13   Q    Like water or something?

14   A    (Witness nods head.)

15   Q    Okay.  Where did the water or something come from?

16   A    I don't know.

17   Q    Did it come from some part of his body?

18   A    I don't know.

19   Q    Where did it go?

20   A    What do you mean?

21   Q    Well, where did it come from, the water or something?

22   Where did it come from?

23   A    The --

24   Q    I'm sorry, from what?

25   A    From the private.

26   Q    Oh, from the private.  His private?

27   A    Uh-huh.

28   Q    That's a yes.  When it came out of his private, where

117

1  did it go, did it stay there or did it go somewhere?

2  A    Go somewhere.

3  Q    Did it go somewhere near you?

4  A    Yeah.

5  Q    Did it go somewhere on you?

6  A    No.

7  Q    Where did it go?

8  A    In my mouth.

9  Q    Was it inside your mouth or on the outside of your

10  mouth?

11  A    Inside.

12  Q    Inside your mouth.  What did it taste like?

13  A    Nothing.

14  Q    Nothing.

15  A    No.

16  Q    Did it taste good or bad or --

17  A    Bad.

18  Q    Bad?

19  A    (Witness nods head.)

20  Q    When the water-type stuff went from out of his private

21  into your mouth, did he say anything while that was

22  happening?

23  A    (Witness shakes head.)

24  Q    No.  Did this happen in a house or in a car or in a

25  school yard or where?

26  A    It would be in the van or a house.

27  Q    In a house?

28  A    (Witness nods head.)

118

1       MR. SCHROEDER:  I couldn't hear her.

2           THE COURT:  She said in a van or a house.

3   Q   (BY MS. McKAY-McCOY) Did it happen in a van and a

4   house, both places?

5   A   (Witness nods head.)

6   Q   That's a question.  Yes?

7   A   (Witness nods head.)

8   Q   I'll ask you about the stuff in the van first and then

9   the house.  Okay.

10      When did the water-type stuff came out of his private

11  and into your mouth and you were in the van, was Angel there

12  too -- I mean Anthony there too, your brother?

13  A   (Witness nods head.)

14  Q   Where was he?

15  A   In the van.

16  Q   Was he in the van?

17  A   (Witness nods head.)

18  Q   Yes?

19  A   (Witness nods head.)

20  Q   Was he asleep or awake?

21  A   Awake.

22  Q   Was he pretending to be asleep or was he awake?

23          MR. SCHROEDER:  Objection.

24          THE COURT:  Overruled.  Could you repeat what you

25  said?

26          THE WITNESS:  Asleep or awake.

27  Q   (BY MS. McKAY-McCOY) Did it happen more than once in

28  the van that the water stuff came out of his private into

1    younger then and I was at the house and there was water

2    stuff coming out of Angel's private, what do you see?

3    A    I was in the dark.

4    Q    It was dark?

5    A    Dark.

6    Q    What part of the house were you in?

7    A    The living room.

8    Q    In the living room?

9    A    (Witness nods head.)

10   Q    Is that where you slept when you stayed at the house?

11   A    Sometimes.  Sometimes I'll sleep with the little girl

12   inside the bed.

13   Q    Or sometimes you slept in the van?

14   A    No.

15   Q    I'm sorry.  Thank you for correcting me.  What did you

16   say?

17   A    Or sometimes I would sleep in the bed with the little

18   girl.

19   Q    With the little girl who lived there?

20   A    Yeah, she was older than me.

21   Q    Okay.  Thank you for telling me.

22        Did his private -- the water stuff from his private in

23   your mouth, did his private ever go in your mouth?  Not the

24   water stuff but the private that the water stuff came out

25   of, did that go into your mouth?

26   A    (Witness nods head.)

27   Q    Did that happen more than one time?

28   A    (Witness nods head.)

22

122

1    MR. SCHROEDER:  Objection; vague as to location.
2    THE COURT:  Overruled.
3    Q    (BY MS. McKAY-McCOY) When the water stuff came out of
4    his private into your mouth, did his private go into your
5    mouth too?  Is that a clear question?
6    A    (Witness nods head.)
7    Q    Was it both, the water stuff and the private that went
8    into your mouth?
9    A    (Witness nods head.)
10    Q    Okay.  Thank you for answering yes.  It helps if you
11    answer out loud.
12    Did his private ever go in your ear?
13    A    (Witness shakes head.)
14    Q    Did his private ever go in your hand?
15    A    (Witness shakes head.)
16    Q    Did his private ever go near your private?
17    A    Sometimes, yeah.
18    Q    Okay.  Did that happen more than once?
19    A    (Witness nods head.)
20    Q    Yes.  Okay.  Did that happen in the van?
21    A    (Witness nods head.)
22    Q    Yes, did it happen in the house?
23    A    (Witness nods head.)
24    Q    Did it happen anywhere else?
25    A    (Witness shakes head.)
26    Q    When his private went in your -- did it go in your
27    private or near it or on your leg or what?  Is that a clear
28    question?

124

1    first grade or before?  Do you remember?

2    A    I think it was first grade.  Kindergarten,

3    kindergarten.

4    Q    Kindergarten.  Thank you.

5         And what grade were you in the last time it happened?

6    A    First grade, first grade.

7    Q    I would like to ask you some questions about his

8    finger.  Did he ever put his finger in your mouth?

9    A    (Witness shakes head.)

10   Q    Did he ever put his finger in your ear?

11   A    (Witness shakes head.)

12   Q    No.  Did he ever put his finger in your private?

13   A    (Witness nods head.)

14   Q    Okay.  Did that happen more than once?

15   A    (Witness nods head.)

16   Q    How old were you when it started?

17   A    I don't know.

18   Q    You don't remember?

19   A    (Witness shakes head.)

20   Q    Okay.  When he put his finger in your private, did he

21   touch your private with his finger?

22   A    (Witness nods head.)

23   Q    What kind of a touch?

24   A    I don't know.

25   Q    Okay.  Let me give you some choices.  You can use those

26   or you can use whatever word you want.

27        Was it like a hard touch, like a slap or was it a pinch

28   or was it a rub or was it a rub back and forth or was it a

125

1    squeeze or, I don't know, what kind of a touch?

2    A    Like back and forth.

3    Q    I'm sorry, back and forth?  Like back and forth?  Show

4    me with your hand, please.

5    A    Back and forth.

6    Q    Oh, back and forth.  Did that hurt?

7    A    A little bit.

8    Q    It did.  Did he say anything while he was doing it?

9    A    (Witness shakes head.)

10   Q    No.  Do you know how old you were when it stopped?

11   A    When I was in second grade.

12   Q    I would like to ask you some questions about his mouth.

13        Did he ever give you a kiss with his mouth on your

14   face?

15   A    (Witness nods head.)

16   Q    Sometimes?

17   A    Sometimes.

18   Q    Did it feel okay when he kissed you on the face?

19   A    (Witness shakes head.)

20   Q    No.  What made it icky?

21   A    I don't know.

22   Q    Did he kiss you on the hand?

23   A    (Witness shakes head.)

24   Q    No.  Did he kiss you on your butt, your bottom?

25   A    (Witness shakes head.)

26   Q    No.  Did he kiss you on your private?

27   A    (Witness shakes head.)

28   Q    Did he use his tongue too, you know, like how you lick

126

1   an ice cream cone?

2            MR. SCHROEDER: Objection.

3            THE COURT: Overruled.

4   Q   (BY MS. McKAY-McCOY) I want to make sure I'm clear.  A

5   kiss is like when you use your lips and a lick is like this,

6   like you're licking an ice cream cone.  Did he use his lips

7   or tongue or both or either one?  You tell me.  On your

8   private, I mean.

9   A    Tongue.

10  Q    I'm sorry?

11  A    This.

12  Q    Did you say lips or lick?

13  A    Tongue.

14           THE COURT: She's gesturing for her tongue.

15           MS. McKAY-McCOY:  I'm sorry, I can't see.  I have

16  to get taller.  Maybe it would help if I stood up I could

17  see more of your face.

18  Q    (BY MS. McKAY-McCOY) He used his tongue on your

19  private?

20  A    (Witness nods head.)

21  Q    How old were you when that started?

22  A    I don't know.

23           MR. SCHROEDER:  Objection; assumes facts not in

24  evidence.

25           THE COURT: Overruled.

26           MR. SCHROEDER:  Frequency and number.

27           THE COURT: Overruled.

28  Q    (BY MS. McKAY-McCOY) Did it happen more than once that

JOAN E. SCHAFER, CSR NO. 6053

127

1    he used his tongue on your private?

2    A    (Witness nods head.)

3    Q    Yes.  Do you know how old you were when it stopped?

4    A    I was 7 years old -- I was 7 years old, I was turning

5    8.

6    Q    Do you know did it happen more than once you said that

7    he put his tongue on your private?  Do you want me to ask

8    the question again?

9    A    Yes.

10    Q    You can tell me any time if my question is dumb.

11          Did he put his tongue on your privates more than one

12    different time?  Is that a clear question?

13    A    I don't know.

14    Q    Okay.  I'll try a different way.  Did he put his tongue

15    on your privates more than once?

16    A    Uh-huh.

17    Q    Was it usually daytime or nighttime or both?  Or when

18    did it happen?

19    A    Usually nighttime.

20    Q    Usually nighttime.  Was it different nights, not all on

21    the same night?

22    A    I don't remember.

23    Q    Is it hard to understand my question a little bit?

24    A    No, not that much.

25    Q    Okay.  Did Angel ever say anything to you about his

26    private and what was going on?  Did he tell you what you

27    were supposed to do or anything like that?

28    A    (Witness shakes head.)

152

1  Q    I couldn't hear you.

2  A    Maybe at -- at a motel -- in a motel.

3  Q    In a motel?

4  A    Uh-huh.

5  Q    It wasn't in the van, it was in a motel?

6  A    What?

7  Q    The other times that this happened, you said there were

8  lots of other times that this happened, right?

9  A    Uh-huh.

10 Q    Okay.  As I understood it before when you asked -- when

11 Ms. McKay-McCoy asked you about it you said that it happened

12 once at Ramon and Myra's and other times it was in the van?

13 A    Yes.

14 Q    Okay.  Now are you saying now that it also -- that it

15 happened in a motel?

16 A    Uh-huh.

17 Q    Okay.  Did it ever happen in the van?

18 A    Yes.

19 Q    Okay.  Can you tell us about how many times that was?

20 A    I don't know.

21 Q    Okay.  Can you tell us about how many times it happened

22 in a motel?

23 A    I don't know how many times.

24 Q    Well, did it happen more in a van or more in a motel?

25 A    Maybe more in the van.

26 Q    Okay.  Your dad's name is Ivan, right?

27 A    Yes.

28 Q    And is Ivan -- you see Ivan, don't you?

153

1  A    Yes.

2  Q    And --

3  A    I know the question already.

4  Q    I couldn't hear you, I'm sorry.

5  A    Never mind.

6  Q    Do you remember complaining to Angel that Ivan had

7  touched you in a way you didn't like?

8           MS. McKAY-McCOY:  Objection.  Excuse me, can we

9  approach the bench?

10          THE WITNESS:  My dad or my uncle --

11          THE COURT:  Just a moment, please.  We're going to

12  talk over here.  We'll be right back.

13      (Whereupon, the attorneys approach the bench.)

14  Q    (BY MR. SCHROEDER) Do you have any idea how many times

15  you had stayed in a motel with Angel?

16  A    No.

17  Q    Okay.  When you stayed at the motel, was your brother

18  there too?

19  A    Yes.

20  Q    Now, do you remember just before you talked to the

21  police, just a few days before you talked to the police that

22  you stayed at a motel with Angel?

23  A    No.

24  Q    You don't remember that?

25  A    (Witness shakes head.)

26  Q    Okay.  You said that -- you described him putting his

27  mouth -- or I'm sorry -- your mouth, that he put his penis

28  or pee-pee inside your mouth; do you remember saying that?

214

1    '99.  The baby is not here yet.

2    Q    Okay.  Are you married?

3    A    Yes, I am.

4    Q    What is your husband's name?

5    A    Onorato Deltoro.

6    Q    Can you spell that for the court reporter?

7    A    O-n-o-r-a-t-o, D-e-l-t-o-r-o.

8    Q    What city do you reside in?

9    A    Oakland, California.

10   Q    How long have you lived in Oakland?

11   A    Mostly all my life.

12   Q    Thank you.  Do you know an individual named Angel

13   Alvarez?

14   A    Yes, I do.

15   Q    How did you meet him?

16   A    Through my -- how do you say, ex-sister-in-law.

17   Q    What was Mr. Alvarez' relationship to your

18   ex-sister-in-law?

19   A    I believe they were just friends.

20   Q    You met him through her?

21   A    Yes.

22   Q    Do you see Mr. Alvarez in court today?

23   A    Yes.

24   Q    Is he the man seated to my far right?

25   A    Yes.

26         MS. McKAY-McCOY:  May the record reflect the

27   witness identified the defendant?

28         THE COURT:  Yes, the record will so reflect.

222

1    Q    When?

2    A    Oh, when?

3    Q    Thank you.

4    A    I believe the appointment was around between maybe

5    three and four in the afternoon.

6    Q    Do you remember which day of the week?

7    A    I believe it was -- I don't remember what day it was.

8    Q    Okay.  Did he agree to take the kids?

9    A    Yes, 'cause he was -- I'm sorry.

10   Q    Go ahead.

11   A    Because he was going to get Anthony and Amanda

12   something for them for their birthday because it was two or

13   three days before their birthdays.  We were going to have a

14   party for them.

15           MR. SCHROEDER:  Your Honor, I ask the mike be

16   closer.

17           THE COURT:  If you could speak into the microphone

18   it would be helpful.  Thank you.

19   Q    (BY MS. McKAY-McCOY) On this occasion did he take care

20   of all three kids or just Amanda and Anthony?

21   A    Just Amanda and Anthony.

22   Q    Did he usually just take care of Amanda and Anthony?

23   A    He was with me.  I have a sister take care of him

24   because at the time I was breast feeding and Junior was too

25   little for him to watch.  That's why he didn't go with him.

26   Q    This occasion around the time you had your wisdom teeth

27   out, how long were Amanda and Anthony with him?

28   A    He had took them, I believe he picked them up the night

223

1   before my appointment.

2   Q    And how long did he keep them?

3   A    He was supposed to bring them back that day.  When he

4   had called, I could barely talk on the phone 'cause my mouth

5   was really swollen, both sides, because I had four taken

6   out, the two top and two bottom.  And he was like, I can't

7   understand a word you're saying.  I started laughing, I'm in

8   too much pain, I can't tell.  He said, okay.  I'll do a

9   favor, I will bring them back tomorrow because then they're

10  going to be running around the house getting into things.

11  This way you don't have to get after them, you just have to

12  deal with Junior.  But Junior at that time didn't even talk

13  'cause he was still little.

14  Q    When Amanda and Anthony went away with Mr. Alvarez on

15  this occasion when you had your teeth out, did they have any

16  unusual bruises or bumps or abrasions before they left?

17  A    No.

18  Q    Do you remember if they had any normal childhood bumps

19  on their shins or something like that?

20  A    I believe Amanda had like a little scar on her forehead

21  from when she fell off her bike when she was two.

22  Q    Apart from that?

23  A    No.

24  Q    When did Amanda and Anthony return with Mr. Alvarez?

25  A    They returned the next day after my appointment.  I

26  believe it was between five and six.

27  Q    Who brought them?

28  A    Angel did, he brought them home.

224

1    Q   Did you notice anything unusual about Anthony when you

2    came in?

3    A   I had noticed that his eyes were really red and sore.

4    He had burns around the eyes.

5    Q   I would like to ask you first about his eyeballs and

6    then about the skin around his eyes.  Were his eyeballs red?

7    A   I believe they were a little red.  They looked a little

8    irritated but I was mainly concerned around his eyes right

9    here.

10    Q   What did you see on the skin around his eyes?

11    A   It looked like it was burned.

12    Q   In what way?

13    A   Like the skin came off.  They were really pink and

14    white like the skin was peeling, and he had a whole bunch,

15    like I don't know if it was Vaseline or ointment around his

16    eyes.

17    Q   Was it around both eyes?

18    A   Excuse me?

19    Q   Was it around both eyes?

20    A   Both eyes.

21    Q   Did you ask what happened?

22    A   Exactly.

23    Q   What did Anthony say?

24    A   He said that Angel had put chili in his eyes.

25    Q   What did the defendant say?

26    A   He said -- he told him that he didn't put chili in his

27    eyes and stop lying.

28    Q   How did you deal with these two different explanations?

1    A      At first I was mad because I was like, what happened to
2    my child, why -- what's wrong with his eyes. But then I
3    was -- I knew that, you know, I didn't think that nothing
4    bad would happen. I just thought maybe it was an accident
5    or something had happened to him. That's about it.
6    Q      What was your reaction to Anthony saying it's not an
7    accident, Angel put chilis in his eyes?
8    A      I told him: What do you mean he put chili in your
9    eyes? He wouldn't directly put chili in your eyes. You
10   must have got chili or something. And me and Anthony were
11   arguing back and forth, and that's when Angel got mad and he
12   said: I'm not watching your kids anymore. He doesn't know
13   how to behave. I told him not to grab the chili at the
14   restaurant and he got it on his hands and he rubbed his eyes
15   and started crying. And he said he had to take him to the
16   rest room and wash his eyes out with water, and that's when
17   they got irritated like that.
18   Q      So you were arguing with your son Anthony?
19   A      And Angel at the same time back and forth.
20   Q      How did the argument end?
21   A      Angel left mad. I told him, I said, you know, if you
22   don't know how to take care of them or apparently you
23   weren't watching them, you don't have to watch my kids
24   anymore. And he was saying: I don't want to watch them
25   anyway. And we started arguing back and forth and we left.
26   Q      After he left, did you talk to the kids?
27   A      Yes.
28   Q      Did Anthony tell you anything?

226

1   A    He just said that he wasn't lying, he was telling the
2   truth.
3   Q    Did Amanda say anything?
4   A    Amanda didn't say anything.  I asked her and she didn't
5   want to talk about it.  She said: I don't know, I'm not
6   saying anything.  Every time I asked her she just didn't say
7   anything.
8   Q    In your experience with her, was that unusual behavior
9   for her?
10  A    No.
11          MR. SCHROEDER:  Your Honor, I'm going to object to
12  that as vague.  I also -- also it's not relevant, it's too
13  general.
14          THE COURT:  I'll sustain the objection.
15  Q    (BY MS. McKAY-McCOY) What were your plans for treating
16  Anthony?  Did you put ointment on it or what did you do?
17  A    No, I asked Angel what's the stuff around his eyes.  He
18  said he put some type of Vaseline around his eye so Anthony
19  wouldn't irritate it anymore.
20  Q    That who had put it?
21  A    That Angel had put it on his eyes.
22  Q    What treatment, if any, did you give?
23  A    I left it alone, and I told him I was going to take him
24  to the doctor in the morning because, you know, they looked
25  really bad.
26  Q    What time of evening was this?
27  A    This was around -- it was already like seven o'clock.
28  Q    Did you give them a bath that night?

227

| 1 | A | Yes, I did, before they went to sleep. |
| 2 | Q | Is that their normal routine? |
| 3 | A | Uh-huh, yes. |
| 4 | Q | Which one did you bathe first; do you recall? |
| 5 | A | I believe I bathed the baby first. |
| 6 | Q | Junior? |
| 7 | A | Junior first. |
| 8 | Q | And in your routine, who do you bathe after Junior? |
| 9 | A | Amanda and Anthony. |

10  Q   When you bathed Anthony, did you notice any injuries or
11     marks apart from the ones around his eyes?
12  A   I believe it was a bruise.  I'm not sure if it was on
13     his back or on his thigh.
14  Q   Did you ask him about it?
15  A   Yes, I asked him.
16  Q   And what did he respond?
17  A   He said that Angel had spanked him because he didn't
18     behave.
19  Q   Did he say in what way he hadn't behaved?
20  A   No, I think it was because of the chili, about the
21     chili in the eyes.  I'm not even sure, I don't remember.
22  Q   Did Anthony make any other statements to you while you
23     were bathing him about him and Angel?
24  A   No, just that he didn't want to go with him anymore.
25  Q   What was your response?
26  A   I told him, okay, he didn't have to go.
27  Q   When you bathed Amanda, did you notice any unusual
28     marks?

1    A    I noticed what I thought was dirt on her cheeks. I
2    tried to wash it off with the washcloth but it was two
3    bruises.
4    Q    What were the two bruises, where on the face?
5    A    On her cheeks right here. Not the dimple area but
6    right here in the middle of her cheek.
7    Q    In the middle of her cheeks?
8    A    Yeah, like when you squeeze someone's cheeks like this.
9    Q    When they didn't wash off, did you ask her about that?
10   A    I asked her and she said, oh, because he squeezes my
11   checks too hard.
12   Q    He meaning who?
13   A    Angel.
14   Q    Did you notice any other bruises or marks on her?
15   A    She had a bruise on her thigh. I'm not sure what side
16   it was.
17   Q    Did you ask her about that?
18   A    Yes, but she said she didn't know how it got there.
19   Q    Did she make any statements to you concerning the
20   defendant while you were bathing her?
21   A    Yes, she did.
22   Q    How did that happen?
23   A    I had told her to wash up her private area, and she had
24   started to washing up with soap and she had complained that
25   it was burned -- it was irritating her. And I had asked
26   her, I said: What's wrong? And she said: Well, sometimes
27   when Angel gives me a bath or a shower, he'll stick his
28   fingers up, I guess, she said to wash her real good on the

1    inside.  And I was like, what?  She says:  I guess 'cause he

2    had long fingernails or something or maybe it scratched her

3    in the inside of her private part.

4    Q    What was your reaction?

5    A    I was just like shocked, I was stuck.  I didn't know

6    what to say, I was just like oh.

7    Q    Did she make any other statements to you concerning

8    Angel while you were bathing her?

9    A    No, that's all she said.

10   Q    When you finished bathing the children, what did you do

11   next?

12   A    I called -- I believe I called the police department.

13   Q    The Oakland Police Department?

14   A    Uh-huh.

15   Q    You were in Oakland at the time?

16   A    Yes, I was living in Oakland at the time.

17   Q    Why did you call the police?

18   A    For the statements that she had said about him washing

19   her up with the soap and for the bruises right here on her

20   cheek.

21   Q    Did a uniformed officer come out?

22   A    Yes, he did.

23   Q    More than one?

24   A    I believe only one came.

25   Q    Man, woman?

26   A    He was a man.

27   Q    Did he talk to the kids?

28   A    Yes, he did.

1    them into the bed, I tucked them -- tucked them in the bed.

2    Q    Did you talk to them about talking to the police?

3    A    Yes, I did.

4    Q    What did you tell them?

5    A    I had asked them why they didn't tell me sooner what

6    was going on and they said that they were scared.

7    Q    Did both Amanda and Anthony tell you that?

8    A    No, Amanda did.

9    Q    What did Anthony say, do you recall?

10   A    He just said he didn't want to go with Angel anymore.

11   Q    This was as you were tucking them into bed?

12   A    Yes.

13   Q    Did you tell them anything else?

14   A    I told them that everything would be okay, and I tucked

15   them into the bed and I gave them a kiss.  And I told them

16   thanks for telling what had happened and that nothing like

17   that would ever happen to them again.

18   Q    At that time did they sleep in separate rooms?

19   A    No, they slept in the same room.

20   Q    Did they have bunk beds or side by side beds or what?

21   A    They had bunk beds.

22   Q    Who slept on top, Amanda or Anthony?

23   A    Anthony.

24   Q    When you tucked Anthony into bed in the top part of the

25   bunk bed, did he say anything to you?

26   A    Actually they didn't want to sleep apart, they wanted

27   to sleep together.

28   Q    That night?

236

1   A   Uh-huh.

2   Q   Did you allow them to sleep in the same bed?

3   A   Yes, I did.

4   Q   As you tucked Anthony into bed, did he say anything to

5   you?

6   A   No, he just said that he loved me and that he wasn't

7   going to be scared 'cause he knows that there's -- I

8   wouldn't let him, Angel, come around the kids anymore.

9   Q   As you tucked Amanda into bed, did she say anything to

10  you?

11  A   She said that she was scared but I told her it was

12  okay, that he wasn't going to touch her or anything.  Not

13  that he wasn't going to touch her but he wasn't going to be

14  able to come around and visit them anymore.  And I told her

15  thank you for telling me and that if she ever had anything

16  to tell me --

17  Q   If she ever had any what?

18  A   If she had anything, you know, ever to tell me that she

19  could go ahead and tell me and I wouldn't be mad 'cause she

20  had said that he was -- she had said that that he had said

21  that if I had ever told that they had got spanked or

22  anything that it would be my fault, and she was scared that

23  they were going to take them away from me, I guess, the

24  police.

25  Q   Did you try to reassure her?

26  A   I told her everything was going to be fine, that they

27  would never take them away from me 'cause, you know, that it

28  would be all right.  And she had said that she didn't really

237

1    tell me I guess everything that was going on.

2    Q    Do you remember as close as you can what she told you?

3    A    I think she said something that she had said that she

4    didn't tell me that he had -- that he -- made her.

5              THE COURT:  Take your time.

6              THE WITNESS:  That she had -- that he had made her

7    drink his pee-pee milk.

8    Q    (BY MS. McKAY-McCOY) When she said the word milk, what

9    was your reaction?

10   A    I was like -- I said what?  What do you mean he made

11   you drink his pee-pee milk, 'cause I just didn't understand.

12   And she said, you know, that it's white stuff that comes out

13   of his pee pee.

14   Q    What was your reaction?

15   A    I didn't know what to say.  I was -- I just started

16   crying 'cause she doesn't know about that.  So then I told

17   her it would be okay and I gave her a hug and I called the

18   police again and they came out to the house.

19   Q    Was it the same officer?

20   A    It was the same officer that came and another officer

21   came later.

22   Q    Another officer or San Jose officer?

23   A    They were Oakland officers.

24   Q    Did they talk to the kids -- well, the first officer,

25   the one who came first, and when he returned did he talk to

26   the kids again?

27   A    Yes, he did.

28   Q    Were you again asked by him to leave?

238

1    A    Yes, I went into the living room and he pulled Amanda

2    to the dining room.

3    Q    Could you hear what the kids were telling him in the

4    dining room as you were in the living room?

5    A    No.

6    Q    Did he again ask you to join them?

7    A    Yes, he asked me to tell him what Amanda had said.

8    Q    Was that while Amanda was there?

9    A    No, he had sent the kids into the room.  He told them

10   to get their clothes and get dressed.

11   Q    So as the kids are in the room getting clothes and

12   getting dressed, you're talking to the officer?

13   A    Yes.

14   Q    And the officer asked you what Amanda told you?

15   A    Yes.

16   Q    Did you tell him what Amanda told you?

17   A    Yes.

18   Q    After that did you and the kids and the officer all

19   talk together?

20   A    I don't believe we did.

21   Q    What happened then?

22   A    I believe the San Jose police officer had called the

23   Oakland police and they said that they had wanted to take

24   over the investigation and they wanted us transported to San

25   Jose immediately.  So they told me to get the kids ready and

26   they transported us to San Jose.

27   Q    Who took you to San Jose?

28   A    A police officer.

JOAN E. SCHAFER, CSR NO. 6053

1   A   I think for about a day and a half, then they sent us
2   home.
3   Q   How did you get home?
4   A   They gave me a bus ticket and I took the Greyhound and
5   then I took a cab when I went home.
6   Q   After Amanda first told you about this, after you -- I
7   take it you were initially quite surprised?
8   A   Uh-huh.
9   Q   Did you try to question her or find out from her what
10  had happened maybe in more detail?
11  A   Yes, I did but she really didn't want to talk about it.
12  Q   Where was that?
13  A   At home.
14  Q   Did she try to -- when she was willing to talk to you?
15  Did she try to explain to you what happened or demonstrate
16  what happened?
17          MR. SCHROEDER:   Objection, Your Honor; assumes
18  facts not in evidence.
19          THE COURT:   Overruled.
20  Q   (BY MS. McKAY-McCOY) Do you understand the question?
21  A   Yes, I do.  I had asked her what had happened and
22  she -- she has a lot of Barbie dolls and I told her to show
23  me what he did with the Barbies.  So we got a girl and boy
24  Barbie and she showed me what he did.  I believe she showed
25  the detectives that were doing the interview with her, I
26  think she might have showed them too because they had
27  Barbies and they were playing.
28  Q   Where did she talk to you about the Barbies, was that

1   at home?

2   A    That was at home.

3   Q    Was that before you were taken to San Jose?

4   A    No, that was afterwards, after everything was already

5   over and they did the interview.

6   Q    What did she demonstrate for you with the Barbie?

7   A    The girl Barbie, I guess the mouth was on the male

8   Barbie's penis and the boy Barbie would lay on top of the

9   girl Barbie and move up and down, and the boy Barbie's mouth

10  would go to the girl Barbie's vagina.

11  Q    When Amanda was demonstrating this for you, what was

12  your reaction?

13               MR. SCHROEDER:  Objection.

14               THE COURT:  Grounds?

15               MR. SCHROEDER:  Relevance.

16               THE COURT:  Sustained.

17  Q    (BY MS. McKAY-McCOY) How would you describe her

18  demeanor?  Was she happy, sad?  How would you describe her?

19  A    She was uncomfortable and she really didn't want to

20  show me.

21  Q    Is it you that asked her to show you with the Barbie

22  dolls?

23  A    Yes, I did.

24  Q    Have you talked about it since then occasionally with

25  her?

26  A    Sometimes we talk about it 'cause I had asked her, you

27  know, if you ever want to talk to me about something you can

28  talk to me.  And she says, no, it's okay, I really don't

246

1   Q   And his nickname is Nots, right?

2   A   Yes.

3   Q   And when you were discussing this about Angel taking

4   you to visit him, to visit Nots, were you married at that

5   time?

6   A   No, I wasn't.

7   Q   You referred to him as your husband, that's why I was

8   asking.

9   A   No, I wasn't married back then.

10  Q   Did you -- so did he take you over to visit your

11  husband or --

12  A   Yes, he did.

13  Q   I'm going to refer to him as your husband because

14  you're married now.

15  A   Yes.

16  Q   So he took you over to visit him?

17  A   Yes, he did.

18  Q   And do you remember where that was?

19  A   It was either in -- it might have been Santa Rita,

20  Dublin.

21  Q   You don't remember going to Jamestown or someplace

22  quite far away?

23  A   Yes, he took me to Jamestown.

24  Q   No, I'm sorry, I'm just talking about the first time.

25  A   No, I think the first time it was either Santa Rita or

26  North County.  It was probably Santa Rita because buses

27  don't go out that way.

28  Q   You're saying he took you there.  Are you saying the

271

1   Q   But you didn't say that's not true?

2   A   No, I didn't say that's not true.

3   Q   And that was because you needed to be on that lease,

4   right?

5   A   I needed to be on the lease to have access to the

6   storage because I didn't have my I.D.

7   Q   So saying you were his wife made it mean you could do

8   that?

9   A   He said it, I didn't.

10  Q   But you had asked him to come over there and help you

11  get this all set up, hadn't you?

12  A   What do you mean?

13  Q   Get set up with the storage unit in Modesto?

14  A   No, I asked him if he could give me a ride out there so

15  I could get a storage for myself.

16  Q   You're saying when you got over there you didn't have

17  your purse.  You had gone over just for the purpose of

18  getting a unit and you didn't have any identification?

19  A   I went all way out there, I left my I.D. at home but I

20  had everything else with me.

21  Q   So you're saying that there was absolutely no

22  indication on your part that you kind of were interested in

23  having a relationship with Angel, he just did all of these

24  errands and took you to these places a long way away like

25  Modesto, just did it as a favor and that was it?

26  A   Yeah, he was my best friend.

27  Q   Now, then, going back to talking to Amanda that night

28  when you called the police, do you need a second?

1    another possible source, we should be able to go into that

2    to raise that point.  That's the reason I'm raising the

3    issue.

4        I think it doesn't matter, it could have been two

5    molests from two different people.  That's a decision for

6    the jury to make.  Submitted.

7        THE COURT:  The difficulty that the Court has with

8    this matter is the timeliness of the motion.  We had in

9    limine motions at the beginning before evidence was

10   presented.  Clearly this evidence was known to you,

11   Mr. Schroeder.  And the complaining witness, Amanda, has

12   already testified in this matter.

13       Now, she's nine years old now.  She was I guess

14   six years old at the time of this event.  And it seems to me

15   that one of the concerns that the Court should be

16   addressing, and one of the issues that the Court must be

17   concerned about is the traumatic effect of the experience of

18   testifying before the Court on the minor in this case.

19       In the Court's mind if this issue had been raised

20   in a timely fashion, the child would have been able to

21   address these issues on the day that she actually appeared

22   here in court, and would have been spared the trauma of

23   coming back at another time to take the witness stand.

24   She's now off the witness stand and back in her home in

25   Oakland, and the Court is very reluctant to have her come

26   back to face these issues and to retake the witness stand.

27       That being said, the other issue that concerns me

28   is that indicia of credibility of the proffered testimony.

1   numerous reasons as to why you didn't think it was a good
2   motion in the first place. So what I'm trying to clarify
3   for the record is whether you're making the ruling based
4   upon -- you're saying that I wasn't timely in raising the
5   issue versus effectively the merits of the issue itself
6   because my position would be --

7           THE COURT:  I think I also addressed the merits,
8   Mr. Schroeder.

9           MR. SCHROEDER:  That's what I want clear for the
10  record. If the Court is saying even if I raised this issue
11  at the time that you say that I should have raised it, I
12  mean the merits still would have been there.

13          THE COURT:  The Court believes that the merits are
14  not there.

15          MR. SCHROEDER:  That's what I'm trying to clarify.

16          THE COURT:  Yes.

17          MR. SCHROEDER:  Even if I raised the issue in
18  limine, you still would have ruled against me based upon
19  what you've elucidated here just now.

20          THE COURT:  I think the issue is clearer to the
21  court at this point because of the timeliness or lack
22  thereof of the motion.

23          MR. SCHROEDER:  I'm not trying to belabor the
24  point, Your Honor, but I think it matters in any kind of
25  appeal issue because what the Court is saying your position
26  is, I didn't raise it in a timely fashion, which I don't
27  believe to be the case.

28          THE COURT:  Mr. Schroeder, I'm really not

474

1    reopening this for argument.
2            MR. SCHROEDER:  I'm not arguing for the Court, I'm
3    trying to get the record made with respect to this.
4            MR. SCHROEDER:  Thank you.
5            THE COURT:  Do you have any response?
6            MS. McKAY-McCOY:  No, submitted.  Thank you.
7            THE COURT:  I'm going to deny the request for the
8    reasons stated under 782.
9            THE DEFENDANT:  Do I have any right to a defense?
10           THE COURT:  For the reasons that I've indicated,
11   and that will conclude this matter.
12           The court will be in recess.  We'll ask the jury
13   to come up.
14           (Whereupon, a brief recess was taken.)
15           THE COURT:  The Court will return to the matter of
16   People versus Angel Alvarez.  The record should reflect the
17   defendant is present in court with his attorney.  The People
18   are present.  The jury is present with two alternates.
19           Good morning.  And the record would show Mr. Anam
20   has been returned to the witness stand.
21           Mr. Schroeder, if you would like to continue your
22   examination.
23           MR. SCHROEDER:  Thank you, Your Honor.
24                  **DIRECT EXAMINATION (CONTINUED)**
25   Q    (BY MR. SCHROEDER)  Mr. Anam, yesterday I asked you
26   about going to the motel in Newark.
27   A    Yes.
28   Q    Do you recall that?

1    children at the flower shop because it's so close to the
2    street because it's close to a parking lot. I always tend
3    to tell them not to run around. They like to run around,
4    they like to chase each other.
5        There's also a lot of, I don't know what you call it, I
6    should have brought some, they're white rocks used as a
7    decorative thing on the floor, it surrounds the flower shop.
8    If you step on these rocks, you can slip and fall. And the
9    children were constantly slipping and falling, but these are
10   tough little kids, they just stand up and keep running.
11   Q   Now, did you try to get them to stop running around?
12   A   Yes, I did. This particular weekend Ruby had
13   specifically told them -- I don't know if I should quote her
14   or not, because maybe that's hearsay. I don't know. But
15   she -- I told her: I can't control the kids at the flower
16   shop. She said: Just grab your belt and whup their asses.
17   I go: I'm not their dad. So what, they got to respect you.
18   Grab your belt and whup their asses.
19   Q   Did you give them a spanking at the flower shop on this
20   Saturday we're talking about?
21   A   Yes, I did.
22   Q   Could you describe how -- first of all, how did it come
23   up that you decided to do it?
24   A   I remember some events happening that weekend, I can't
25   really place which day they happened. Most of the weekends
26   were all the same to me. I know I had spanked Amanda for
27   spitting in her soup as kind of her way of telling me she's
28   not going to eat it because she wanted something else. And

508

1    I had grabbed my belt and I spanked her.  I also had spanked

2    Anthony for playing with scissors.  It was during the time I

3    was making a sale to a lady.  Amanda was assisting me.  He

4    ran into the shop, momentarily grabbed the scissors and was

5    playing with them.

6    Q    Okay.

7              MR. SCHROEDER:  I'm going to ask these be marked

8    defense next in order, I think it's B.

9              THE CLERK:  C.

10             THE COURT:  C.

11             MR. SCHROEDER:  C, I'm sorry.

12        (Whereupon, Defendant's Exhibit No. C was marked for

13   identification only.)

14   Q    (BY MR. SCHROEDER) I'm going to show you what's been

15   marked Defense C.  Do you recognize those scissor -- they're

16   obviously scissors; do you recognize them?

17   A    Yes.

18   Q    And where are those from?

19   A    From the flower shop.

20   Q    Now, you said you had a problem, you started to make

21   reference to a problem with Anthony with scissors.  What

22   specifically happened with that?

23   A    He would watch me use the scissors frequently.  I

24   needed the scissors to cut cellophane wrap to wrap the

25   flowers.  Being a child in his exploratory stage, he likes

26   to imitate adults.  He would grab the scissors and try to

27   cut cellophane with them or other objects.

28   Q    Okay.  Now, did you express any concern to him about

509

1   his playing with the scissors?

2   A    Yes, I did.

3   Q    What did you say?

4   A    On that particular time when the lady came to purchase

5   the flowers, she had given me the change and the money back.

6   I turned around to go to the register to place them in the

7   register and I found him cutting little pieces of string

8   from his jeans in his crotch area.  There were little -- I

9   guess the jeans were worn out.  For instance, little pieces

10  of string coming out and he was attempting to cut them with

11  the scissors.

12  Q    Did that alarm you?

13  A    Yes, it did.

14  Q    What did you do?

15  A    I yelled:  Well, Anthony what are you doing?  And when

16  he looked up, I -- I don't know if he was playing with me

17  but he says I have scissors and he was doing this with them,

18  opening them and they were getting very close to his face.

19  Q    So what did you do?

20  A    I grabbed his hand, yanked the scissors out and put --

21  actually I dropped the money.  I sat him down, put the

22  scissors back up because we have some little nails that we

23  put the scissors up there.  This one was left on the table

24  after I had cut the cellophane.  I grabbed my belt and

25  spanked him twice and told him not to play with the

26  scissors.  That was the last time I told him.

27  Q    The belt you refer to, was that something you were

28  wearing at that time?

517

1    We'll be in recess until five minutes past eleven.

2    (Whereupon, the mid-morning recess was taken.)

3    THE COURT:  The Court will return to the matter of

4    People versus Angel Alvarez.  The record should reflect the

5    defendant is present in court with his attorney.  The People

6    are present.  And the jury with two alternates are also

7    present.

8    I'll ask Mr. Alvarez to return to the witness

9    stand.

10    And, Mr. Schroeder, if you would like to continue

11    your direct examination.

12    MR. SCHROEDER:  Thank you, Your Honor.

13    Q   (BY MR. SCHROEDER) Okay.  Now, before we took the

14    break, you had earlier described Anthony playing with the

15    scissors?

16    A   Yes.

17    Q   Do you remember looking back on that time, do you

18    remember specifically which day he did that?

19    A   No.

20    Q   So is it fair to say you basically just remember it

21    happening, you don't remember which day?

22    A   I remember it happening that weekend, Saturday or

23    Sunday.

24    Q   And in terms of the spanking that you just described to

25    us earlier, do you remember which day that occurred on?

26    A   It occurred when he played with the scissors.

27    Q   So therefore you don't know which day specifically?

28    A   No, but I'm sure it's that weekend.

536

1    A    No.

2    Q    Now, as I understand it then from what we've already

3    heard, the next day you were awakened by Mr. Ejaz knocking

4    on the door of the motel?

5    A    More like pounding.

6    Q    Once you were awakened and he was there, how long do

7    you think it was till you left with the children to go to

8    Oakland?

9    A    Within a few minutes.  I realized this was an important

10   shipment for him.  He had to go to South Korea.  So I woke

11   up the kids, woke them and placed them in the van where the

12   blankets were, turned in the key, got in the van, took off.

13   I would say ten minutes.

14   Q    Did you get ahold of Ruby before you left the motel?

15   A    No.

16   Q    So you didn't know one way or the other whether she was

17   there when you were heading up to Oakland?

18   A    I was hoping she was going to be home.

19   Q    But you didn't know?

20   A    Didn't know.

21   Q    So now, were you able to drive in the diamond lane

22   because you had the children?

23   A    Yeah.

24   Q    About what time roughly would you say you got to

25   Oakland?

26   A    Around 8:20.

27   Q    And once you arrived there, did you -- did you meet

28   with Ruby at that time?

1    A    Yes, knocked on the door, Ruby opened the door.

2    Q    Okay. And once you saw her, did you get into any kind

3    of an argument with her?

4    A    Yeah. There were a few issues that I wanted to clear

5    up with you. First of all, where were you last night, I

6    tried to get ahold of you. We talked about that and --

7    Q    Did you in any way express feelings about your

8    involvement with the kids and what your feelings were with

9    the way you were being treated by her with respect to that?

10   A    Yes, I told her, you know I missed a class last night

11   because of you, these kids. I've done a lot of things for

12   you guys and you still on top of that you go and marry this

13   guy. And she got angry. She said: How do you know that?

14   She glared at Amanda. Amanda tends to talk a lot. And we

15   had basically an argument about how I found out certain

16   things, an argument about the fact that she was missing that

17   previous night and I had to miss a class. And I told her:

18   I'm not going to do that anymore. The Quintanillas don't

19   want the children at the house no more, that's it. As far

20   as the $200 you want for the party this weekend, forget it

21   because this is crazy. It's getting out of hand, I ain't

22   your nanny. I'm trying to get with you, I'm not trying to

23   look for employment. I don't need this.

24   Q    How would you describe the discussion? Was it totally

25   normal tones like we're talking in here or was it argument?

26   A    No.

27        THE COURT: Let him finish the question, please.

28   Q    (BY MR. SCHROEDER) Let me finish. Okay?

584

| 1 | Q | And you reprimanded him? |

1   Q    And you reprimanded him?

2   A    Yes, I did.

3   Q    Did you tell Ruby that?

4   A    Yes, I did.

5   Q    When?

6   A    On Sunday.

7   Q    Why?

8   A    Ruby always wants to know how the kids are doing, see

9   how I'm handling them.

10  Q    What was her response when you said he was cutting

11  threads off his pants with the scissors?

12  A    Did you whup his ass.

13  Q    What was your response?

14  A    I said no.

15  Q    Did you explain to Officer Rosengren, you know, all

16  this penis thing, it's because Anthony was cutting threads

17  off his pants with scissors; did you tell Officer Rosengren

18  that?

19  A    No.

20  Q    The reason why not is?

21  A    He didn't ask.

22  Q    Had you punished either of these kids with a belt

23  before?

24  A    Not until that weekend, no.

25  Q    Had you spanked them?

26  A    Yes, I did.

27  Q    When you spanked Amanda where?

28  A    On her butt.

585

1   Q   Where were you in the van, floral shop, where?

2   A   The flower shop.

3   Q   And where was Anthony when you would spank her in the

4   flower shop?

5   A   In the restaurant.

6   Q   Did you ever make Anthony go outside and shut the door

7   and spank Amanda behind the closed door?

8   A   No.

9   Q   So there's absolutely no reason for Anthony to say that

10  Angel makes me go outside and he shuts the door and then

11  spanks Amanda?

12  A   I think you misunderstood him.  I told him to sit down,

13  wait here.  I left the restaurant and shut the door behind

14  me from the restaurant and went to the flower shop.  I

15  didn't think it was appropriate to spank a child in a public

16  restaurant.

17  Q   When you hit yourself with a belt to demonstrate for

18  us, that didn't hurt, did it?

19  A   No.

20  Q   It didn't leave a mark?

21  A   No.

22  Q   Is that exactly how hard you hit Amanda and Anthony?

23  A   Yes.

24  Q   So your testimony is you never hit Amanda or Anthony

25  hard enough to leave a mark?

26  A   That's correct.

27  Q   So there would be absolutely no reason for them to be

28  very upset because you hurt them?

616

1   Q   When was that?

2   A   A long time ago.

3   Q   What was your response?

4   A   No.

5   Q   Why?

6   A   I don't find him personally attractive.

7   Q   What was his reaction when you said no?

8   A   He would always tell me:  Oh, come on, you have a loser

9   husband and stuff like that.

10  Q   When did you marry your husband?

11  A   In July of I believe '96.

12  Q   Was he in prison at the time?

13  A   Yes, he was.

14  Q   And how did you get there to marry him?

15  A   Angel gave me a ride.

16  Q   Was he present at the ceremony?

17  A   No.

18  Q   Did you talk about it on the way home, how it went?

19  A   Yes.

20  Q   Where did you keep your marriage license?

21  A   Excuse me?

22  Q   Where do you keep your marriage license?

23  A   At my house.

24  Q   Where?

25  A   On the wall in a little picture frame.

26  Q   When did you put it up in a little picture frame?

27  A   Probably about I think a month and a half after I got

28  it.

1    UNDER OATH IN THESE PROCEEDINGS.

2            COULD YOU STATE YOUR FULL NAME AND SPELL YOUR LAST

3    NAME FOR THE RECORD?

4            THE WITNESS:  E-J-A-Z; MIDDLE INITIALS, U-L; LAST

5    NAME, A-N-A-M, ANAM.

6                    FURTHER REDIRECT EXAMINATION

7    BY MR. SCHROEDER:

8    Q    MR. ANAM, I AM GOING TO REFER YOU BACK TO THE TIME

9    THAT WE TALKED ABOUT WHEN YOU WERE ON THE STAND BEFORE,

10   RELATED TO RIGHT AROUND THE TIME THAT ANGEL WAS TAKEN INTO

11   CUSTODY, HE WAS IN JAIL?

12   A    YES.

13   Q    AND IN THE COURSE OF HIM BEING IN JAIL, DID YOU PLACE

14   ANY TELEPHONE CALLS FOR HIM?

15   A    YES.

16   Q    AND WHY DID YOU DO THAT?

17   A    BECAUSE HE COULD ONLY MAKE LOCAL CALLS FROM THERE.

18   Q    AND DID HE ASK YOU TO ASSIST HIM IN SOME WAY TO CALL

19   SOMEBODY ELSE?

20   A    YES.

21   Q    AND WHO WAS HE ASKING YOU TO CALL?

22   A    HE WAS ASKING ME TO CALL HIS FAMILY AND HIS -- THE

23   LADY NAMED RUBY.

24   Q    IN THE COURSE OF YOUR BUSINESS, DO YOU HAVE REASON TO

25   MAINTAIN YOUR -- KEEP YOUR TELEPHONE BILLS?

26   A    YES.

27   Q    IS THAT MAINLY FOR TAX PURPOSES?

28   A    YES.

1    A    A TELEPHONE BILL.

2    Q    IS THAT YOUR TELEPHONE BILL?

3    A    YES.

4    Q    AND DIRECTING YOUR ATTENTION TO THAT BILL, AS TO --

5    DOES IT REFLECT ANY CALLS MADE ON NOVEMBER 21, 1996?

6    A    YES.

7    Q    ON THAT BILL, DOES THAT IN ANY WAY INDICATE SOMETHING

8    THAT YOU RECALL HAPPENING WHEN YOU WERE MAKING TELEPHONE

9    CALLS FOR ANGEL ALVAREZ?

10   A    YES.

11   Q    WHAT DOES IT SHOW?

12   A    IT SHOWS THERE WERE FOUR CALLS MADE.

13   Q    DO YOU REMEMBER MAKING FOUR CALLS?

14   A    YES.

15   Q    CAN YOU TELL US BASICALLY WHAT HAPPENED WHEN YOU MADE

16   THE CALL -- THE FIRST THREE CALLS?

17   A    EVERY TIME I CALLED, THE PERSON ON THE OTHER SIDE HUNG

18   UP THE PHONE.

19   Q    WHEN YOU CALLED, WHO -- NOT THE PARTY THAT YOU WERE

20   CALLING, BUT WHO SPOKE WHEN YOU PLACED THE CALL FROM, IN

21   FACT, YOUR END OF THE CALL, WAS IT YOU, OR ANGEL?

22   A    ANGEL.

23   Q    ON THE FOURTH CALL, THE ONE THAT IS NUMBER 14 ON THE

24   LIST, DID YOU DO ANYTHING SPECIAL WITH RESPECT TO THE PHONE

25   CALL ON THAT FOURTH CALL?

26   A    YES.

27   Q    WHAT DID YOU DO?

28   A    I HAD ASKED, WHEN HE FINALLY CONNECTED, WHEN HE MADE

1    IT TO CONNECT THE CALL AND THEY STARTED HAVING THE

2    CONVERSATION, I ASKED ANGEL AT THAT TIME, WOULD YOU LIKE ME

3    TO GET OFF THE LINE, SO THAT WAY I CAN GO ATTEND TO MY

4    BUSINESS?  HE SAID, NO, PLEASE, STAY ON THE PHONE, BECAUSE

5    PREVIOUSLY SHE HAD HUNG UP ALREADY THREE TIMES.  SO, HE

6    SAID, PLEASE, STAY ON THE LINE, IF SHE HANGS UP, YOU CAN

7    DIAL THE PHONE NUMBER AGAIN.

8    Q    DO YOU REMEMBER, MORE OR LESS, BASICALLY WHAT

9    MR. ALVAREZ WAS SAYING IN THAT TELEPHONE CONVERSATION?

10   A    YES.

11   Q    AND WHAT WAS THE NATURE OF THAT?

12            MS. MCKAY-MCCOY:  OBJECTION.  HEARSAY.

13            MR. SCHROEDER:  NOT FOR THE TRUTH, SIMPLY THAT THE

14   STATEMENT WAS MADE.

15            THE COURT:  SUSTAIN THE OBJECTION.

16   Q    (BY MR. SCHROEDER)  WITH RESPECT TO THE PARTY ON THE

17   OTHER END, DID THAT PARTY RESPOND TO ANY OF THE THINGS THAT

18   MR. ALVAREZ SAID?

19   A    YES.

20   Q    WAS THERE ANY PARTICULAR RESPONSE THAT STICKS OUT IN

21   YOUR MIND?

22   A    YES.

23   Q    WHAT WAS THAT?  WHAT WAS SAID?

24   A    FROM THE OTHER SIDE?

25   Q    YES.  THE THING THAT STICKS OUT IN YOUR MIND, WHAT WAS

26   SAID?

27   A    SHOULD I STATE ON THE RECORD?

28   Q    YOU CAN SAY EXACTLY WHAT WAS SAID.  YOU ARE STATING

1   WHAT SOMEBODY ELSE SAID.  ARE YOU RELUCTANT TO USE THE

2   WORDS?

3   A    YES, I AM.

4   Q    AND WE NEED TO KNOW WHAT THEY ARE IN COURT.  YOU ARE

5   NOT SAYING IT YOURSELF.

6            THE COURT:  GO AHEAD AND ANSWER THE QUESTION.

7            THE WITNESS:  SHE WAS SAYING TO ANGEL, THAT, YOU

8   KNOW, YOU SHOULD NOT HAVE FUCKED WITH ME, AND THIS IS WHAT

9   YOU GET FOR MESSING WITH ME.

10  Q    (BY MR. SCHROEDER)  I NOTICE ON THE LISTING OF THE

11  PHONE BILL THAT THE -- IT SHOWS THAT THE CONVERSATION LASTED

12  EIGHT MINUTES.  DOES THAT FIT -- DO YOU HAVE A MEMORY OF

13  THERE BEING TALKING BACK AND FORTH FOR MOST OF THAT PERIOD

14  OF TIME?

15  A    NOT TOO MUCH, JUST A LITTLE BIT.

16  Q    AS FAR AS YOUR MEMORY OF IT?

17  A    YES.

18  Q    DID ANGEL IN ANY WAY SAY ANYTHING TO YOU ABOUT WHAT

19  YOU SHOULD SAY ABOUT THIS TELEPHONE CONVERSATION?

20  A    NO.

21           MR. SCHROEDER:  NO FURTHER QUESTIONS.

22           THE COURT:  CROSS EXAMINATION.

23                FURTHER RECROSS-EXAMINATION

24  BY MS. MCKAY-MCCOY:

25  Q    DID SHE SAY ANYTHING ELSE?

26  A    NO.

27  Q    YOU MEAN, THAT'S ALL SHE SAID FOR EIGHT MINUTES, OR

28  THAT'S ALL YOU REMEMBER?

1    A    NO.

2    Q    SHE DID NOT SOUND UPSET AT ALL TO YOU?

3    A    NO.

4    Q    DID THE DEFENDANT SOUND, THE TENOR OF HIS VOICE, DID

5    HE SOUND UPSET TO YOU AT ALL?

6    A    YES.

7    Q    DURING THIS EIGHT MINUTES, CAN YOU REMEMBER ANYTHING

8    ELSE THAT SHE SAID, OTHER THAN WHAT YOU HAVE ALREADY TOLD

9    US?

10    A    NO.

11    Q    NOTHING ELSE AT ALL?

12    A    NO.

13            MS. MCKAY-MCCOY:  THANK YOU.

14            THE COURT:  REDIRECT EXAMINATION, MR. SCHROEDER?

15                FURTHER REDIRECT EXAMINATION

16    BY MR. SCHROEDER:

17    Q    WHEN YOU SAY SHE DID NOT SOUND UPSET, OR SHE DID NOT

18    HAVE VERY MUCH TO SAY, DID YOU THINK THAT THE -- WHEN SHE

19    RESPONDED BY SWEARING LIKE THAT, SAYING THAT'S WHAT YOU GET

20    FOR FUCKING WITH ME, DID YOU THINK THAT SOUNDED LIKE

21    SOMEBODY WHO WAS JUST TALKING IN NORMAL --

22            MS. MCKAY-MCCOY:  OBJECTION.  SPECULATION AND

23    VAGUE.

24            THE COURT:  SUSTAINED.

25    Q    (BY MR. SCHROEDER)  DID THE FACT THAT THERE WAS STRONG

26    LANGUAGE LIKE THAT USED, DID THAT -- WHAT DID YOU THINK

27    ABOUT THAT AS FAR AS THE NATURE OF THE CONVERSATION?

28    A    SHOULD I ANSWER YES OR NO, OR EXPLAIN?

1      THE COURT:  GO AHEAD, EXPLAIN.

2      THE WITNESS:  BEING THAT I WAS ON THE PHONE AND I

3  WAS THINKING THAT THIS LADY SHOULD BE UPSET ABOUT WHAT

4  HAPPENED TO HER CHILDREN, BUT SHE DID NOT SOUND LIKE THAT,

5  WHATSOEVER.  SHE DID NOT EVEN MENTION THE CHILDREN ON THE

6  PHONE CALL.

7  Q    (BY MR. SCHROEDER)  SO, WHEN YOU SAY SHE DID NOT SOUND

8  UPSET, IS THAT REFERRING THEN TO WHAT YOU JUST SAID ABOUT

9  NOT MENTIONING THE CHILDREN?

10 A    YES.

11 Q    DID YOU THINK THAT THE RESPONSE OF, THAT'S WHAT YOU

12 GET FOR FUCKING WITH ME, SOUNDED AT ALL LIKE AN UPSET

13 RESPONSE?  I DON'T MEAN NECESSARILY THE TONE, BUT THE USE OF

14 THE PHRASE?

15     MS. MCKAY-MCCOY:  OBJECTION.  SPECULATION AND

16 VAGUE.

17     THE COURT:  SUSTAINED.

18     MR. SCHROEDER:  NO FURTHER QUESTIONS.

19              RECROSS-EXAMINATION

20 BY MS. MCKAY-MCCOY:

21 Q    WHY WERE YOU LISTENING IN?

22 A    BECAUSE HE HAD ASKED ME TO STAY ON THE PHONE.

23 Q    DID YOU INTRODUCE YOURSELF TO HER, OR EAVESDROP?

24 A    NO, SHE KNEW I WAS ON THE PHONE.

25     MR. SCHROEDER:  OBJECTION TO THE USE OF THE WORD,

26 "EAVESDROP."

27     THE COURT:  OBJECTION OVERRULED.  I THINK IT IS

28 USED IN NORMAL PARLANCE.  GO AHEAD.

1    Q    (BY MS. MCKAY-MCCOY)  DID YOU TELL HER THAT YOU WERE

2  ON THE LINE?

3    A    SHE HEARD ME ON THE PHONE WHILE I WAS TALKING.

4    Q    DID YOU TELL HER THAT YOU WERE ON THE LINE?

5    A    NO, I DID NOT TELL HER.  I DID NOT HAVE A CONVERSATION

6  WITH HER WHATSOEVER.

7    Q    DID YOU TELL HER WHO YOU WERE?

8    A    NO.

9    Q    YOU SIMPLY SPOKE TO ANGEL AFTER SHE PICKED UP THE

10  PHONE?

11    A    NO, ANGEL STARTED THE CONVERSATION.

12    Q    DID YOU JOIN THE CONVERSATION?

13    A    TO INTERRUPT ANGEL, SAYING, I AM GOING TO GET OFF THE

14  LINE RIGHT NOW SO YOU GUYS CAN TALK.

15    Q    BUT YOU DID NOT GET OFF THE PHONE?

16    A    BECAUSE HE ASKED ME NOT TO.

17    Q    WHY WOULD YOU SAY, I AM GETTING OFF THE LINE SO YOU

18  GUYS CAN TALK?

19    A    NO, LIKE PUTTING THE PHONE DOWN AND WALKING AWAY,

20  BECAUSE I AM THE ONE CONNECTING THE CALLS.

21    Q    DID YOU PUT THE PHONE DOWN AND WALK AWAY?

22    A    NO, BECAUSE I ASKED HIM FIRST, I AM GOING TO DO THAT,

23  SO YOU GUYS CAN TALK, AND HE ASKED ME NOT TO.

24    Q    WHAT DID YOU SAY ON THE LINE AFTER THE WOMAN PICKED UP

25  THE PHONE?

26    A    I DID NOT SAY NOTHING.

27    Q    IF YOU DID NOT SAY ANYTHING, HOW WOULD SHE KNOW THAT

28  YOU WERE ON THE LINE LISTENING IN?

1    LISTENING IN TO SOMEBODY ELSE'S CONVERSATION?

2    A    NO, BECAUSE I KNEW THE CONVERSATION WOULD NOT LAST

3    LONG, BECAUSE SHE HAD ALREADY PREVIOUSLY HUNG UP THREE

4    TIMES.

5    Q    WHY WERE YOU WILLING TO DO THIS FAVOR FOR THE

6    DEFENDANT?

7    A    BECAUSE HE CANNOT MAKE LONG DISTANCE CALLS FROM THERE.

8         MS. MCKAY-MCCOY:  THANK YOU.  NOTHING FURTHER.

9                   FURTHER REDIRECT EXAMINATION

10   BY MR. SCHROEDER:

11   Q    ONE QUESTION.  WERE THERE ANY FEMALES AT YOUR

12   RESIDENCE THAT SPOKE ON THE TELEPHONE?

13   A    NO.

14   Q    WERE THERE ANY FEMALES AT YOUR RESIDENCE AT ALL WHEN

15   THESE CALLS WERE BEING MADE?

16   A    NO.

17         MR. SCHROEDER:  THANK YOU.  NO FURTHER QUESTIONS.

18         THE COURT:  MS. MC COY?

19         MS. MCKAY-MCCOY:  THANK YOU, NO.

20         THE COURT:  COUNSEL, COULD YOU APPROACH AND BRING

21   THAT EXHIBIT?

22         (WHEREUPON, THE ATTORNEYS APPROACH THE BENCH AND A

23   DISCUSSION WAS HAD.)

24         THE COURT:  YOU MAY STEP DOWN.  THANK YOU.  MAY

25   THE WITNESS BE EXCUSED?

26         MR. SCHROEDER:  YES.

27         MS. MCKAY-MCCOY:  YES.

28         THE COURT:  MY UNDERSTANDING IS THAT THE DEFENSE

1    EVIDENCE OUTSIDE OF THE COURTROOM.

2              COURT WILL BE IN RECESS.  THANK YOU.

3         (RECESS.)

4              THE COURT:  COURT WILL RETURN TO THE MATTER OF THE

5    PEOPLE VERSUS ANGEL ALVAREZ.  RECORD SHOULD REFLECT THE

6    DEFENDANT IS PRESENT IN COURT, WITH HIS ATTORNEY, AND THE

7    PEOPLE ARE PRESENT.  THE JURY IS PRESENT, WITH THE TWO

8    ALTERNATES.

9              WE DO HAVE A COUPLE STIPULATIONS THAT NEED TO BE

10   READ INTO THE RECORD.  AS YOU WILL RECALL, STIPULATIONS ARE

11   AGREEMENTS BETWEEN THE ATTORNEYS THAT YOU ARE TO ACCEPT AS

12   HAVING BEEN CONCLUSIVELY PROVEN IN THIS TRIAL.

13             MR. SCHROEDER.

14             MR. SCHROEDER:  YES, YOUR HONOR.  BEFORE I READ

15   THAT, I DID NOT MOVE IN DEFENSE H, PHONE RECORDS, IN

16   EVIDENCE.  THEY WERE MARKED, BUT NOT MOVED IN.

17             MS. MCKAY-MCCOY:  NO OBJECTION.

18             THE COURT:  ALL RIGHT.  H IS ADMITTED IN EVIDENCE

19             (DEFENSE EXHIBIT H, RECEIVED IN EVIDENCE.)

20             MR. SCHROEDER:  FIRST STIPULATION I WILL READ IS

21   THE ONE I MADE A MISTAKE ON YESTERDAY.  THAT IS THE

22   FOLLOWING; FROM NOVEMBER 20, 1996, UNTIL JANUARY 29, 1997,

23   ANGEL ALVAREZ WAS IN CUSTODY IN SANTA CLARA COUNTY JAIL.

24             DURING THAT TIME HE WAS UNDER THE CARE OF THE JAIL

25   MEDICAL STAFF.  HE WAS SEEN BY THE STAFF ON NINE OCCASIONS.

26   ANY PERSON INCARCERATED IN THE SANTA CLARA COUNTY JAIL HAS

27   THE SANTA CLARA VALLEY MEDICAL CENTER FOR MEDICAL CARE WHEN

28   NEEDED.

1    DURING THE TIME OF INCARCERATION SAID MEDICAL

2    RECORDS CONTAINED NO REPORT BY ANGEL ALVAREZ, OR THE VALLEY

3    MEDICAL CENTER STAFF, OF PHYSICAL SYMPTOMS OF ANY KIND.

4    THE SECOND STIPULATION IS, PURSUANT TO

5    INVESTIGATION OF THIS CASE, SAN JOSE POLICE DEPARTMENT

6    SEIZED VARIOUS ITEMS FROM ANGEL ALVAREZ'S VAN.  INCLUDED ARE

7    ITEMS THAT HAVE BEEN MARKED AS DEFENSE EXHIBITS D, E, F AND

8    G.  THESE ITEMS HAVE CONTINUOUSLY REMAINED IN POLICE CUSTODY

9    SINCE THEIR SEIZURE BY THE POLICE AFTER ANGEL ALVAREZ'S

10   ARREST.

11   ON APRIL 15, 1997, CRIMINALIST, KATHY BENJAMIN, OF

12   THE SANTA CLARA CRIME LABORATORY, EXAMINED DEFENSE EXHIBIT

13   G, THE UNDERWEAR, AND DEFENSE EXHIBIT E, THE DINOSAUR

14   SLEEPING BAG, AND DID NOT DETECT THE PRESENCE OF SEMEN.

15   THANK YOU, YOUR HONOR.

16   THE COURT:  ALL RIGHT, VERY WELL.

17   LADIES AND GENTLEMEN, I AM GOING TO INSTRUCT YOU

18   ON THE LAW THAT APPLIES TO THIS CASE, AND YOU HAVE BEEN

19   PROVIDED WITH COPIES OF THE JURY INSTRUCTIONS.

20   BEFORE I START READING THESE INSTRUCTIONS, LET ME

21   JUST INDICATE TO YOU THAT THE INSTRUCTIONS I AM GIVING TO

22   YOU HAVE BEEN PROVIDED TO YOU IN WRITTEN FORM FOR YOUR

23   DELIBERATIONS.  YOU MAY TAKE NOTES ON THE INSTRUCTION'S

24   FORM.  THEY MAY NOT LEAVE THE COURTHOUSE.  YOU MAY NOT TAKE

25   THEM HOME AT NIGHT AND STUDY THEM.

26   YOU WILL FIND THAT THE INSTRUCTIONS MAY BE TYPED,

27   PRINTED OR HANDWRITTEN.  PORTIONS MAY HAVE BEEN ADDED OR

28   DELETED.  YOU MUST DISREGARD ANY DELETED PART OF AN

1    THE TERM FORCE MEANS PHYSICAL FORCE THAT IS

2    SUBSTANTIALLY DIFFERENT FROM OR SUBSTANTIALLY GREATER THAN

3    THAT NECESSARY TO ACCOMPLISH THE LEWD ACT ITSELF.

4    THE TERM DURESS MEANS A DIRECT OR IMPLIED THREAT OF

5    FORCE, VIOLENCE, DANGER, HARDSHIP, OR RETRIBUTION,

6    SUFFICIENT TO COERCE A REASONABLE PERSON OF ORDINARY

7    SUSCEPTIBILITIES TO, ONE, PERFORM AN ACT WHICH OTHERWISE

8    WOULD NOT HAVE BEEN PERFORMED; OR, TWO, ACQUIESCE IN AN ACT

9    TO WHICH ONE OTHER WOULD NOT HAVE SUBMITTED.  THE TOTAL

10   CIRCUMSTANCES, INCLUDING THE AGE OF THE VICTIM AND THEIR

11   RELATIONSHIP TO DEFENDANT, ARE FACTORS TO CONSIDER IN

12   APPRAISING THE EXISTENCE OF DURESS.

13   IN ORDER TO PROVE THIS CRIME, EACH OF THE FOLLOWING

14   ELEMENTS MUST BE PROVED;

15        1.  A PERSON TOUCHED THE BODY OF A CHILD;

16        2.  THE CHILD WAS UNDER 14 YEARS OF AGE;

17        3.  THE TOUCHING WAS DONE WITH THE SPECIFIC INTENT TO

18   AROUSE, APPEAL TO, OR GRATIFY THE LUST, PASSIONS OR SEXUAL

19   DESIRES OF THAT PERSON OR THE CHILD.

20        4.  THE TOUCHING WAS DONE BY THE USE OF FORCE,

21   VIOLENCE, DURESS, MENACE OR FEAR OF IMMEDIATE AND UNLAWFUL

22   INJURY ON THE CHILD OR ANOTHER PERSON.

23   IF YOU ARE NOT SATISFIED BEYOND A REASONABLE DOUBT

24   THAT THE DEFENDANT IS GUILTY OF THE CRIME CHARGED, YOU MAY

25   NEVERTHELESS CONVICT HIM OF ANY LESSER CRIME IF YOU ARE

26   CONVINCED BEYOND A REASONABLE DOUBT THAT THE DEFENDANT IS

27   GUILTY OF THE LESSER CRIME.  THE CRIME OF A LEWD AND

28   LASCIVIOUS ACT ON A CHILD IS LESSER TO THAT OF FORCIBLE LEWD

1   GOOD AND THEY BEHAVE, AND THEY DO WHAT THEY ARE TOLD, GOOD

2   THINGS WILL HAPPEN, AFFECTION, PRAISE, PETS, PATS, HUGS.  IF

3   THEY ARE BAD, DISOBEDIENT, BAD THINGS WILL HAPPEN, THINGS

4   THAT ARE EMBARRASSING, PAINFUL AND SCARY, LIKE PUNISHMENT.

5        YOU KNOW WHAT SEX IS?  EMBARRASSING, PAINFUL AND

6   SCARY.  IT IS OBVIOUSLY PUNISHMENT.  WHAT IS THE KID

7   SUPPOSED TO THINK.  BAD CONSEQUENCES, BAD BEHAVIOR.  I HAVE

8   DONE SOMETHING WRONG.  WHAT HAVE I DONE?  I KNOW IT IS

9   WRONG.  THAT THIS WOULD NOT BE HAPPENING TO ME UNLESS IT

10  WERE MY FAULT, I WILL GET IN TROUBLE.  AND THAT'S A

11  PERFECTLY LOGICAL CONCLUSION.  IT'S AMAZING ANY KIDS EVER

12  TELL.  SOMETHING HAS TO INTERVENE TO GIVE THE CHILD

13  PERMISSION TO TELL.

14       YOU KNOW WHAT ELSE IS HAPPENING HERE?  THE MOLESTER

15  AND THE MOLESTED KNOW SOMETHING VERY IMPORTANT.  ADULTS

16  BELIEVE OTHER ADULTS, THEY DON'T BELIEVE KIDS.  IT IS SO

17  UNNATURAL FOR A CHILD TO ACCUSE AN ADULT OF WRONGDOING, THAT

18  ADULTS AUTOMATICALLY THINK, NO.

19       AND YOU CAN SEE THAT HAPPENING EVEN WITH PHYSICAL

20  ABUSE.  WHEN ANTHONY COMES HOME AND SAYS, ANGEL PUT CHILI IN

21  MY EYES, AND RUBY QUICKLY SAYS, NO, ANGEL WOULD NOT DO THAT,

22  SHE AUTOMATICALLY BELIEVES ANGEL.  ANTHONY SAYS, WHAT, I AM

23  THE ONE TELLING THE TRUTH, HE IS LYING.  MOM DOES NOT

24  BELIEVE ME AT FIRST, HE STILL RESENTS THAT, AND RIGHTFULLY

25  SO.

26       THE BEST SPIN THAT RUBY CAN GIVE ON IT IS, WELL,

27  STILL, YOU SHOULD WATCH THE KIDS BETTER.  SHE BUYS ANGEL'S

28  VERSION BECAUSE HE IS THE ADULT.  ANTHONY IS JUST A CHILD.

1   KEEPS CREATING NEW CRIMES, BUT I WANT YOU TO START WITH THIS

2   ONE, THIS IS YOUR BASIC INGREDIENT.

3   COUNT THREE, A TYPE OF CHILD MOLESTING.  YOU WILL

4   IMMEDIATELY NOTICE SOMETHING HAS BEEN EDITED. `FORCE,

5   VIOLENCE, DURESS, MENACE, OR FEAR OF BODILY INJURY TO THE

6   CHILD OR TO ANOTHER PERSON.  BASIC FELONY CHILD MOLESTING

7   DOES NOT INVOLVE FORCE.  THE CHILD COULD WANT THIS.  CHILD

8   COULD BE PLAYING A GAME, CHILD COULD NOT REALIZE WHAT WAS

9   GOING ON.  BUT, IF THE CHILD DOES REALIZE WHAT IS GOING ON,

10  AND IT IS FORCIBLE, EITHER PHYSICAL FORCE OR INTIMIDATION,

11  THAT'S WORSE, THAT'S A DIFFERENT CRIME.

12  WHAT YOU TAKE INTO ACCOUNT WHEN YOU LOOK AT FORCE IS

13  THE VULNERABILITY OF THE CHILD, FOR EXAMPLE, THE AGE.  ARE

14  WE TALKING ABOUT A 13 YEAR-OLD VICTIM, A 19 YEAR-OLD

15  DEFENDANT, OR A VERY YOUNG CHILD.  AND THE SIZE OF THE

16  VICTIM.  IS THE VICTIM NEAR THE DEFENDANT'S SIZE OR

17  ONE-FOURTH OF THE DEFENDANT'S SIZE?  AND THE RELATIONSHIP

18  BETWEEN THE VICTIM AND THE DEFENDANT.  IS THIS A STRANGER,

19  AND THE CHILD HAS THE OPTION OF SAYING NO, I AM GOING TO

20  TELL MOM, OR IS IT A KNOWN, TRUSTED ADULT WHERE MOM SAID, GO

21  WITH HIM, IT IS OKAY WITH ME, I TRUST HIM.  YOU DO WHAT HE

22  SAYS.

23  HOW MANY OPTIONS DOES THE CHILD HAVE IN AMANDA'S

24  CASE?  ABSOLUTELY NONE.  MOM HANDED HER OVER TO THIS GUY.

25  MOM KNOWS EVERYTHING.  WHAT IS SHE SUPPOSED TO DO, HITCHHIKE

26  HOME?  SHE IS FAR FROM HOME.  SHE IS WITH THIS GUY AND HER

27  OPTIONS ARE NONE.

28  THIS IS A GOOD PLACE TO TALK ABOUT THE CONCEPT OF

1   YOU TALKING ABOUT, HONEY?  NO, ACCORDING TO THE DEFENDANT,

2   AMANDA SAYS THAT, AND MOTHER SAYS, OKAY.  IT IS PART OF HIS

3   EFFORT TO PUT RUBY ON TRIAL INSTEAD OF HIMSELF.

4         COMPARE THAT TO WHAT AMANDA SAYS AND WHAT RUBY SAYS

5   AND WHAT ANTHONY SAYS.  ANTHONY SAYS, I COME HOME UPSET AND

6   SAY MOM, ANGEL PUT CHILE IN MY EYES.  LOOK, ATTENTION, I AM

7   HURTING, MOM, PAY ATTENTION.  MOM SAYS YEAH, HONEY, WHAT

8   HAPPENED?  ANGEL PUT CHILE IN MY EYES.  NO, ANGEL WOULD NOT

9   DO THAT.  ANGEL, HOW COULD YOU LET MY BOY DO THAT.  DOES

10  THAT MAKE SENSE?

11        AMANDA DOES NOT WANT TO GET INVOLVED, I DON'T KNOW

12  HOW IT HAPPENED, MOM.  IT IS ONLY AFTER THE POLICE, I DON'T

13  KNOW WHAT HAPPENED, TO OAKLAND, OAKLAND COP GOES AWAY, AND

14  CHILD, AMANDA, GETS PERMISSION TO TELL.  ONLY WHEN YOU GET

15  INTERVENTION FROM MOM SAYING, IT IS OKAY, YOU CAN TELL, ONLY

16  THEN DOES AMANDA START TALKING ABOUT PEE-PEE MILK.  IF SHE

17  HAD SAID THAT WHEN SHE CAME IN, RUBY'S REACTION WOULD HAVE

18  BEEN THE SAME AS IT WAS THEN, EARLIER.

19        WHEN AMANDA SAYS, AFTER THE BATH AND AFTER THE POLICE

20  ARE GONE, I WANT TO TALK ABOUT THE PEE-PEE MILK, AND THEN

21  RUBY BECOMES UPSET.  IF THE DEFENDANT WERE RIGHT, RUBY WOULD

22  HAVE BEEN UPSET WHEN AMANDA CAME HOME, AND SHE IS CLEARLY

23  NOT.  WHICH OF THOSE VERSIONS MAKES SENSE TO YOU?  JUST, IS

24  THIS A QUESTION OF FIGURING OUT WHAT FITS YOUR COMMON SENSE?

25        ONE OF THE OTHER THINGS THAT YOU CONSIDER IS BIAS,

26  INTEREST, OR OTHER MOTIVE, AND I TELL YOU, I GIVE UP ON THIS

27  ONE.  ACCORDING TO THE DEFENDANT, HE HAD NOT MOLESTED

28  AMANDA.  HE HAD NOT PUT CHILE IN THE EYES OF ANTHONY.  HE

1   DON'T KNOW.  ONLY WAY TO FIND OUT, IS DO THAT.  ONCE SHE IS
2   OUT OF THERE AND THE EXAMINATION IS COMPLETED, THERE IS
3   NEVER GOING TO BE ANOTHER WAY TO CHECK THAT OUT.

4   THEY CONTROL THE FLOW OF INFORMATION.  IT WAS NOT
5   SOME KIND OF CONSPIRACY WHERE IT WAS LIKE, WHAT CAN WE DO TO
6   GET ANGEL ALVAREZ.  IT WAS JUST, HEY, WE WON'T DO THIS, FOR
7   WHATEVER REASON.  I DID NOT FIND HER REASONS CONVINCING, BUT
8   THEY MAY HAVE OVERLOOKED IT.  BUT, BOTTOM LINE, IT DID NOT
9   HAPPEN.

10  ONE OF THE THINGS THAT DOES HAPPEN IS THEY TAKE A
11  CULTURE, COMES BACK POSITIVE, AFTER -- BY DECEMBER 5TH, WE
12  HAVE THE RESULT, IT IS POSITIVE.  NOW, BY CONTRAST, OFFICER
13  ALVAREZ CAME IN AND TESTIFIED TODAY.  HE CAME IN AND TOLD
14  YOU HOW, YES, THEY DO A SEXUAL ASSAULT EXAM ON THE PERSON
15  WHO IS BELIEVED TO BE THE PERPETRATOR.  THEY DO THE EXAM.
16  AND THEY COLLECT A VARIETY OF THINGS RELATED TO WHAT MIGHT
17  BE POSSIBLE EVIDENCE IN A SEXUAL ASSAULT.  THEY DO ALL OF
18  THAT.

19  HE SAID THEY DID A PENILE SWAB, BUT IT IS JUST AROUND
20  THE OUTSIDE OF THE PENIS, AND MAYBE JUST AROUND THE URETHRAL
21  OPENING, BUT THERE IS NO INSERTION.  THEY DO THAT ON THE
22  CHILD TO SEE IF THEY CAN GET A CULTURE, WHICH THEY DID, BUT
23  WHAT HAPPENS?  DECEMBER 5, THEY FIND OUT THAT SHE, AMANDA,
24  IS POSITIVE FOR CHLAMYDIA.

25  NOW, AS BEST WE CAN TELL, AND THERE WAS REFERENCE, I
26  ASKED DETECTIVE ALVAREZ ABOUT THIS, APPARENTLY, WE KNOW THAT
27  THERE WAS NO POLICE REPORT MADE ON THIS UNTIL APRIL 17TH,
28  1997, SO WE ARE TALKING ABOUT FIVE MONTHS LATER.  FIVE

1    MONTHS LATER THERE IS A POLICE REPORT DONE REFLECTING THE
2    FACT THAT THIS TEST CAME BACK POSITIVE.

3        NOW, IF YOU ARE RUNNING THE WAR, DOING THE MISSION,
4    AND YOU ARE TRYING TO GATHER ALL THE NECESSARY INTELLIGENCE,
5    ISN'T IT IMPORTANT, WHEN YOU ARE GOING TO MAKE THIS KIND OF
6    AN ACCUSATION, SOMETHING AS PROFOUND AS WE ARE TALKING ABOUT
7    HERE, AS TO WHETHER OR NOT HE COMMITTED THESE EXTREMELY
8    EGREGIOUS SEXUAL ACTS, DOESN'T IT MAKE SENSE, IF YOU REALLY
9    CARE ABOUT BEING FAIR AND IMPARTIAL, AND GETTING ALL THE
10   INFORMATION, DOESN'T IT MAKE SENSE THAT YOU WOULD SAY, NOW
11   WHAT WE HAVE IS POSITIVE CHLAMYDIA.

12       MR. ALVAREZ IS STILL IN JAIL.  WE HAVE A STIPULATION
13   HE WAS IN JAIL DURING THIS PERIOD OF TIME UP UNTIL JANUARY
14   27, 1997.  LET'S GO DOWN -- WE WILL GET A COURT ORDER IF WE
15   NEED TO, IF HE DOES NOT WANT TO COOPERATE.  LET'S GO DOWN
16   AND GET A SWAB FROM HIS URETHRA TO SEE WHETHER OR NOT HE
17   SHOWS UP FOR POSITIVE CHLAMYDIA, BECAUSE WE THINK HE GAVE IT
18   TO HER.

19       YOU ARE HERE TODAY HEARING THE PROSECUTOR ARGUE TO
20   YOU HEY, HE GAVE IT TO HER, I REST MY CASE.  SHE BASICALLY
21   COULD HAVE STOOD UP AND SAID THAT TO YOU, SHE GOT CHLAMYDIA,
22   WHO ELSE COULD SHE HAVE GOTTEN IT FROM?  SHE HAD TO HAVE
23   GOTTEN IT FROM HIM.  BY THE WAY, YOU KNOW, WE JUST NEVER GOT
24   AROUND TO CHECKING HIM OUT, BUT YOU NEED TO MAKE A DECISION
25   BEYOND A REASONABLE DOUBT THAT THIS HAPPENED, BECAUSE WE ARE
26   TELLING YOU THAT IT HAPPENED, AND BECAUSE HER MOTHER TOLD
27   YOU IT HAPPENED A CERTAIN WAY.

28       AND THEN, AFTER SHE TALKED TO HER MOTHER, SHE CAME

1    AND TOLD THE POLICE THAT IT HAPPENED A CERTAIN WAY, SO,

2    THEREFORE, THAT'S PROOF BEYOND A REASONABLE DOUBT.

3         TALK ABOUT THE PERFECT CRIME.  THIS IS THE PERFECT

4    ACCUSATION, BECAUSE WHAT DOES SHE DO, SHE STANDS UP IN A FEW

5    MINUTES AND SAYS, HEY, IT IS A CHILD, YOU NEED TO PROTECT

6    CHILDREN, WHICH YOU DO.  HOW CAN YOU SAY I DON'T WANT TO

7    PROTECT A CHILD.  SO, YOU ARE PUT IN A VERY DIFFICULT

8    POSTURE HERE, WHICH IS, KNOW WHAT, IF WE SAY THAT ANGEL

9    ALVAREZ IS NOT GUILTY, WE ARE -- MAYBE WE ARE LETTING A

10   CHILD MOLESTER OUT.  HE COULD GO DO THIS AGAIN.  IT IS A

11   TERRIBLE THING, THAT'S THE EMOTIONAL POWER OF SOMETHING LIKE

12   THIS.  IT IS MORE POWERFUL THAN A BURGLARY AND PROPERTY

13   CRIMES BECAUSE IT INVOLVES A CHILD.

14        SO, I MENTIONED THAT THE DEFENSE HAS AN OPPORTUNITY

15   TO DO SOMETHING ABOUT THIS, BUT BECAUSE THE STATE CONTROLS

16   THE FLOW OF INFORMATION, IT IS NOT UNTIL THE DEFENSE FINDS

17   OUT THAT THERE IS A POSITIVE CHLAMYDIA RESULT ON THE CHILD,

18   IT IS NOT UNTIL THEN THAT THE DEFENSE HAS ANY OPPORTUNITY TO

19   TRY TO DO ANYTHING.

20        WHAT DID DR. PORTMORE TELL YOU?  IF YOU HAVE HAD

21   CHLAMYDIA, THERE IS A WAY TO TREAT IT.  AND THE -- AND I

22   THINK MISS RITTER SAID THAT THERE WAS A COURSE OF TREATMENT

23   FOR THE CHILD TO GET RID OF IT, AND WHEN YOU GET RID OF IT,

24   IT IS GONE.  SO, IF ANGEL ALVAREZ FINDS OUT THAT THE CHILD

25   HAS CHLAMYDIA, HE SHOULD SAY, I SHOULD GET MYSELF SOME

26   PRESCRIPTION DRUG TO GET RID OF THIS STUFF SO I DON'T HAVE

27   IT IF SOMEBODY WANTS TO GIVE ME A TEST.

28        THE PROSECUTOR HAS THAT ARGUMENT BECAUSE MR. ALVAREZ

1   NEVER EVER HAD AN OPPORTUNITY TO, BECAUSE HE DIDN'T KNOW
2   ABOUT IT.  WHEN HE WAS UNDER THEIR CONTROL, LOCKED UP IN
3   JAIL, HE NEVER HAD AN OPPORTUNITY TO HAVE IT CHECKED.  SO,
4   THEREFORE, WHAT WE END UP HAVING IS A SITUATION WHERE YOU
5   CAN'T PROVE A NEGATIVE.  THERE IS NO WAY WE CAN COME IN HERE
6   AND SAY TO YOU, WELL, HE NEVER HAD IT BECAUSE HOW CAN WE
7   PROVE THAT?
8       SO, WE GO TO THE NEXT BEST POSSIBLE THING WE CAN DO,
9   WHICH I WILL ADMIT TO YOU OFF THE TOP, I SAID THIS IN MY
10  OPENING STATEMENTS TO YOU, IT IS NOT AS ADEQUATE AS I WOULD
11  LIKE IT TO BE.  IT IS THE BEST WE CAN DO UNDER THE
12  CIRCUMSTANCES, BECAUSE THE STATE CHOSE NOT TO GIVE YOU ALL
13  THE INFORMATION.  I AM NOT SAYING IT WAS A CONSPIRACY.  I AM
14  JUST SAYING IT DID NOT HAPPEN.  BY THE TIME THE DEFENSE
15  COULD KNOW ABOUT IT, IT WAS TOO LATE TO DO ANYTHING ABOUT IT
16  EXCEPT WHAT WE DID DO.
17      I BROUGHT DR. AMY PORTMORE IN HERE.  SHE OBVIOUSLY IS
18  WELL-QUALIFIED, THERE IS NO DISPUTE ABOUT THAT.  SHE
19  BASICALLY SAID, YOU KNOW, WE HAVE GOT THIS TEST, IT CAN BE
20  GIVEN.  AND I WON'T GO BACK OVER ALL THE DETAILS OF IT, YOU
21  HEARD ABOUT IT.  BUT SHE SAID, WE HAVE GOT THIS TEST AND IT
22  IS NOT A PERFECT TEST, THE GOLD STANDARD BEST TEST IS TO
23  TAKE A SWAB TO DO A CULTURE.  BUT WE DID NOT HAVE THAT IN
24  THIS CASE.
25      SO, WHAT DO WE DO?  OKAY, WE TAKE A BLADDER TEST, AND
26  BECAUSE THE BODY REACTS TO INFECTIONS, IT PRODUCES CERTAIN
27  ANTI-BODIES.  THOSE ANTI-BODIES WILL SHOW, IF YOU GIVE A
28  CERTAIN KIND OF TEST, SHE DESCRIBED IT TO YOU, I G A, I G G,

1  I G M TESTS.  THOSE TESTS WILL SHOW CERTAIN ANTI-BODIES IN

2  YOUR SYSTEM, AND THEN THEY CAN LOOK AT THOSE AND SAY THIS

3  REFLECTS WHETHER YOU HAD CHLAMYDIA, OR TRICHOMYCOSIS, OR

4  CHLAMYDIA, PNEUMONIA.

5      UNFORTUNATELY, BELIEVE ME, THIS IS -- MAKES IT

6  DIFFICULT.  I AM WELL AWARE HOW DIFFICULT IT MAKES IT IN

7  THIS CASE.  WE ARE STUCK WITH THE FACT THAT DR. PORTMORE HAS

8  TO GET UP THERE AND SAY TO YOU, YOU KNOW, WE CAN'T TELL.

9  YOU HAVE GOT THESE MEASUREMENTS, 32 AND 64, SHE TALKED ABOUT

10  THAT, AND I WILL GO BACK OVER THAT BECAUSE YOU HEARD IT

11  ALREADY.  SHE SAID YOU HAVE GOT THESE MEASUREMENTS, THEY ARE

12  REAL CLOSE TOGETHER, AND THE DIFFERENCE BETWEEN THEM DOES

13  NOT MEAN VERY MUCH.

14      BUT THE BOTTOM LINE IS THAT BECAUSE OF THE

15  CROSS-REACTIVITY BETWEEN THE TWO DISEASES, BECAUSE THEY ARE

16  SO SIMILAR TO EACH OTHER, BECAUSE OF THAT I CAN'T TELL YOU

17  IF HE DID, IN FACT, HAVE CHLAMYDIA.  BUT I ALSO CAN'T TELL

18  YOU THAT HE DID NOT HAVE IT.  IT IS UNCERTAIN.  SHE DID SAY,

19  IF YOU HAVE BRONCHIAL TYPE INFECTIONS, THE PNEUMONIA

20  BACTERIA IS PRESENT IN THAT, AND THAT COULD CAUSE YOU TO

21  SHOW THE RESULTS THAT WE SAW.  BUT WE ARE NOT IN A POSITION

22  TO BE ABLE TO SHOW YOU IN ANY SOLID, DEFINITIVE WAY WHAT

23  THOSE TESTS MEAN.

24      I WISH WE WERE.  BUT I WOULD ASK YOU TO LOOK AT IT

25  THIS WAY.  I TALKED ABOUT THE SCALES.  THE ISSUE HERE IS FOR

26  YOU TO LOOK AT AND SAY, YOU KNOW, HAVE THEY PROVEN BEYOND A

27  REASONABLE DOUBT THAT HE GAVE HER CHLAMYDIA?  BECAUSE I

28  DON'T DISPUTE THAT GIVING A CHILD OR ANYBODY ELSE CHLAMYDIA,

1   THAT'S GREAT BODILY INJURY.  I DON'T DISPUTE THAT.  OF

2   COURSE IT IS.

3        BUT THE ISSUE HERE IS NOT HOW HORRIBLE THAT IS,

4   BECAUSE IT IS HORRIBLE, THE ISSUE IS WHETHER OR NOT HE

5   INFLICTED THAT ON HER.  I AM NOT GOING TO STAND HERE AND

6   TELL YOU THERE ISN'T A BASIS FOR THE DISTRICT ATTORNEY TO

7   GET UP HERE WHEN I AM DONE, AND SAY TO YOU, YOU KNOW, THIS

8   IS ALL A BUNCH OF HOGWASH, SMOKE SCREEN, A RED HERRING,

9   WHICH IT IS NOT, IT IS A LEGITIMATE ARGUMENT REGARDING

10  REASONABLE DOUBT AND BALANCE.  AND THIS IS WHERE THE GRAY

11  AREA COMES INTO PLAY.  SHE WILL TELL YOU IT IS ALL BOGUS

12  BECAUSE IT SHOWED HE MAY HAVE HAD CHLAMYDIA.  THAT'S GOOD

13  ENOUGH GIVEN WHAT AMANDA SAID IN THIS CASE.

14        TALK ABOUT THE PERFECT ACCUSATION.  BECAUSE YOU HAVE

15  A LITTLE GIRL SAYING IT A CERTAIN WAY, THAT IT HAPPENED A

16  CERTAIN WAY.  AND THERE IS A STRONG, STRONG DESIRE TO

17  BELIEVE WHAT SHE TELLS YOU BECAUSE IT IS A POWERFUL

18  ACCUSATION.

19        NOW, WHAT I WOULD ASK YOU TO THINK ABOUT, THOUGH, IS

20  ON THAT BALANCE, THAT WHEN YOU HAVE GOT A TEST THAT COMES

21  BACK THE WAY OURS DID, WHERE YOU CAN'T SAY FOR SURE EITHER

22  WAY THAT'S REASONABLE DOUBT, YOU HAVE TO DECIDE WHETHER YOU

23  THINK THAT IT IS.  I AM JUST ARGUING TO YOU, SAYING TO YOU

24  THAT I THINK THAT IS REASONABLE DOUBT.  THAT RAISES SERIOUS

25  QUESTIONS ABOUT WHETHER OR NOT IT PROVES IT.

26        SECOND THING RELATED TO THIS TEST IS, MISS RITTER

27  TESTIFIED, SHE IS NOT A DOCTOR, SHE TESTIFIED THAT SHE

28  REMEMBERED SOME STUDIES, AND SHE DID NOT THINK THAT YOU

1    COULD PASS THIS DISEASE ANYWAY OTHER THAN GENITAL.  IN OTHER

2    WORDS, TOUCHING -- NORMALLY, IT WOULD BE THE MALE GENITALS

3    AGAINST FEMALE GENITALS, THAT'S REALLY THE ONLY WAY SHE SAID

4    YOU COULD PASS IT.

5          DR. PORTMORE, WHO ON THIS SUBJECT IS VASTLY MORE

6    QUALIFIED THAN MISS RITTER, NOT SAYING.  DR. PORTMORE IS AN

7    EXPERT ON INFECTIOUS DISEASE.  DR. PORTMORE SAID, IT COULD

8    BE PASSED.  IT WAS NOT LIKELY, BUT IT WAS MEDICALLY

9    REASONABLY AND POSSIBLE THAT IT COULD BE PASSED IN A WAY

10   OTHER THAN THROUGH CONTACT WITH THE PENIS ON THE VAGINA,

11   WHICH IS WHAT IS CLAIMED HERE.

12         IT COULD HAVE BEEN PASSED THROUGH, FOR EXAMPLE,

13   DIGITALLY, WITH A FINGER.  AND WHO KNOWS WHAT WAYS THAT

14   COULD HAVE HAPPENED.  I GRANT YOU, WE DO NOT HAVE ANY

15   SPECIFIC EVIDENCE SAYING TO YOU THAT JOE SMITH DID THIS, NOT

16   ANGEL ALVAREZ.  THAT'S TRUE.

17         I KNOW THAT THE DISTRICT ATTORNEY WILL ARGUE THAT TO

18   YOU, THAT THE ONLY POSSIBLE PERSON THAT COULD HAVE DONE THIS

19   IS ANGEL ALVAREZ BECAUSE THAT'S WHAT THE CHILD SAYS.  THE

20   CHILD SAID AFTER SHE HAD CONTACT WITH HER MOTHER, AND TALKED

21   TO HER MOTHER ABOUT IT.  BUT I WOULD SUBMIT TO YOU THAT IT

22   IS NOT BEYOND REASON OR AN UNREASONABLE CONCLUSION TO

23   BELIEVE THAT MAY HAVE HAPPENED FROM SOME OTHER SOURCE.  AND

24   THE ONLY WAY WE COULD HAVE FOUND OUT WHETHER OR NOT HE HAD

25   CHLAMYDIA WAS COMPLETELY IGNORED.  BECAUSE THE MISSION OF

26   THAT MACHINE, I DON'T USE THAT IN A NEGATIVE SENSE, IT IS A

27   MACHINE THAT HAS TO BE THERE AND DO ITS JOB, IT DID NOT DO

28   ITS JOB RIGHT BECAUSE IT LEFT OUT ONE KEY PIECE OF

1  INFORMATION THAT YOU DON'T HAVE, THAT YOU ARE BEING ASKED TO
2  JUMP TO THAT CONCLUSION.  DON'T DO IT, IT IS NOT
3  APPROPRIATE.

4         ONE LAST THING ALONG THOSE LINES.  OTHER PEOPLE,
5  OTHER THAN ANGEL ALVAREZ, HAD ACCESS TO AMANDA.  IF YOU HAVE
6  THAT DISEASE AND IT CAN BE PASSED DIGITALLY, YOU HAVE GOT TO
7  CONSIDER, WHEN YOU ARE WEIGHING AND BALANCING REASONABLE
8  DOUBT, YOU HAVE TO CONSIDER WHETHER THAT COULD HAVE BEEN
9  DONE BY SOMEBODY ELSE.  PERHAPS NOT EVEN WITH A SEXUAL
10 INTENT, BATHING, PUTTING ON SOME TYPE OF MEDICATION, IT IS
11 POSSIBLE IT COULD HAVE HAPPENED.  IT IS NOT SO OUTLANDISH IT
12 COULD NOT HAVE HAPPENED THAT WAY.

13        NOW, I AM NOT GOING TO STAND HERE AND TELL YOU IT
14 COULD NOT HAVE HAPPENED ANOTHER WAY, BUT THAT'S WHERE THE
15 GRAY AND THE BALANCE COMES INTO PLAY.  NEXT PIECE OF
16 PHYSICAL EVIDENCE THAT I WANT TO TALK TO YOU ABOUT IS THE
17 SITUATION WITH ANTHONY.

18        WHAT I WOULD ASK YOU TO DO WITH HIM IS LISTEN TO HIS
19 TAPE.  AND I AM GOING TO CITE TO YOU A COUPLE SECTIONS ON
20 HIS TAPE.  I WILL GIVE YOU THE PAGE AND LINE NUMBER AND YOU
21 CAN -- YOU WILL -- LISTENING TO IT, PROBABLY YOU NEED THE
22 TRANSCRIPT BECAUSE IT IS HARD TO UNDERSTAND EVERYTHING.  BUT
23 I AM GOING TO ASK YOU TO LISTEN TO AND READ, START WITH PAGE
24 17, LINE 21.  I AM GOING TO READ A FEW SELECTED PIECES OF
25 IT.

26        ANTHONY SAYS -- FIRST OF ALL, OFFICER ACOSTA SAYS
27 OKAY, ANTHONY, HOW DID YOU GET THE CUT ON YOUR PEE-PEE?
28 ANTHONY SAYS, I DON'T KNOW.  ANGEL WAS PRETENDING HE WAS

1    CONTAINED A LIST OF PROPERTY THAT WAS TAKEN FROM

2    MR. ALVAREZ'S VAN, AND INCLUDED IN THAT WERE SOME THINGS

3    THAT THE POLICE, AGAIN, THE MACHINE IS WORKING ON THE

4    INTELLIGENCE IT HAS GOT AND IT IS TRYING TO GO FORWARD AND

5    ENGAGE IN THE COMBAT OF PROSECUTING THIS CASE.

6        SO, THERE ARE CERTAIN THINGS THAT THEY THINK OUGHT TO

7    BE CHECKED OUT BASED UPON WHAT AMANDA TOLD THEM ABOUT WHAT

8    HAPPENED.  AND THOSE THINGS WERE CHECKED OUT.  AND WE READ

9    YOU A DESCRIPTION AND WE REFERRED TO THESE VARIOUS ITEMS OF

10   EVIDENCE.  ONE OF THEM, I WON'T TAKE IT OUT OF HERE, IS THE

11   BAG, THE SLEEPING BAG WITH THE DINOSAURS ON IT.  IT IS IN

12   EVIDENCE AND YOU CAN LOOK AT IT, CAREFULLY EXAMINE IT.

13       THE SANTA CLARA COUNTY CRIME LAB IS A HIGHLY

14   QUALIFIED ORGANIZATION.  PEOPLE ARE THERE JUST TO EVALUATE

15   THESE KINDS OF THINGS.  WHAT WE HAVE, THEN, IS A RESULT

16   WHICH SAYS, WE FOUND NO SEMEN ANYWHERE ON ANY OF THESE

17   ARTICLES THAT YOU HAVE ASKED US TO EXAMINE.  NONE.

18       NOW, THE CHILD HAS TOLD YOU SOMETHING REALLY

19   DISGUSTING, AND THAT'S WHAT GOES BACK TO THIS PASSIONATE

20   EMOTION THAT ARISES IN A CASE LIKE THIS.  I RECOGNIZE A LOT

21   OF PEOPLE DON'T THINK IT IS A GOOD IDEA FOR ADULTS TO DO

22   THAT, AND I KNOW THAT 99.99 PERCENT OF THE POPULATION ARE

23   GOING TO BE TOTALLY REVOLTED BY THE IDEA OF A MAN,

24   SPECIFICALLY THIS ONE, TAKING HIS PENIS AND PUTTING IT

25   INSIDE OF AMANDA, IN HER MOUTH, AND EJACULATING IN THERE.

26   IT IS DISGUSTING.

27       AND I KNOW THAT THAT'S A POWERFUL ARGUMENT FOR THE

28   D.A., HOW ELSE, WHAT ELSE COULD IT BE?  BUT YOU HAVE TO LOOK

1   EXPLANATION FOR THAT.  SO, WHAT I AM SAYING IS THAT THIS
2   BLANKET, FOR WHATEVER REASON, THE POLICE DON'T EVEN CHECK IT
3   OUT, AND THAT GOES TO THIS ISSUE OF THE MIND SET, YOU KNOW,
4   WE WILL CHECK TO SEE IF THERE IS SEMEN.  AND WHEN THEY --
5   GIVEN WHAT SHE CLAIM HAPPENED HERE, YOU DON'T FIND ANY AT
6   ALL.  YOU DON'T GO, HEY, MAYBE, WE SHOULD CHECK MORE OF THE
7   ITEMS, MAYBE WE MISSED SOMETHING.  GO BACK AND TAKE A LOOK
8   AT THE BLANKET.  DON'T TELL ME YOU CAN'T OPEN UP THE BAG.
9   OF COURSE YOU CAN OPEN THE BAGS, YOU JUST WRITE IT DOWN THAT
10  YOU HAVE OPENED UP THE BAG.  OR TAKE THEM ALL TO THE LAB,
11  HAVE THEM LOOK, AND DECIDE WHAT OUGHT TO BE LOOKED AT.  IT
12  WAS NOT DONE.

13          BUT THEY WANT YOU TO BELIEVE THAT BEYOND A
14  REASONABLE DOUBT, THAT MR. ALVAREZ DID WHAT HE IS ACCUSED
15  OF.  EVEN THOUGH THEY HAVE NOT TAKEN THE TIME TO GIVE YOU
16  THAT INFORMATION, BUT THEY ARE SAYING HEY, FIND HIM GUILTY
17  ANYWAY, BECAUSE WE HAVE PROVEN OUR CASE.

18          NOW, WITH RESPECT TO RUBY.  WHEN I SAY, WHEN THE
19  D.A. TELLS YOU WHAT A PERFECT CRIME THIS IS, I HAVE
20  MENTIONED THIS SEVERAL TIMES BECAUSE I THINK IT IS REALLY
21  INSTRUCTIVE, THE D.A. TELLS YOU THIS IS A PERFECT CRIME
22  BECAUSE NOBODY IS THERE TO TELL.  IT IS NOT REPORTED IN ANY
23  WAY.  YOU JUST HAVE TO RELY ON A CHILD TO GIVE YOU THE
24  INFORMATION.  THEN SHE CREATES THIS PICTURE, NOBODY WILL
25  BELIEVE A CHILD.  CHILDREN ARE JUST KIND OF THINKING THAT
26  ALL ADULTS ARE GODZILLA.  SHE MAKES THE ADULT WORLD SOUND
27  MONSTROUS.

28          NOW, I AM NOT SAYING THAT THERE IS NOT A REASON

1   I PUT IT IN THERE ONLY BECAUSE I WANTED YOU TO BE AWARE HOW
2   LESLIE HERNANDEZ WAS TELLING THE TRUTH ABOUT WHAT HAPPENED,
3   THAT THE CHILD, AMANDA HAD DIARRHEA, AND THE PANTIES, I
4   SUBMIT, LOOK LIKE THEY HAVE DIARRHEA.  I HAVE THEM IN A
5   SEALED BAG.  THAT'S WHY I PUT THAT IN EVIDENCE, IT SUPPORTED
6   WHAT LESLIE HERNANDEZ WAS TALKING ABOUT WHAT HAPPENED THAT
7   DAY.

8       I THINK THERE IS ONE OTHER ARGUABLE USEFULNESS, WHICH
9   IS THAT IT LOOKS LIKE AMANDA PROBABLY HAD SOMETHING IN THE
10  WAY OF BEING A LITTLE BIT SICK, BECAUSE SHE HAD DIARRHEA,
11  AND, OF COURSE, SHE THREW UP.  AND THE D.A. HAS HER
12  EXPLANATION OF IT, AND I WILL BE TALKING ABOUT WHAT WE SAY
13  IS AN ALTERNATIVE REASONABLE EXPLANATION FOR WHAT MIGHT HAVE
14  HAPPENED.

15      THE POINT THAT I AM MAKING IS THAT THE CHILD
16  OBVIOUSLY HAD SOMETHING BOTHERING HER, OR SHE WOULDN'T HAVE
17  HAD DIARRHEA.  AND YOU CAN SEE IN THE PANTIES THAT SHE DID.

18      NOW, WHEN YOU GO TO THE SITUATION WITH RUBY, RUBY IS
19  VERY IMPORTANT IN THIS CASE BECAUSE SHE IS THE CONDUIT BY
20  WHICH THIS INFORMATION STARTS TO GET FED INTO THE SYSTEM I
21  TALKED ABOUT.  SO, SHE IS A SOURCE OF INTELLIGENCE FOR THE
22  ARMY THAT GOES FORWARD WITH THESE KINDS OF CASES.

23      THE REASON I BROUGHT EJAZ ANAM IN HERE WAS BECAUSE I
24  WANTED YOU TO BE AWARE THAT THERE HAD BEEN SOME INTERACTION
25  REGARDING WHAT HAD HAPPENED THAT DAY.  NOW, WE DON'T HAVE --
26  IT WOULD BE GREAT, BUT WE DON'T HAVE A VIDEOTAPE OF WHAT
27  HAPPENED, AND SO WE HAVE TO RELY ON WHAT PEOPLE SAW IN
28  LITTLE BITS AND PIECES AS WE GO THROUGH THE CASE.

1   GREAT BODILY INJURY OR DEATH, VERSUS THE LESS SERIOUS TYPE,
2   WHICH IS THE MISDEMEANOR TYPE.  BUT RUBY GOT CAUGHT ON
3   SOMETHING, I THINK, IN TERMS OF THE STORY SHE IS PUTTING
4   OUT.  I THINK THAT THE KIDS SAID SOMETHING TO HER THAT
5   CAUSED HER TO START TO THINK THE WORST OF MR. ALVAREZ.  I
6   THINK THAT THERE WAS SOMETHING SAID.

7        FOR EXAMPLE, I THINK THAT AMANDA PROBABLY -- I DON'T
8   HAVE ANY DOUBT THAT AMANDA SAID, I DRANK PEE-PEE MILK AND IT
9   MADE ME THROW UP.  I THINK SHE SAID SOMETHING LIKE THAT TO
10  HER MOTHER.  HER MOTHER UNDERSTANDABLY GOT REALLY ALARMED.
11  SHE GOT ALARMED BY IT, AND SHE ASSUMED, UNDERSTANDABLY TO
12  START OFF WITH, UNDERSTANDABLY SHE ASSUMED THE WORST, WHICH
13  IS, OF COURSE, WHAT YOU ARE BEING ASKED TO BELIEVE HERE,
14  THAT IT WAS ORAL COPULATION.

15       BECAUSE SHE ASSUMED THE WORST, IT GOES FROM THERE.
16  SHE IS THE PERSON WHO SORT OF STARTS THIS THING MOVING.
17  WHAT DOES SHE DO HERE?  ANGEL ALVAREZ, WHO HAS KNOWN HER FOR
18  SEVERAL YEARS, WHO HAS TAKEN CARE OF HER KIDS ON A VERY
19  REGULAR BASIS, FOR QUITE A LONG PERIOD OF TIME, SHE CALLS
20  HIM UP AND SAYS, ANGEL, I DON'T KNOW WHAT IS GOING ON HERE.
21  ACCORDING TO THE D.A., SHE DID NOT REALLY EVEN BELIEVE
22  ANTHONY IN THE BEGINNING ABOUT THE EYES.

23       WHAT DID SHE DO?  SHE IMMEDIATELY CALLS OAKLAND
24  POLICE DEPARTMENT ONCE SHE HEARS ABOUT THIS.  WHY?  SHE
25  TESTIFIED TO US THAT SHE TOLD THE POLICE THAT HER DAUGHTER
26  DESCRIBED FINGERS BEING STUCK INSIDE HER VAGINA, AND SHE IS
27  SAYING, THE OAKLAND POLICE, AFTER I TOLD THEM THAT, I DON'T
28  BELIEVE THAT.  IF SHE TOLD THEM THAT FINGERS WERE INSIDE OF

1    INFORMATION, AND BECAUSE THEY HAVE BEEN FIGHTING, BECAUSE HE

2    WAS TOLD HE WON'T DO IT ANYMORE, HE HAS HAD IT, HE FEELS HE

3    IS BEING TAKEN ADVANTAGE OF, SHE IS NOT HAPPY WITH HIM.  AND

4    SHE MAKES THE ASSUMPTION THAT HE IS THE WORST KIND OF

5    PERSON, THAT HE WOULD DO SOMETHING LIKE THIS TO HER, THAT'S

6    WHAT I THINK HAPPENED.

7         I CAN'T PROVE IT, I RECOGNIZE THAT.  D.A. CAN'T PROVE

8    IT.  SHE CAN -- SHE CAN ARGUE THIS HAPPENED.  THAT'S WHERE

9    YOU GOT INTO THE QUESTION OF REASONABLE DOUBT AND THE

10   BALANCING PROCESS.  SORRY THIS IS TAKING SO LONG.  HE IS

11   ACCUSED OF A FORCIBLE SEX ACT AGAINST A CHILD, AND ALSO LEWD

12   CONDUCT WITH FORCE.

13        THERE IS LESSER INCLUDED OFFENSE, WHICH THE D.A.

14   TALKED ABOUT.  SHE GAVE YOU A GOOD DESCRIPTION OF THAT.  YOU

15   HAVE TO DECIDE, FOR EXAMPLE, IF YOU WERE TO DECIDE, WELL,

16   MR. ALVAREZ DID COMMIT A SEX ACT WITH AMANDA, YOU HAVE TO

17   DECIDE, OKAY, IF THAT HAPPENED, WAS IT DONE WITH FORCE, OR

18   WAS IT JUST SOMETHING THAT HE DID, WHICH IS ILLEGAL, BUT IT

19   WAS NOT DONE WITH FORCE.  YOU HAVE TO MAKE THAT DECISION.  I

20   AM SAYING TO YOU, AS YOU HAVE HEARD, THAT HE DID NOT DO ANY

21   OF THOSE THINGS.  BUT, IF YOU THINK HE DID, YOU HAVE TO

22   REACH A DECISION ON THAT PARTICULAR QUESTION.

23        NOW, ONE OF THE THINGS THAT YOU CAN HAVE, I SUSPECT

24   THE DISTRICT ATTORNEY WILL ARGUE THIS WHEN SHE FINISHES.

25   SHE WILL SAY THAT WE ARE NOT TALKING ABOUT PHYSICAL FORCE,

26   WE ARE TALKING ABOUT DURESS, PUTTING A CHILD INTO FEAR.

27   RUBY SAID, WHEN SHE WAS QUESTIONED ABOUT THIS, REGARDING

28   AMANDA, SHE SAID -- ASKED HER WHY SHE DID NOT TELL.  RUBY

SUPP. REPORTER'S TRANSCRIPT
"Supp. RT"

9

1   because they're scared of the defendant.  And they don't

2   want to be in the same room because they don't know you from

3   a bail of hay because it's been a long time.  A fourth of

4   their life times it has taken to get this case to trial.

5   Because it was a terrifying, embarrassing, humiliating

6   experience they don't want to talk about.  And that is

7   something you have to take into account when you see these

8   children.  Thank you.

9           THE COURT:  Thank you, Ms. McKay-McCoy.

10          Mr. Schroeder, do you see wish to make an opening

11  statement?

12          MR. SCHROEDER:  I'll make it at this time.

13          THE COURT:  All right.  Very well.

14          MR. SCHROEDER:  Ladies and gentlemen, as the judge

15  said, this is an opening statement.  It is not an argument

16  to you.  I'm just going to give you basically an overview

17  from our perspective of what I expect the evidence to show

18  in this case.  You decide the case from what comes from the

19  witness stand, so if I say something to you which turns out

20  not to be exactly what's in the evidence, keep in mind I'm

21  giving you more or less what I expect the evidence to show.

22          Mr. Alvarez had a relationship with Ruby, Ruby

23  Rubio.  They had known each other for some period of time.

24  The District Attorney has told you that the reason,

25  basically his interest was not in Ruby but in the children.

26  I think the evidence will show contrary to that.  He had a

27  relationship, he was a good friend of Ruby.  And, yes, he

28  liked the children.  And, yes, he helped out Ms. Rubio a lot

1    with caring for the children.  She essentially was a single

2    parent and needed assistance and he was willing to provide

3    it much to his now great consternation given the

4    circumstances he finds himself in.

5          But I think the evidence will show after you've

6    heard all of it, it's not a situation where as the D.A. is

7    trying to characterize it here this morning already as

8    something where he's saying here's some little kids I can

9    molest so therefore I want to become friends with them.

10         I don't think the evidence will show that.  I

11   think it will show he is a friend, somebody who helps her

12   out which is very frequently.

13         I also think that this was a long term

14   relationship.  This had been going on for a long period of

15   time.  The evidence will show there was absolutely no

16   indication of any kind of a problem in this relationship,

17   nothing to indicate there was anything going on improper.

18   The children were not being abused in any way until this

19   fateful weekend of November of 1996, mid-November of 1996.

20   That's when this issue came to the fore which brings us all

21   here.

22         The situation came to light as Ms. McKay-McCoy has

23   said to you after this weekend was over and the children

24   were brought home.  It's important to keep in mind when you

25   listen to the evidence that something important happened

26   when Mr. Alvarez brought those children home which was he

27   told the mother:  You know, look, I can't keep taking care

28   of these kids for you for long periods of time.  You've got

1    to take care of them.  I'll help you out occasionally, but
2    I've about had it with trying to take care of kids that are
3    really a handful.  And he felt he was being taken advantage
4    of.  Coupled with that and related to it was the fact that
5    there had been plans and she had been talking to him, Ruby
6    had been talking to Mr. Alvarez as if she wanted to have a
7    relationship with him, they would be boyfriend and girl
8    friend.

9           Now, I expect she will be denying that, but I
10   think there will be evidence to indicate to the contrary,
11   that there was this type of intent on both their parts.
12   Mr. Alvarez basically said to her:  I'm not going to do this
13   anymore.  And he told her that he was so fed up with the way
14   he was being treated by her that he was going to perhaps
15   even report her for certain things that she had done that he
16   thought were illegal related to the father of these children
17   who has been referred to by his nickname which is Nots.

18          And he made some threats to her regarding that
19   because he was very upset with the fact that she was
20   mistreating him.  By that I mean she was using him
21   essentially as a baby-sitter when she didn't want to take
22   care of the kids and holding out on the description to him
23   that they were going to have a relationship when in fact
24   that wasn't her intent.  And he felt he was being used, so
25   he let her know that and there was an argument about it.

26          The evidence will also show that Ruby Rubio had
27   told Mr. Alvarez:  I spank my children and it's okay with me
28   if you spank them in they misbehave.

EXHIBIT  C

CLERK'S TRANSCRIPT
"CT"

6

YOU CAN TELL US A YEAR, TELL US A YEAR.

THE WITNESS: OKAY. WITHIN THE YEAR OF '96.

BY MS. MC KAY MC COY:

Q    THANK YOU.

A    '95.

THE COURT: WAS IT '95 INTO '96?

THE WITNESS: '95 INTO '96.

THE COURT: OKAY.

BY MS. MC KAY MC COY:

Q    THANK YOU FOR MAKING IT CLEAR. AFTER FRIDAY, NOVEMBER

15TH, 1996, WHEN DID YOU SEE YOUR CHILDREN AGAIN?

A    NOVEMBER 19TH. I BELIEVE IT WAS A TUESDAY, BECAUSE THE

MONDAY I HAD MY FOUR WISDOM TEETH PULLED OUT AND I NEEDED A

BABYSITTER AND HE OFFERED TO TAKE THEM.

Q    OFFERED TO TAKE THEM OR KEEP THEM?

A    KEEP THEM.

Q    DID YOU SEE THEM AGAIN THE FOLLOWING TUESDAY?

A    HE BROUGHT THEM HOME THAT TUESDAY MORNING.

Q    DID YOU NOTICE --

A    I HAD SURGERY MONDAY.

Q    THANK YOU. DID YOU NOTICE ANYTHING UNUSUAL WHEN HE

BROUGHT THEM BACK TUESDAY MORNING?

A    ANTHONY HAD RED MARKS AROUND HIS EYES. THEY LOOKED LIKE

BURNS.

Q    DID ANTHONY HAVE ANY OTHER INJURIES?

A    NOT THAT I SAW.

Q    I NEED TO MAKE MY QUESTION CLEAR. DID HE HAVE ANY OTHER

INJURIES TO HIS FACE?

7

1  A    NO, BUT HE HAD SOME TO HIS BODY, BUT I DIDN'T NOTICE

2  THOSE UNTIL LATER THAT NIGHT WHEN I GAVE HIM A BATH.

3  Q    WHEN DID YOU NOTICE LATER THAT NIGHT WHEN YOU GAVE HIM A

4  BATH?

5  A    HE HAD BRUISES ON HIS BACK, ON HIS BUTT.

6  Q    ANYWHERE ELSE?

7  A    I BELIEVE ON HIS LOWER THIGHS.

8  Q    DID YOU OBSERVE ANY CUTS ANYWHERE ON HIS BODY?

9  A    NO, NOT UNTIL THE POLICE WERE CALLED.

10 Q    TELL ME ABOUT CALLING THE POLICE.

11 A    I CALLED THE POLICE AFTER I GAVE THE KIDS A BATH, AND I

12 ASKED THEM WHAT HAPPENED AND THEY TOLD ME.  I CALLED THE

13 POLICE, THEY CAME OUT THE FIRST TIME AND THEN I HAD TO CALL

14 THEM BACK THE SECOND TIME THAT SAME NIGHT.

15 Q    WHICH POLICE AGENCY DID YOU CALL?

16 A    OAKLAND POLICE DEPARTMENT.

17 Q    DID THEY COME OUT THE FIRST TIME YOU CALLED?

18 A    YES, THEY DID.

19 Q    HOW DID IT COME ABOUT THAT THEY CAME OUT AGAIN?  TELL ME

20 ABOUT THAT.

21 A    BECAUSE I WAS PUTTING AMANDA AND THE KIDS TO BED AND I

22 WAS TELLING THEM I WAS VERY PROUD OF THEM.  THEY WERE TELLING

23 THE OFFICERS THE TRUTH.  I DIDN'T KNOW WHAT WAS GOING ON AND

24 I WAS VERY PROUD OF THEM THAT THEY, YOU KNOW, HAD THE COURAGE

25 TO TELL THEM.

26 Q    DID YOU NOTICE ANOTHER UNUSUAL INJURY?  YOU CAN TAKE

27 YOUR TIME.

28 A    THAT'S WHEN MY -- WHEN MY DAUGHTER AMANDA TOLD ME THAT SHE

8

1   DIDN'T TELL ME THE COMPLETE TRUTH, AND THAT HE HAD TOUCHED HER

2   WHERE HE WASN'T SUPPOSED TO.  AND THE REASON WHY SHE DIDN'T

3   TELL THE OFFICER THE FIRST TIME IS BECAUSE HE WAS GOING TO HURT

4   ME IF HE FOUND OUT THAT SHE HAD TOLD.  AND SO I HAD TO CALL

5   THEM AGAIN, AND THEY CAME OUT A SECOND TIME.  AND THEN THEY DID

6   -- THEY STARTED ASKING AMANDA AND ANTHONY QUESTIONS, AND THAT'S

7   WHEN I HAD NOTICED THAT -- ANTHONY HAD TOLD ME HE HAD A CUT ON

8   HIS PEE PEE, AND AMANDA HAD TOLD ME THAT HE HAD TOUCHED HER

9   DOWN THERE.  THAT'S WHEN EVERYTHING CAME OUT, THE SECOND TIME

10  WHEN THE POLICE CAME.

11  Q   LET ME BREAK THAT UP INTO TWO PARTS, ANTHONY AND

12  AMANDA.  DID YOU SEE A CUT ON ANTHONY'S PENIS?

13  A   YES, WE DID, BECAUSE THE OFFICER TOLD HIM TO PULL --

14  RETRACT HIS SKIN, AND THERE WAS A LITTLE RED MARK.  IT LOOKED

15  LIKE A LITTLE CUT.  THEY TOOK PHOTOGRAPHS.

16  Q   DID ANTHONY AT ANY TIME THIS DAY TO YOU OR TO THE POLICE

17  OFFICERS APPEAR TO BE UPSET?

18  A   VERY --

19          MR. SCHROEDER:  OBJECTION TO THE POLICE OFFICERS,

20  YOUR HONOR.

21          THE COURT:  OVERRULED.

22          MR. SCHROEDER:  SHE SAID, DID HE APPEAR TO BE UPSET

23  TO THE POLICE OFFICERS, IF I UNDERSTOOD HER CORRECTLY.

24          THE COURT:  TO HER OR TO THE POLICE OFFICERS.

25          MR. SCHROEDER:  AND MY OBJECTION WOULD BE TO THE

26  FORM OF THE QUESTION WITH RESPECT TO THE POLICE OFFICERS,

27  SINCE I DON'T THINK SHE COULD TESTIFY AS TO WHAT THE POLICE

28  OFFICERS' OBSERVATIONS WERE.

10

1  PUNISHMENT.  HE ASKED HIM IF HE WANTED IT IN HIS MOUTH OR IN

2  HIS EYES, AND ANTHONY SAID IN HIS MOUTH, AND ANGEL SAID NO,

3  YOU'RE GOING TO GET IT IN YOUR MOUTH ANYWAY.

4  Q    LET ME ASK YOU SOME QUESTIONS ABOUT AMANDA.  IF I

5  UNDERSTAND YOUR TESTIMONY, AS YOU WERE PUTTING THE KIDS TO

6  BED AND PRAISING THEM FOR TALKING TO THE POLICE, AMANDA

7  DISCLOSED ADDITIONAL INFORMATION; IS THAT CORRECT?

8  A    UH-HUM; YES.

9  Q    WAS SHE -- DID SHE APPEAR TO YOU TO BE UPSET OR

10 DISTRESSED WHEN SHE TOLD YOU THIS?

11 A    SHE LOOKED LIKE SHE REALLY DIDN'T WANT TO TALK ABOUT

12 IT.  SHE WAS, LIKE, ASHAMED.  SHE DIDN'T WANT TO TELL ME.

13 SHE WOULD JUST GIVE ME, LIKE, BITS AND PIECES OF WHAT HAD

14 HAPPENED.  AND THEN I TOLD HER IT'S OKAY.  YOU CAN TELL ME.

15 I'M NOT -- YOU KNOW, I'M NOT GOING TO BE MAD AT YOU.  IT'S

16 NOT YOUR FAULT.  AND THAT'S WHEN SHE STARTED TELLING ME

17 EVERYTHING, BECAUSE HE SAID THAT IT WAS GOING TO BE HER FAULT

18 AND I WOULD BE MAD AT HER IF SHE TOLD ME.

19 Q    TOLD YOU ABOUT WHAT?

20 A    ABOUT WHAT HAD HAPPENED, ABOUT WHAT HE DID TO HER.

21 Q    DID SHE TELL YOU WHAT HE HAD -- THE DEFENDANT HAD DONE

22 TO HER?

23 A    YES.

24 Q    WHAT DID SHE TELL YOU?

25 A    SHE SAID THAT HE HAD MADE HER DRINK HIS PEE PEE MILK,

26 AND THAT HE HAD SPANKED HER.  SHE HAD TOLD ME THAT HE HAD

27 SPANKED HER BUT SHE DIDN'T TELL ME THE REASON WHY.  AND SHE

28 SAID THE REASON WHY HE SPANKED HER IS BECAUSE HE HAD JUST

20

            THE COURT:  LET HIM ASK THE QUESTION, YOU

UNDERSTAND IT AND WAIT.

            THE WITNESS:  OKAY.  I'M SORRY.

            MR. SCHROEDER:  EXCUSE ME JUST A MOMENT, YOUR

HONOR.

            THE COURT:  SURE.

BY MR. SCHROEDER:

Q    WITH RESPECT TO -- EXCUSE ME.  WITH RESPECT TO AMANDA,

WHEN THE KIDS WERE BROUGHT BACK TO YOU ON TUESDAY, ABOUT

ROUGHLY WHAT TIME OF THE DAY WOULD YOU SAY THAT WAS?

A    I BELIEVE IT WAS BETWEEN 9:00 AND 10:00 O'CLOCK.  IT

COULD HAVE BEEN 8:30.  I DON'T REMEMBER.  IT WAS PRETTY EARLY

IN THE MORNING.

Q    ALL RIGHT.  AND THIS WAS ON A TUESDAY, YOU SAID?

A    YES.

Q    AND WHAT WAS IT THAT PROMPTED YOU OR CAUSED YOU TO THINK

THERE MIGHT BE SOMETHING WRONG WITH AMANDA?

A    I DIDN'T NOTICE ANYTHING UNTIL I GAVE HER A BATH.  SHE

HAD BRUISES ON HER THIGHS, HER BACK AND HER BUTT.  AND I

NOTICED A LITTLE BRUISE ON HER CHEEK.

Q    DO YOU REMEMBER THAT YOU GOT A PHONE CALL FROM ANGEL ON

SUNDAY THAT WOULD HAVE BEEN THE 17TH OF NOVEMBER TELLING YOU

THAT AMANDA WAS SICK AND HAD BEEN THROWING UP AND HAD

DIARRHEA?

A    HE CALLED ME BUT HE DIDN'T TELL ME SHE WAS SICK.

Q    HE DIDN'T SAY ANYTHING ABOUT THAT AT ALL?

A    NO.  HE JUST SAID THAT SHE'D ATE A LOT.

Q    HE JUST CALLED YOU TO TELL YOU THAT SHE ATE A LOT?

23

1  SOMEONE TO WATCH THE KIDS FOR THE MORNING WHEN I HAD MY WISDOM
2  TEETH PULLED OUT, AND HE SAID THAT IT WAS NO PROBLEM, THAT HE
3  WOULD WATCH THE KIDS FOR ME BECAUSE I HAD TO GET THAT DONE.
4  Q    OKAY.
5  A    AND SINCE HE ALREADY HAD THEM, THAT HE MIGHT AS WELL
6  JUST TAKE THEM TO, LIKE, GREAT AMERICA OR SOMETHING FOR ONE
7  DAY.
8  Q    OKAY.  NOW, WHEN -- GETTING BACK TO TUESDAY THEN WHEN
9  SHE CAME HOME, YOU'RE SAYING THAT YOU DIDN'T REALLY NOTICE
10 ANYTHING WRONG WITH HER UNTIL YOU GAVE HER A BATH?
11 A    SHE JUST HAD A BRUISE ON HER CHEEK.  IT WAS JUST LIKE A
12 LITTLE DOT, BUT I THOUGHT IT WAS JUST LIKE DIRT WHEN THEY
13 WERE OUT, SO THAT'S WHY I GAVE THEM A BATH IN THE AFTERNOON.
14 Q    DID SHE -- WHEN SHE GOT HOME, YOU SAID THAT WAS IN
15 THE -- FAIRLY EARLY IN THE MORNING, WAS SHE ACTING AT ALL
16 UNUSUAL AT THAT TIME?
17 A    SHE WAS JUST REALLY QUIET.
18 Q    WAS THAT UNUSUAL?
19 A    NO.  AMANDA'S A PRETTY QUIET CHILD.
20 Q    OKAY.  NOW, WHEN YOU SAW THE BRUISES, WHAT DID SHE --
21 GIVE ME A SPECIFIC IDEA OF WHAT SHE SAID TO YOU -- OR STRIKE
22 THAT -- WHAT YOU SAID TO HER WHEN YOU FIRST SAW IT.
23 A    I WAS GIVING HER A BATH AND I TOLD HER TO WASH UP, BECAUSE
24 I DON'T TOUCH THEM IN THEIR PRIVATE PART BECAUSE THAT'S THEIR
25 OWN PRIVATE THINGS.  I LET THEM WASH THEMSELVES.  AND I ASKED
26 HER WHAT HAPPENED.  I NOTICED THAT WHEN SHE HAD TO REACH FOR
27 HER SOAP SHE HAD, LIKE, A BRUISE ON HER THIGH, AND I TOLD HER,
28 WHAT HAPPENED?  AND SHE SAID, OH, ANGEL SPANKED ME.  AND I

24

1  SAID, TURN AROUND, BECAUSE I WANTED TO LOOK AT HER BODY,

2  BECAUSE I WANTED TO MAKE SURE SHE DIDN'T HAVE ANYTHING ELSE,

3  LIKE ANY OTHER BRUISES, AND I NOTICED ON HER BACK, JUST A

4  LITTLE BIT ON HER LOWER BACK, AND ON HER OTHER THIGH AND A

5  COUPLE ON HER BUTT.  AND I TOLD HER, WHAT HAPPENED?  AND SHE

6  SAID HE HAD SPANKED HER BECAUSE SHE HAD THREW UP ON HIS COVER.

7  Q    OKAY.  NOW, WITH RESPECT TO THE SPANKING, DO YOU SPANK

8  YOUR CHILDREN SOMETIMES?

9  A    YES, I DO SOMETIMES.

10 Q    WHEN YOU SPANK THEM DO YOU EVER USE A BELT?

11 A    SOMETIMES I DO.  I USED TO.

12 Q    OKAY.  NOW, HAD -- YOU HAD TOLD ANGEL THAT IF NECESSARY

13 HE COULD SPANK THE CHILDREN; ISN'T THAT RIGHT?

14 A    YES, WITH HIS HAND.

15 Q    DID YOU SPECIFICALLY SAY WITH THE HAND?

16 A    YES, I DID.

17 Q    YOU SURE ABOUT THAT?

18 A    YES, I DID.  AND HE SAID THAT IT PROBABLY WOULDN'T BE

19 NECESSARY BECAUSE THEY LISTEN TO HIM, AND THAT HE USUALLY

20 JUST PUTS THEM ON PUNISHMENT.  HE SITS THEM IN THE CORNER.

21 Q    NOW, WHEN SHE WAS DESCRIBING THIS TO YOU, SHE SAID THAT

22 A BELT HAD BEEN USED?

23 A    SHE DIDN'T SAY WHAT HAD BEEN USED.  SHE JUST SAID SHE

24 WAS SPANKED.

25 Q    DID YOU ASK HER, GIVEN THE FACT THAT YOU SAW THESE

26 PARTICULAR INJURIES, DID YOU SAY TO HER, YOU KNOW, HOW DID IT

27 HAPPEN OR TRY TO GET SOME DETAILS FROM HER?

28 A    YES.  I ASKED HER LATER AND SHE SAID IT WAS WITH HIS

25

1  SHOE.

2  Q    SAID IT WAS WITH A SHOE?

3  A    YES.

4  Q    DID YOU ASK HER WHAT -- WHAT KIND OF SHOE IT WAS?

5  A    SHE SAID IT WAS HIS SANDAL.

6  Q    OKAY.  YOU SAID THAT YOU ASKED HER THAT LATER.  WAS THAT

7  AFTER THE OAKLAND POLICE HAD BEEN THERE OR BEFORE?

8  A    THAT WAS WHILE THE OAKLAND POLICE WERE THERE.

9  Q    SO WHEN THE OAKLAND POLICE WERE THERE YOU WERE THERE

10  DURING THE WHOLE TIME THEY WERE TALKING TO HER?

11  A    YES, I WAS.

12  Q    DID YOU NOTICE WHETHER THE OFFICER WAS WRITING DOWN

13  ANYTHING, LIKE TAKING NOTES?

14  A    HE WAS MAKING A REPORT.

15  Q    HE WAS YOU SAY?

16  A    UH-HUM; YES.

17  Q    OKAY.  SO WHEN SHE TOLD YOU THAT SHE HAD BEEN SPANKED BY

18  HIM, WAS THERE SOMETHING IN PARTICULAR THAT CAUSED YOU AT

19  THAT POINT TO CALL -- STRIKE THAT.  WAS THERE SOMETHING IN

20  PARTICULAR THAT CAUSED YOU TO CALL THE POLICE AFTER SHE TOLD

21  YOU SHE HAD BEEN SPANKED BY HIM?

22  A    NO.

23  Q    SO THE FACT THAT SHE TOLD YOU THAT SHE HAD BEEN SPANKED

24  BY HIM CAUSED YOU TO CALL THE OAKLAND POLICE DEPARTMENT?

25  A    NO, NOT UNTIL I GAVE ANTHONY A BATH.  THEN I CALLED THE

26  OAKLAND POLICE DEPARTMENT.

27  Q    OKAY.  NOW, WHEN YOU GAVE ANTHONY A BATH, WHAT WAS IT

28  THAT YOU SAW?

26

1    A    HE HAD BRUISES ON HIS BUTT AND ON HIS THIGHS.

2    Q    AND DID YOU ASK HIM HOW HE GOT THOSE?

3    A    YES, I DID.

4    Q    AND WHAT DID HE SAY?

5    A    HE SAID HE SPANKED HIM WITH HIS SHOE AND HIS HAND.

6    Q    NOW, YOU WERE AWARE THAT -- STRIKE THAT.  WERE YOU AWARE

7    THAT THE CHILDREN HAD BEEN, AT LEAST ON PREVIOUS OCCASIONS,

8    AT LEAST ONE PREVIOUS OCCASION, THAT THEY HAD BEEN SPANKED BY

9    ANGEL?

10   A    YES, THEY HAVE -- THEY HAVE BEEN SPANKED BEFORE BY

11   ANGEL, BUT THERE WERE NEVER ANY BRUISES.

12   Q    SO AS A RESULT OF SEEING THE BRUISES ON ANTHONY YOU

13   DECIDED TO CALL THE OAKLAND POLICE DEPARTMENT?

14   A    YES, I DID, 'CAUSE THEY BOTH HAD BRUISES, AND THEN I

15   JUST KNEW SOMETHING WAS WRONG.

16   Q    WELL, WHEN YOU SAW THEM ON AMANDA, AS I UNDERSTAND IT,

17   YOU DIDN'T CALL THE OAKLAND POLICE?

18   A    NO, I DIDN'T, BECAUSE I WAS GIVING THEM BOTH A BATH.  I

19   WAS GIVING MY DAUGHTER A BATH FIRST, THEN I TOLD HER JUST

20   WRAP YOURSELF UP IN A TOWEL AND THEN CALL ANTHONY SO I CAN

21   GIVE HIM A BATH.  AND THEN I NOTICED THE BRUISES ON HIM AND I

22   SAID THERE'S SOMETHING WRONG, BECAUSE YOU BOTH HAVE BRUISES.

23   AND I THOUGHT -- YOU KNOW, SOMETIMES ANTHONY, HE'S -- HE'S

24   NOT A PROBLEM CHILD BUT HE'S VERY DIFFICULT SOMETIMES, AND SO

25   I WAS JUST, LIKE -- I DIDN'T, YOU KNOW, AMANDA SHOULD HAVE

26   BEEN -- I FIGURED AMANDA IS A REALLY QUIET CHILD.  I WAS,

27   LIKE, WHY WOULD SHE BE SPANKED LIKE THAT?  AND I NOTICED ON

28   ANTHONY, AND I SAID SOMETHING IS WRONG, AND THEN HE STARTED

1 | WESLEY J. SCHROEDER
Attorney at Law
2 | 181 Devine Street
San Jose, CA  95110
3 | (408) 277-0377
State Bar #59977

F I L E D

JUN 1 1 1999

STEPHEN V. LOVE
County Clerk
Santa Clara County

4

Attorney for Defendant,
5 | ANGEL ALVAREZ

DEPUTY

6

7

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8

IN AND FOR THE COUNTY OF SANTA CLARA

9

10

11

| | |
|---|---|
| PEOPLE OF THE STATE ) OF CALIFORNIA, ) ) Plaintiff, ) ) vs. ) ) ANGEL ALVAREZ, ) ) Defendant, ) ) _____ ) | Case No. 198084<br><br>NOTICE OF MOTION FOR ORDER PERMITTING CROSS-EXAMINATION OF PRIOR SEXUAL CONTACT OF COMPLAINING WITNESS<br><br>Date:    June 14, 1999<br>Time:    9:00 a.m.<br>Place:   Judge Emerson<br>         Department 33 |

12

13

14

15

16

17

18    TO THE DISTRICT ATTORNEY OF SANTA CLARA COUNTY AND HER

19  REPRESENTATIVE:

20    PLEASE TAKE NOTICE that on June 14, 1999, at 9:00 a.m.,

21  or as soon thereafter as the matter may be heard in the

22  courtroom of Department 33 of the above-entitled court, the

23  defendant will move for an order allowing cross-examination of

24  the complaining witness in this case regarding the prior

25  sexual contact of the witness.

26    This motion will be made on the grounds that prior sexual

27  contact is relevant and material to the determination of the

28  credibility of the complaining witness.

206

1

1    The motion will be based on this notice of motion, the

2    attached offer of proof, the memorandum of points and

3    authorities served and filed herewith, on the records on file

4    in this action, and on such oral and documentary evidence as

5    may be presented at the hearing on the motion.

6

7    Dated: 6-11-99

8                                    WESLEY J. SCHROEDER
                                     Attorney for Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                              207

                            2

1  | WESLEY J. SCHROEDER
   | Attorney at Law
2  | 181 Devine Street
   | San Jose, CA  95110
3  | (408) 277-0377
   | State Bar #59977
4  |
   | Attorney for Defendant,
5  | ANGEL ALVAREZ

6

7           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8               IN AND FOR THE COUNTY OF SANTA CLARA

9

10

11 | PEOPLE OF THE STATE )        Case No. 198084
   | OF CALIFORNIA,      )
12 |                     )        POINTS AND AUTHORITIES
   |       Plaintiff,    )        IN SUPPORT OF MOTION
13 |                     )        FOR ORDER REGARDING
   | vs.                 )        PRIOR SEXUAL CONTACT
14 |                     )        OF COMPLAINING WITNESS
   | ANGEL ALVAREZ,      )
15 |                     )                .
   |       Defendant,    )
16 | _____)

17      Defendant submits the following points and authorities in

18 support of the motion for an order regarding prior sexual

19 contact of the complaining witness.

20                              I

21               THE  TRIAL  COURT  HAS  DISCRETION  TO

22               ADMIT  EVIDENCE  OF  THE  PRIOR  SEXUAL

23               CONTACT  OF  THE  COMPLAINING  WITNESS

24               IN ORDER TO IMPEACH THE CREDIBILITY

25               OF THE WITNESS

26

27      Evidence Code § 782 provides a procedure by which the

28 trial court is given discretion to admit evidence of the prior

                                1            208

1   sexual contact of the complaining witness to attack the

2   credibility of that witness, even though the offer concerns an

3   underlying issue, such as consent, the prior relevant sexual

4   contact may be admissible. (People v Daggett (1990, 2nd Dist)

5   225 Cal App 3d 751, 275 Cal Rptr 287; People v Rioz (1984, 5th

6   Dist) 161 Cal App 3d 905, 207 Cal Rptr 903.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

6-11-99            WESLEY J. SCHROEDER
21                       ATTORNEY AT LAW

22

23

24

25

26

27

28                                   **209**

1  WESLEY J. SCHROEDER
   Attorney at Law
2  181 Devine Street
   San Jose, CA  95110
3  (408) 277-0377
   State Bar #59977
4
   Attorney for Defendant,
5  ANGEL ALVAREZ

6

7        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8             IN AND FOR THE COUNTY OF SANTA CLARA

9

10                             ·

11
   PEOPLE OF THE STATE )        Case No. 198084
12 OF CALIFORNIA,      )
                       )        OFFER OF PROOF REGARDING
13      Plaintiff,     )        PRIOR SEXUAL CONTACT OF
                       )        THE COMPLAINING WITNESS
14 vs.                 )
                       )
15 ANGEL ALVAREZ,      )
                       )
16      Defendant,     )
   _____)
17
        Defendant ANGEL ALVAREZ, through counsel, hereby submits
18
   the following offer of proof regarding prior sexual contact of
19
   the complaining witness:
20
        If called to testify, the following witnesses would state
21
   the following:
22
        The complaining witness in this case, Amanda Acosta, was
23
   regularly babysat by defendant, Angel Alvarez.  In the course
24
   of his babysitting duties with Amanda she confided in him that
25
   her biological father, Ivan Acosta, had molested her.
26
        This was stated to defendant sometime in October, 1996.
27
   At that time she told defendant Ivan had taken her to
28
   McDonald's and then to her grandmother's house.  She stated

                              1
                                            210

1   that at her grandmother's she and her father had their clothes
2   off, and he touched her "down there."

3       After being told of this by Amanda, defendant spoke with
4   Amanda's mother, Ruby Rubio. He inquired as to whether Ivan
5   had molested Amanda. When he asked this question, Ms. Rubio
6   responded by glaring angrily at Amanda and scolding her by
7   saying, "Why are you opening your mouth, you little bitch?
8   Don't be talking shit." Ms. Rubio then advised defendant this
9   matter was none of his business.

10      The complaining witness did contract chlamydia in this
11  case.   There will be medical testimony that it is possible
12  sexual contact resulting in a chlamydia infection can remain
13  dormant for some period of time before it shows symptoms.
14  Since   the   prosecution   is   alleging   defendant   infected
15  complaining witness with chlamydia, it is important to the
16  defense to present an alternative explanation as to how this
17  infection could have been contracted.

18      For this reason, while this does not really involve
19  sexual conduct by the complaining witness, it does involve
20  sexual contact imposed upon her by her father.   Therefore,
21  questions of her and her mother, Ms. Rubio, are relevant and
22  material to the defense in order to establish an alternative
23  explanation as to how this infection may have occurred.

24      In addition, sometime in late-summer of 1996, Amanda
25  confided in defendant she had seen her mother and father
26  kissing each other and "doing nasty things."   From the
27  description given, it appeared that such activity took place
28  when Amanda slept in the same bedroom with her parents in

                                    2                   **211**

1    Hayward.

2        Because of this statement, which does not involve sexual

3    activity on the part of complaining witness but does involve

4    observations of sexual activity by her, it is a material and

5    relevant  inquiry  necessary  to  establish  the  complaining

6    witness has observed sex acts in the past which could explain

7    her ability to describe sexual actions.

8        I declare under penalty of perjury that the foregoing is

9    true and correct.

10        Executed  on  _____6-11-99_____,  at  San

11   Jose, California.

12

13                    Respectfully submitted,

14

15

16                    WESLEY S. SCHROEDER
                      Attorney for Defendant

17

18

19

20

21

22

23

24

25

26

27

28

                                                    212

                          3

CALJIC 10.42

LEWD ACT WITH A CHILD UNDER
FOURTEEN YEARS—FORCE OR FEAR
(Pen. Code, § 288, subd. (b)(1))


JAMES C. EMERSON
_____
Judge


[Defendant is accused [in Count [  3  ] of having
committed the crime of lewd act with a child by force or fear in
violation of section 288, subdivision (b)(1) of the Penal Code.]

Every person who willfully commits any lewd or lascivious
act upon or with the body, or any part or member thereof, of a
child under the age of 14 years, by the use of force, violence,
duress, menace, or fear of immediate and unlawful bodily injury
on the child or another person, and with the specific intent of
arousing, appealing to, or gratifying the lust or passions or
sexual desires of that person or the child, is guilty of the
crime of a lewd act with a child by force or fear in violation of
Penal Code section 288, subdivision (b)(1).

A "lewd or lascivious act" is defined as any touching of the
body of a child under the age of 14 years with the specific
intent to arouse, appeal to, or gratify the sexual desires of
either party.  To constitute a lewd or lascivious act, it is not
necessary that the bare skin be touched.  The touching may be
through the clothing of the child.

[The law does not require that the lust, passions, or sexual
desires of either persons be actually aroused, appealed to, or
gratified.]

The term "force" means physical force that is substantially
different from or substantially greater than that necessary to
accomplish the lewd act itself.

[The term "duress" means a direct or implied threat of
force, violence, danger, hardship or retribution sufficient to
coerce a reasonable person of ordinary susceptibilities to (1)
perform an act which otherwise would not have been performed, or
(2) acquiesce in an act to which one otherwise would not have

273

submitted. The total circumstances, including the age of the victim, and ▓▓▓ [her] relationship to defendant, are factors to consider in appraising the existence of duress.]

In order to prove this crime, each of the following elements must be proved:

1. A person touched the body of a child;

2. The child was under 14 years of age;

3. The touching was done with the specific intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of that person or the child; and

4. The touching was done by the use of force, violence, duress, menace, or fear of immediate and unlawful injury on the child or another person.

274

SUPP. CLERK'S TRANSCRIPT 1
"Supp. CT 1"

PEOPLE VS. ANGEL ALVAREZ
DOCKET NO. C9615417
SAN JOSE POLICE DEPARTMENT
INTERVIEW OF AMANDA ACOSTA 11-20-96

1 ALVAREZ    When, when he touched, you said, okay, first you
2           said, which, which...

3 ACOSTA     Achoo.

4 ALVAREZ    Ooh!  Bless you.  Which did he do first?  Did he
5           uh, touch you with his uh, with his pee pee first?

6 ACOSTA     Yeah.

7 ALVAREZ    Where did he touch you?

8 ACOSTA     Um, down there.

9 ALVAREZ    Huh?

10 ACOSTA    Down there.

11 ALVAREZ   What, what is down there?

12 ACOSTA    Pee.

13 ALVAREZ   Oh, your pee.  Let me ask you.  Okay, I forgot to
14          ask you that.  You know what?

15 ACOSTA    No.

16 ALVAREZ   Let me ask you, okay?  What do you use your pee
17          for?

18 ACOSTA    To go pee.

19 ALVAREZ   That's what it's for, huh?  The pee...

20 ACOSTA    This is to go caca.

21 ALVAREZ   Oh, the, the butt is to go caca and the pee, and
22          the pee is to go...

23 ACOSTA    Pee pee.

24 ALVAREZ   To go pee pee.  Okay.  You know what?  I've got,
25          I've got another picture here, okay?  Um, what,
26          what, what do you call this, what do you call this

**17**

orge W. Kennedy
District Attorney
unty of Santa Clara
Jose, California 95110

PEOPLE VS. ANGEL ALVAREZ
DOCKET NO. C9615417
SAN JOSE POLICE DEPARTMENT
INTERVIEW OF AMANDA ACOSTA 11-20-96

1   ACOSTA      Um huh.

2   ALVAREZ     Where did he put the milk from his pee pee?

3   ACOSTA      (inaudible) in the little hole.

4   ALVAREZ     Huh?

5   ACOSTA      In the little hole.

6   ALVAREZ     Yeah, but I mean, it came out of the little hole,

7               right?  It didn't go into the little hole.

8   ACOSTA      It came out of the little hole.

9   ALVAREZ     And then when it came out of the little hole, where

10              did it uh...

11  ACOSTA      In my mouth.

12  ALVAREZ     It came out in, in your mouth?

13  ACOSTA      Um huh.

14  ALVAREZ     Did uh, I forgot, I don't know if I asked you.  Did

15              he touch you, look.  Amanda.

16  ACOSTA      Um huh.

17  ALVAREZ     Did he touch you with his pee pee, show me where he

18              touched you with his pee pee on, on your body?

19              Mark it, mark it with this.

20  ACOSTA      Okay.

21  ALVAREZ     Go ahead.  Show, show...

22  ACOSTA      Um...

23  ALVAREZ     Where did he touch you?

24  ACOSTA      Where's the pee?

25  ALVAREZ     Your pee is right there.

26  ACOSTA      Um.

**20**

orge W. Kennedy
District Attorney
unty of Santa Clara
Jose, California 95110

PEOPLE VS. ANGEL ALVAREZ
DOCKET NO. C9615417
SAN JOSE POLICE DEPARTMENT
INTERVIEW OF AMANDA ACOSTA 11-20-96

1   ALVAREZ     Oh, you're talking about his pee pee or your pee
2               pee?
3   ACOSTA      Mine.
4   ALVAREZ     Yours?  Um.  Where, where is your pee pee?  Where,
5               where, okay.  Did, did he touch you there with,
6               with his, right there?  Is that where he touched
7               you with uh, with his pee pee?
8   ACOSTA      Um huh.
9   ALVAREZ     Are you sure?
10  ACOSTA      Um huh.  No.
11  ALVAREZ     You're not sure?  Oh, okay.  Let me ask you.  Did
12              he touch you here?
13  ACOSTA      No.  Yeah.
14  ALVAREZ     Yes or no?
15  ACOSTA      Yes.
16  ALVAREZ     Remember we were talking about telling the truth?
17  ACOSTA      Um huh.
18  ALVAREZ     Okay.  So did he touch you there with his pee pee?
19  ACOSTA      No.
20  ALVAREZ     He didn't touch you there with his pee pee?
21  ACOSTA      No.
22  ALVAREZ     Where did he touch you with his pee pee?
23  ACOSTA      Nowhere.
24  ALVAREZ     Nowhere?
25  ACOSTA      Uh uh.
26  ALVAREZ     Now, okay, now remember.  You just told me a little

PEOPLE VS. ANGEL ALVAREZ
DOCKET NO. C9615417
SAN JOSE POLICE DEPARTMENT
INTERVIEW OF AMANDA ACOSTA 11-20-96

1        while ago that he put his pee pee in your mouth.

2        Is that true or is that not true?

3  ACOSTA    True.

4  ALVAREZ   Huh?

5  ACOSTA    True.

6  ALVAREZ   It's true?  Okay.  And did he, did he touch you...

7        Let me ask you.  Did he touch you here?  What did

8        he touch you here with?

9  ACOSTA    His finger.

10 ALVAREZ   His finger?

11 ACOSTA    Only.

12 ALVAREZ   Uh?

13 ACOSTA    His finger only.

14 ALVAREZ   His finger only?

15 ACOSTA    Um huh.

16 ALVAREZ   How many times did he um, did he touch you with his

17       finger here?

18 ACOSTA    A lot of times.

19 ALVAREZ   A lot of times?  Remember the, this last time when

20       you threw up, did he, did he touch you that day

21       with uh, with his finger there?  He did?

22 ACOSTA    Um huh.

23 ALVAREZ   Did, did you ever, did you ever uh, did he ever

24       kiss you here on your pee?

25 ACOSTA    Um huh.

26 ALVAREZ   Is that a yes or a no?

**22**

21

PEOPLE VS. ANGEL ALVAREZ
DOCKET NO. C9615417
SAN JOSE POLICE DEPARTMENT
INTERVIEW OF AMANDA ACOSTA 11-20-96

1   ACOSTA      Yes.

2   ALVAREZ     He did?

3   ACOSTA      Yeah.

4   ALVAREZ     How many times did he kiss you there with his pee?

5   ACOSTA      A lot.

6   ALVAREZ     A lot of times?

7   ACOSTA      Um huh.

8   ALVAREZ     This, this last time when you threw up, did um, did

9               he kiss you there?

10  ACOSTA      Yeah.

11  ALVAREZ     Huh?

12  ACOSTA      Yeah.

13  ALVAREZ     Do you remember when we were talking about telling

14              the truth?

15  ACOSTA      Yes.

16  ALVAREZ     Are you telling me the truth now?

17  ACOSTA      Yeah. (inaudible).

18  ALVAREZ     Huh?

19  ACOSTA      Yeah.

20  ALVAREZ     You are telling me the truth?

21  ACOSTA      Um huh.

22  ALVAREZ     Okay.  I'll tell you what.  Let me ask you.

23  ACOSTA      Um huh.

24  ALVAREZ     Okay?  Did, uh, just one, one last time.

25  ACOSTA      Huh.

26  ALVAREZ     He touched you here on your pee.

PEOPLE VS. ANGEL ALVAREZ
SJPD #96-324-1241
SAN JOSE POLICE DEPARTMENT
INTERVIEW OF DEFENDANT BY OFFICER ERIC ROSENGREN ON 11-20-96

1  ROSENGREN Have you hit the little girl before, I mean this weekend?

2  ALVAREZ   Hum um.  No.

3  ROSENGREN What happened this weekend?

4  ALVAREZ   I never hit them—but I always hit them with my hand, on
5            their butts.

6  ROSENGREN Did you use your belt that we have here, or...

7  ALVAREZ   That belt.

8  ROSENGREN What happened this weekend that made you use the belt as
9            opposed to other weekends?

10 ALVAREZ   Well, Amanda is a really smart girl.  Because she knows
11           how to bribe you, you know.  "If you buy me this, I'll be
12           nice," or even, you know what I mean?  Um, basically, her
13           mother taught her that.  Her mother tells her um, to tell
14           me, "Buy me this, buy me that."  So...but Amanda wanted to
15           go to McDonald's, and I said, "No."  'Cause you know like
16           when we go to dinner, we go to a restaurant.  And I took
17           them to the restaurant, and the chicken soup, and she went
18           (inaudible) the chicken soup.  And I said, "Okay, Amanda,
19           don't be acting like that right now."  That's when she
20           goes, "I want McDonald's.  I want a Happy Meal."  I said,
21           "You're gonna eat that soup, because that's all I'm buying
22           for you."  And she wouldn't eat it.

23 ROSENGREN Hm.

24 ALVAREZ   And she, you know, like spit in it.  And so when I took
25           her to the flower shop, I have a flower shop that my
26           sister and I own.  I spanked her there.  Um, she said she

19

**96**

SUPP. CLERK'S TRANSCRIPT 2
"Supp. CT 2"

PEOPLE VS. ANGEL ALVAREZ
SJPD #96-324-1241
SAN JOSE POLICE DEPARTMENT
INTERVIEW OF DEFENDANT BY OFFICER ERIC ROSENGREN ON 11-20-96

1   ALVAREZ    Yeah.

2   ROSENGREN  Doesn't make sense my friend.  She's angry at you every

3              weekend, and this weekend all of a sudden she's gonna make

4              up all these allegations?

5   ALVAREZ    She's angry.

6   ROSENGREN  Or   have   the   children   making   these   extraordinary

7              allegations?

8   ALVAREZ    Because I threatened that I would tell that she harbored

9              him, unless she stopped seeing him.  That's what I told

10             her.  I told her, that fact that she hid him was a felony.

11             You were harboring a felon, and that's a crime.  She goes,

12             "What are you gonna do?"  I go, "I don't know, I'm gonna

13             think about it.  Maybe you should stop seeing this guy."

14  ROSENGREN  Do you understand that now you've asked for an attorney

15             that nothing can be used against you?

16  ALVAREZ    Now that I've asked for an attorney?

17  ROSENGREN  Um hum.  That we cannot use any of your statement against

18             you?  How do you feel about these kids?  Do you still love

19             them?

20  ALVAREZ    Of course I do.

21  ROSENGREN  How do you think they feel after the weekend that they

22             spent with you?

23  ALVAREZ    They still love me.

24  ROSENGREN  How do you think Amanda's gonna feel, say it comes time

25             for court, and she has to sit there in front of all these

26             strangers, and tell them about the sexual activities that

EXHIBIT  D

DECLARATION OF
FRANK H. SAUNDERS

I, Frank H. Saunders declare as follows:

1. I am a resident of Santa Cruz County, California.

2. I am self-employed as a consultant in Law Enforcement, Security and Private Investigations (CA Lic. #AA-8900). I am doing business under the name of Frank Saunders & Associates, Inc. My business address is: PO Box 1730, Capitola, CA, 95010.

3. I was employed for fifteen (15) years with the Santa Monica, California, Police Department and hold that agency's highest award, "The Medal of Valor." I worked for over ten (10) years as a FTO (Field Training Officer) and have accumulated experience in all areas of investigation, report writing and evidence handling since 1965. My current CV is also attached and should be considered as a part of this declaration.

4. Presently I am professionally affiliated with the National Association of Chiefs of Police, PORAC (Police Officers Research Association of California), numerous other police officers' organizations and hold both a *Field Training Officer (FTO)* and an *Advanced* Certificate from POST (Commission for Peace Officers' Standards and Training). I am listed as a police expert with the Northern California Defense Counsel's Expert Bank, Americans for Effective Law Enforcement (Chicago, IL), Who's Who in American Law Enforcement (North Miami, FL), and am shown as one of the top 5,000 Court Certified Expert Witnesses in the country by the National Forensic Center (San Diego, CA).

5. I have qualified as an expert and been allowed to testify as an expert witness well in excess of 400 cases in Federal, State and Municipal courts in California, Illinois, Nevada, Arizona, Hawaii, Oregon, Washington, Delaware, North Carolina, Wyoming, Montana, Mississippi, Alaska, Indiana, Pennsylvania, Iowa, New Mexico, Missouri, Tennessee and New Plymouth, New Zealand, since 1981.

6. During that 24 year period, I have been retained by both plaintiffs and such agency/officer/defendants (in both and criminal and civil trials) as the San Diego Police

Department; the Los Angeles Sheriff's Department; Los Angeles Police Department (twice); San Francisco (twice); Oakland (twice); Sacramento County, CA; Torrance, CA; El Cajon, CA; Santa Cruz, CA; Tustin, CA; Long Beach, CA (twice); East Bay Regional Park District, CA (twice); Sanger, CA: (twice); Los Gatos, CA; Sunnyvale, CA; San Jose, CA (twice); Santa Clara County, CA; Santa Maria, CA Santa Ana, CA; Fullerton, CA; Kern County, CA; Glenn County CA; Westminster, CA; Richmond, CA; Livermore, CA; Compton, CA; Oregon State Police; Spokane, Washington; Klamath Falls, Oregon; County of Maui, Hawaii; County of Asa, Idaho; Wilmington Delaware Police Department; Delaware State Police (four times); New Castle County, Delaware Police Department; Hanford, CA; Hazel Park, Michigan P.D.; Siskiyou County, CA ; the INS; Springfield, IL PD; and Albuquerque, New Mexico (3 times).

7. Based upon my review of the indicated materials (see attached listing) done at the direct request of the indicated Defendant, and weighed against my personal law enforcement training and in particular my in-the-field as well as my investigative experience, dating back to 1965, it is at this time my firm professional opinion that I can never recall a more confusing and convoluted "chain-of-evidence" series of violations, then is clearly demonstrated during this specific instance presently under review.

8. Sequentially, Item #4, described as a "red plaid blanket" on page # 1 (of 2) of the examined San Jose PD "evidence log", was released (03-28-97) from San Jose PD evidence room to the Santa Clara County Crime Laboratory, for supposed testing along with other evidentiary items relevant to this criminal prosecution. However, no indication of the result of any such "testing" being conducted (on this blanket) is shown on the crime lab report (of Criminalist Kathy Benjamin) dated 04-15-97. This red plaid blanket (item #4) is then shown as being returned to the SJPD property room on 11-16-98, along with items #1 through #5. This same item (#4; i.e.: the red plaid blanket) for approximately a one-day period is shown being sent to the SAIU (Sexual Assault Investigative Unit) (on 06-10-98) before being logged back into the SJPD property room the next day (06-11-98). Interestingly enough, it is the next property log entry that is most curious. Although there is no indication that any items were logged out of the property room in 1998, Officer R. Ramos shows a log entry for a "returned property" on June 16 of 1998, after the returning entry from the SAIU, dated almost a year later, and not indicating a location from where

these items were returning _from_. Again, items #1 through #5 (<u>apparently</u> including the same item #4: the blanket in question) were released to court on 06-15-99 but the blanket was <u>not</u> signed back <u>into</u> the property room until 08-04-99 if (apparently) the same Officer R. Ramos, listing of "item #4", as almost an afterthought to that latest log entry indicating that item #5 _returned_ on that date.

9.    From a careful study of the supplied material, it is totally <u>impossible</u> to accurately ascertain if: (a) item #4 was ever "released" (much less _when_ and to _where_, on more than one occasion), if (b), such a determination is only to be based on Officer R. Ramos' various (and missing?) log entries over the history of this quite badly shattered "chain-of-evidence" incident(s), as my to-date-review thus far clearly seems to show.


I hereby declare under penalty of perjury that the matters stated herein are true and correct and are based upon my personal knowledge, and review at this time, and if I were called as a witness, I could testify competently thereto.   Executed in the City of Santa Cruz, State of California on this 11th day of July, 2005.

Frank H. Saunders

## PEOPLE OF CALIFORNIA vs. ANGEL ALVAREZ
## OUR CASE # 25-019

**OCCURRED: 12-13-96**
**CONTACTED: 06-08-06**

- **MATERIALS REVIEWED**

- Santa Clara County District Attorney's Office letter (02-04-05)
  DA Kimberly A. Connors: to - Frank G. Prantil, Esq.

- San Jose PD Supplemental Report Case # 96-324-1241 (02-03-05)
  Detective Mark Stephens

- County of Santa Clara Crime: Report: # M 960659 (04-15-97)
  by Criminalist Kathy S. Benjamin

- County of Santa Clara Crime Lab: Evidence Management Log
  (05-20-98 through 09-04-98)

- San Jose PD Property / Evidence Chain of Custody Record (12-13-96)

EXHIBIT  E

1  WESLEY J. SCHROEDER
   Attorney at Law
2  181 Devine Street
   San Jose, CA  95110
3  (408) 277-0377
   State Bar #59977
4
   Attorney for Defendant,
5  ANGEL ALVAREZ



STEPHEN V. LOVE

DEPUTY

6

7              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                   IN AND FOR THE COUNTY OF SANTA CLARA

9

10

11
   PEOPLE OF THE STATE )          Case No. 198084
12 OF CALIFORNIA,      )
                       )          NOTICE OF MOTION FOR
13       Plaintiff,    )          ORDER PERMITTING CROSS-
                       )          EXAMINATION OF PRIOR
14 vs.                 )          SEXUAL CONTACT OF
                       )          COMPLAINING WITNESS
15 ANGEL ALVAREZ,      )
                       )          Date:    June 14, 1999
16       Defendant,    )          Time:    9:00 a.m.
   _____ )          Place:   Judge Emerson
17                                         Department 33

18       TO THE DISTRICT ATTORNEY OF SANTA CLARA COUNTY AND HER

19 REPRESENTATIVE:

20       PLEASE TAKE NOTICE that on June 14, 1999, at 9:00 a.m.,

21 or as soon thereafter as the matter may be heard in the

22 courtroom of Department 33 of the above-entitled court, the

23 defendant will move for an order allowing cross-examination of

24 the complaining witness in this case regarding the prior

25 sexual contact of the witness.

26       This motion will be made on the grounds that prior sexual

27 contact is relevant and material to the determination of the

28 credibility of the complaining witness.              206

                                 1

1    The motion will be based on this notice of motion, the
2    attached offer of proof, the memorandum of points and
3    authorities served and filed herewith, on the records on file
4    in this action, and on such oral and documentary evidence as
5    may be presented at the hearing on the motion.
6
7    Dated: 6-11-99
8                                    WESLEY J. SCHROEDER
                                     Attorney for Defendant
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28                                                207

                                   2

1 | WESLEY J. SCHROEDER
Attorney at Law
2 | 181 Devine Street
San Jose, CA  95110
3 | (408) 277-0377
State Bar #59977
4 |
Attorney for Defendant,
5 | ANGEL ALVAREZ

6

7
IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
8
IN AND FOR THE COUNTY OF SANTA CLARA
9

10

11 | PEOPLE OF THE STATE )        Case No. 198084
OF CALIFORNIA,        ;
12 |                      )        POINTS AND AUTHORITIES
                       )        IN SUPPORT OF MOTION
13 |     Plaintiff,      )        FOR ORDER REGARDING
                       )        PRIOR SEXUAL CONTACT
14 | vs.                  )        OF COMPLAINING WITNESS
                       ;
15 | ANGEL ALVAREZ,       )
                       )            .
16 |     Defendant,      )
_____)

17 |     Defendant submits the following points and authorities in

18 | support of the motion for an order regarding prior sexual

19 | contact of the complaining witness.

20 |                              I

21 |               THE TRIAL COURT HAS DISCRETION TO

22 |               ADMIT EVIDENCE OF THE PRIOR SEXUAL

23 |               CONTACT OF THE COMPLAINING WITNESS

24 |               IN ORDER TO IMPEACH THE CREDIBILITY

25 |               OF THE WITNESS

26

27 |     Evidence Code § 782 provides a procedure by which the

28 | trial court is given discretion to admit evidence of the prior

1

208

1   sexual contact of the complaining witness to attack the

2   credibility of that witness, even though the offer concerns an

3   underlying issue, such as consent, the prior relevant sexual

4   contact may be admissible. (People v Daggett (1990, 2nd Dist)

5   225 Cal App 3d 751, 275 Cal Rptr 287; People v Rioz (1984, 5th

6   Dist) 161 Cal App 3d 905, 207 Cal Rptr 903.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   6-11-99                  WESLEY J. SCHROEDER
                             ATTORNEY AT LAW
22

23

24

25

26

27

28                                            **209**

                             2

1 | WESLEY J. SCHROEDER
Attorney at Law
2 | 181 Devine Street
San Jose, CA  95110
3 | (408) 277-0377
State Bar #59977
4 |
Attorney for Defendant,
5 | ANGEL ALVAREZ

6

7          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8             IN AND FOR THE COUNTY OF SANTA CLARA

9

10

11
PEOPLE OF THE STATE )          Case No. 198084
12 | OF CALIFORNIA,      )
                    )          OFFER OF PROOF REGARDING
13 |     Plaintiff,       )     PRIOR SEXUAL CONTACT OF
                    )          THE COMPLAINING WITNESS
14 | vs.                 )
                    )
15 | ANGEL ALVAREZ,      )
                    )
16 |     Defendant,      )
    _____)
17
        Defendant ANGEL ALVAREZ, through counsel, hereby submits
18
the following offer of proof regarding prior sexual contact of
19
the complaining witness:
20
        If called to testify, the following witnesses would state
21
the following:
22
        The complaining witness in this case, Amanda Acosta, was
23
regularly babysat by defendant, Angel Alvarez.  In the course
24
of his babysitting duties with Amanda she confided in him that
25
her biological father, Ivan Acosta, had molested her.
26
        This was stated to defendant sometime in October, 1996.
27
At that time she told defendant Ivan had taken her to
28
McDonald's and then to her grandmother's house.  She stated

                                 1                       210

1   that at her grandmother's she and her father had their clothes
2   off, and he touched her "down there."

3       After being told of this by Amanda, defendant spoke with
4   Amanda's mother, Ruby Rubio.  He inquired as to whether Ivan
5   had molested Amanda.  When he asked this question, Ms. Rubio
6   responded by glaring angrily at Amanda and scolding her by
7   saying, "Why are you opening your mouth, you little bitch?
8   Don't be talking shit."  Ms. Rubio then advised defendant this
9   matter was none of his business.

10      The complaining witness did contract chlamydia in this
11  case.   There will be medical testimony that it is possible
12  sexual contact resulting in a chlamydia infection can remain
13  dormant for some period of time before it shows symptoms.
14  Since   the   prosecution   is   alleging   defendant   infected
15  complaining witness with chlamydia, it is important to the
16  defense to present an alternative explanation as to how this
17  infection could have been contracted.

18      For this reason, while this does not really involve
19  sexual conduct by the complaining witness, it does involve
20  sexual contact imposed upon her by her father.   Therefore,
21  questions of her and her mother, Ms. Rubio, are relevant and
22  material to the defense in order to establish an alternative
23  explanation as to how this infection may have occurred.

24      In addition, sometime in late-summer of 1996, Amanda
25  confided in defendant she had seen her mother and father
26  kissing each other and "doing nasty things."   From the
27  description given, it appeared that such activity took place
28  when Amanda slept in the same bedroom with her parents in

                            2                    **211**

1  Hayward.

2      Because of this statement, which does not involve sexual

3  activity on the part of complaining witness but does involve

4  observations of sexual activity by her, it is a material and

5  relevant inquiry necessary to establish the complaining

6  witness has observed sex acts in the past which could explain

7  her ability to describe sexual actions.

8      I declare under penalty of perjury that the foregoing is

9  true and correct.

10     Executed on _____6-11-99_____, at San

11 Jose, California.

12

13                    Respectfully submitted,

14

15                    _____

16                    WESLEY N. SCHROEDER
                       Attorney for Defendant

17

18

19

20

21

22

23

24

25

26

27

28

                                              **212**

                          3

EXHIBIT  F

CALJIC 10.55        AGGRAVATED SEXUAL ASSAULT OF A CHILD
(Pen. Code, § 269, subd. (a))


JAMES C. EMERSON
_____
Judge


[Defendant is accused [in Count ~~1~~ _2_ ] of having violated section 269, subdivision (a) of the Penal Code, a crime.]

Every person who commits [any of] the following acts upon a child who is under 14 years of age and 10 or more years younger than the person is guilty of the crime of aggravated sexual assault of a child in violation of Penal Code section 269, subdivision (a): *the said △ did commit a violation in that the said △ did commit a violation of Penal Code § 288 a by force, violence, duress, menace or fear of immediate and*
In order to commit this crime, each of the following *unlawful* elements must be proved: *bodily injury.*

1. A person committed *a violation of Penal Code § 288a* ~~by force~~; *violence, duress, menace*

2. The alleged victim was under 14 years of age; and *or fear*

3. The alleged victim was 10 or more years younger than the perpetrator of the acts.


284

CALJIC 10.42

LEWD ACT WITH A CHILD UNDER
FOURTEEN YEARS—FORCE OR FEAR
(Pen. Code, § 288, subd. (b)(1))

JAMES C. EMERSON

Judge

[Defendant is accused [in Count 3 ] of having
committed the crime of lewd act with a child by force or fear in
violation of section 288, subdivision (b)(1) of the Penal Code.]

Every person who willfully commits any lewd or lascivious
act upon or with the body, or any part or member thereof, of a
child under the age of 14 years, by the use of force, violence,
duress, menace, or fear of immediate and unlawful bodily injury
on the child or another person, and with the specific intent of
arousing, appealing to, or gratifying the lust or passions or
sexual desires of that person or the child, is guilty of the
crime of a lewd act with a child by force or fear in violation of
Penal Code section 288, subdivision (b)(1).

A "lewd or lascivious act" is defined as any touching of the
body of a child under the age of 14 years with the specific
intent to arouse, appeal to, or gratify the sexual desires of
either party.  To constitute a lewd or lascivious act, it is not
necessary that the bare skin be touched.  The touching may be
through the clothing of the child.

[The law does not require that the lust, passions, or sexual
desires of either persons be actually aroused, appealed to, or
gratified.]

The term "force" means physical force that is substantially
different from or substantially greater than that necessary to
accomplish the lewd act itself.

[The term "duress" means a direct or implied threat of
force, violence, danger, hardship or retribution sufficient to
coerce a reasonable person of ordinary susceptibilities to (1)
perform an act which otherwise would not have been performed, or
(2) acquiesce in an act to which one otherwise would not have

273

submitted.  The total circumstances, including the age of the victim, and ▮▮▮▮ [her] relationship to defendant, are factors to consider in appraising the existence of duress.]

In order to prove this crime, each of the following elements must be proved:

1. A person touched the body of a child;

2. The child was under 14 years of age;

3. The touching was done with the specific intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of that person or the child; and

4. The touching was done by the use of force, violence, duress, menace, or fear of immediate and unlawful injury on the child or another person.

274

EXHIBIT  G

# F I L E D

JUN 1 7 1999

STEPHEN V. LOVE
County Clerk
Santa Clara County

BY _____
DEPUTY

Jury Note # *1*

Received by:
Date: JUN 1 7 1999
Time: 11:02 am

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA
                                    Plaintiff,

          vs

          _____
                                    Defendant,

No. _____

Photographic Image May Be
Poor Due To Condition Of
Original Document.

We, the jury in the above-entitled cause, request the following:

_Please have Court reporter read to us at 1:30 p.m. preferrably_

Date:
6/17/99

**Juror #6**

226

FILED
JUN 1 7 1999
STEPHEN V. LOVE
County Clerk
Santa Clara County
_____ DEPUTY

Received by:
Date:
Time:     JUN 1 7 1999
11:07 a.m.

Jury Note # 2

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA
                                    Plaintiff,

vs

_____
                                    Defendant,

No. _____

Photographic Image May Be
Poor Due To Condition Of
Original Document.

We, the jury in the above-entitled cause, request the following:

Is there any more photos of Miranda
in a non-sexual nature besides the
ones at hand.

Date: JUN 1 7 1999

Juror
#6

227

Ⓢ 9564

FILED
JUN 17 1999
STEPHEN V. LOVE
Chief Exec. Officer / Clerk
Santa Clara County
BY _____ DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA )
                                    Plaintiff, )
                                              )
                                              )
                                              )
                                              )
vs                                            )
                                              )
Angel Alvarez                                 )
                              Defendant )
                                              )

CASE NO. 198084

**Court's response to juror note #** 2

You have been provided all of the
physical evidence which was admitted
in the trial. No further evidence will
be forthcoming. You must base your
decision on the evidence which was
presented, and not from any other
source

6-17-99
Date

James C. Emerson
Hon. James C. Emerson

221

FILED

JUN 18 1999

STEPHEN V. LOVE

Received by: J Smith
Date: 6/17/99
Time: 4:13 pm

Jury Note # 3

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA
Plaintiff,

vs

Angel Alvarez

Defendant,

No. 198084

We, the jury in the above-entitled cause, request the following:

Can you re-explain great bodily injury and help clarify Section #12022.8. Does the act have to be with the intent of causing great bodily injury. For example can an infectious disease be considered great bodily injury.

Date: JUN 17 1999

Juror #6

228

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA )
                                     Plaintiff, )
                                           )
                                           )      CASE NO. 198084
                                           )
                                           )
vs                                         )
                                           )
Angel Alvarez                         )
                                  Defendant )
                                           )

Court's response to juror note # 3

For clarification of the definition of "Great
Bodily Injury" and Penal Code 12022.8, please see
instruction 17.20.1, which is at page 46 of the
instructions. The "Great Bodily Injury" must be a
consequence of the crime. No specific intent for
the infliction of "Great Bodily Injury" is required.
Whether an infectious disease can be "Great
Bodily Injury" is a factual determination for the
jury to decide after applying the jury instruction
referenced above.

6-17-99
_____
Date

_____
James C. Emerson
Hon. James C. Emerson

222

F I L E D

JUN 1 8 1999

Received by:
Date: _/ / : / 6_    JUN 1 8 1999
Time:

Jury Note # 4

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA
                                    Plaintiff,

vs

Angel Jesus Alvarez

                                    Defendant,

No. 198084

We, the jury in the above-entitled cause, request the following:

Our understanding of CALJIC 17.03
is that the defendant can be
guilty of only one of the
first 3 counts or
can be not guilty on all
of the first 3 counts.

Is this correct?

Date: JUN 1 8 1999

Juror
#6

229

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

**FILED**

JUN 1 8 1999

STEPHEN V. LOVE
County Clerk
Santa Clara County
BY _____ DEPUTY

THE PEOPLE OF THE STATE OF CALIFORNIA )
Plaintiff, )
)
)
)
vs )
)
Angel Jesus Alvarez )
Defendant )
)

CASE NO. 198084

Court's response to juror note # 4

_Your reading of 17.03 is correct._

6-18-99
Date

James C. Emerson
Hon. James C. Emerson

223

Received by:
Date: JUN 1 8 1999
Time: 12:30 pm

Jury Note # 5

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA
                                    Plaintiff,

vs

Angel Alvarez

                                    Defendant,

No. 198084

We, the jury in the above-entitled cause, request the following:

Count 4 refers to "great bodily harm and death". Everywhere else in the documentation referring to Count 4 it refers to "great bodily harm or death. Is the and a typo?

Date: JUN 1 8 1999

Juror #6

230

8564

FILED

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA

JUN 1 8 1999

STEPHEN V. LOVE
County Clerk
Santa Clara County

BY _____ DEPUTY

THE PEOPLE OF THE STATE OF CALIFORNIA )
                              Plaintiff,    )
                                            )
                                            )    CASE NO. 198084
                                            )
                                            )
vs                                          )
                                            )
Angel Jesus                                 )
Alvarez                                     )
                              Defendant )
_____ )

Court's response to juror note # 5

The "and" in the phrase "great bodily
harm and death" should be: read to mean
"and/or"

_____                    James C. Emerson
6-18-99                            Hon. James C. Emerson
Date                                          224

FILED

JUN 1 8 1999
STEPHEN V. LOVE

Received by:
Date:
Time: 1:52 pm
6/18/99

Jury Note # 6

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA
                                    Plaintiff,

vs

Angel Alvarez

                                    Defendant,

No. 198084

We, the jury in the above-entitled cause, request the following:

What is the latest time we
can submit our verdicts today,
and have them delivered today

Date: JUN 1 8 1999

JUROR
#6

231

FILED

JUN 1 8 1999

STEPHEN V. LOVE
County Clerk
Santa Clara County

BY _____ DEPUTY

Received by: 2:33PM
Date:
Time: JUN 1 8 1999

Jury Note # 7

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA
                            Plaintiff,

vs

Anthony Alvarez

                            Defendant,

No. 196084

We, the jury in the above-entitled cause, request the following:

Is there a difference between
2738(a)(1) and 273a(1).
The first notation is in the
description of count 7. The
2nd notation is on page 32
in the CALJIC 9.37.

Date: JUN 1 8 1999

Juror #6

232




**F I L E D**

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA  JUN 1 8 1999

IN AND FOR THE COUNTY OF SANTA CLARA

STEPHEN V. LOVE
County Clerk
Santa Clara County

BY _____ DEPUTY

THE PEOPLE OF THE STATE OF CALIFORNIA )
                                    Plaintiff,  )
                                                )
                                                )   CASE NO. 198084
                                                )
                                                )
   vs                                           )
                                                )
Angel   Alvarez                                 )
                                                )
                                    Defendant ) )
                                                )
_____)

Court's response to juror note #  **7**

_The   Correct   Code   section   is_
_Penal Code   273 a (a).   Please   refer_
_to   the   Information,   and   the   language_
_of   Counts   4   and   7   and   apply_
_CALJIC 9.37   to   The   language   in   each Count._

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

___6 - 18 - 99___                    _James C. Emerson_
      Date                           Hon. James C. Emerson

                                              225

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA

**DATE June 17,  1999**

**CASE NO. 198084**
**CRIMINAL MINUTES**

HONORABLE JAMES C. EMERSON

**Clerk    Angela Mavrakakis/ Jennifer Smith**
**Deputy  Dave Rodriquez**

**Court Reporter L. Traube**

**CASE NAME ;  PEOPLE OF THE STATE OF CALIFORNIA VS ANGEL JESUS**
**ALVAREZ**

**Michele McKay-McCoy**
**Deputy District Attorney**

**Wes Schroeder**
**Defense Attorney**

NINTH DAY OF JURY TRIAL

At 9:08 a.m. Court resumes with all parties present to include the Jury and the two alternates. The People proceed with their rebuttal argument. The Court gives the final Jury instructions to the Jury.

The Parties stipulate that the exhibits may go into the Jury room. They further stipulate that should there be read-back the reporter may enter the juryroom for readback. At 9:30 a.m. Deputy Rodriquez is sworn to take charge of the Jury room. The Jury enters the jury room and resumes deliberations.

The Court addresses the two alternates. They are thanked and placed on telephone standby. Court stands adjourned.

At 11:02 a.m. the 1st note is received from the Jury requesting readback at 1:30 p.m. At 11:07 a.m. the 2nd note is received from the Jury. At 11:20 a.m. the Court submits a response to Note #2. At 12:05 p.m. the Jury breaks for lunch.

At 1:16 p.m. the Jury re-enters the Jury room and resumes deliberations. At 1:30 p.m. the reporter Lorna Traube enters the Jury room and proceeds with readback. At 1:52 p.m. the reporter exits the jury room. At 2:53 p.m. the Jury takes a break. At 3:03 p.m. the Jury re-enters the jury room and resumes deliberations.

**233**

Page 2
198084

At 4:13 p.m. the Jury submits note #3. The Court submits a response to the note. At 5:00 p.m. the Jury breaks for the evening. They will resume deliberations on **Friday June 18, 1999 @9:00 a.m. Dept. 33.**

234

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA

**DATE June 18, 1999**
                                            **CASE NO. 198084**
                                            **CRIMINAL MINUTES**
                    **HONORABLE JAMES C. EMERSON**

**Clerk   Angela Mavrakakis**                **Court Reporter L. Traube**
**Deputy  Dave Rodriquez**

**CASE NAME ;  PEOPLE OF THE STATE OF CALIFORNIA VS ANGEL JESUS
ALVAREZ**

**Michele McKay-McCoy**                      **Wes Schroeder**
**Deputy District Attorney**                 **Defense Attorney**

---

### TENTH DAY OF JURY TRIAL

---

At 8:55 a.m. the Jury enters the Jury room and resumes deliberations. At 10:50 a.m. the Jury takes a break. At 11:00 a.m. the Jury re-enters the jury room and resumes deliberations. At 11:16 a.m. the Court receives note #4 from the Jury. At 12:30 p.m. the Jury submits note #5 to the Court and breaks for lunch.

At 1:30p.m. the Jury re-enters the jury room and resumes deliberations. At 1:52 p.m. the Jury submits note #6 to the Court. At 2:00 p.m. the Court submits a response to notes # 4 & 5.

At 2:02 p.m. Court resumes with all parties present to include the Jury. The People are represented by Deputy District Attorney Jay Boyarsky. The Court proceeds to instruct the jury regarding Note #6 which indicates how long they may . The Jury exits the courtroom and re-enters the jury room to resume deliberations.

At 2:55 p.m. note #7 is received by the Court. At 3:09 p.m. the jury takes a break. At 3:19 p.m. the Jury re-enters the jury room and resumes deliberations. At 3:24 p.m. the Court submits a response to Note #7. At 3:25 p.m. the Jury informs the Deputy that they have reached verdicts.

At 3:32 p.m. Court resumes with all parties present to include the Jury. The People are represented by Deputy District Attorney Delores Carr. The jury indicates that they have reached a verdict. The Court directs the Clerk to read the verdict ;

302

Page 2 of 2
198084

**Count 1 PC 288.5(A) - NOT GUILTY**
**Count 2 PC 269      - GUILTY**
**Count 3 PC 288(B)(1) - NOT GUILTY**

**Allegation to Count 3- PC 12022.8 - NOT TRUE**

**Count 4 PC 273A(A) - NOT GUILTY**
**Lessor included to Count 4 - PC 273A(B) - GUILTY**

**Count 5 PC 273D(A) - GUILTY**
**Count 6 PC 273D(A) - GUILTY**

**Count 7 273A(A)(1) - NOT GUILTY**
**Lessor included to Count 7 - PC 273A(B) - GUILTY**

The Court directs the Clerk to poll the Jury. All twelve jurors indicate that this is their true and correct verdict. The Court directs the Clerk to record the verdict. The Court thanks the Jury and they are released from their admonition. The Defendant is remanded into custody. The Property bond is exonerated. Time is waived for sentencing and the matter is set for **August 13, 1999 @9:00 a.m. Dept. 33.**