1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  VIOLET M. LEE, State Bar No. 77144
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5896
    Fax:  (415) 703-1234
8   Email:  Violet.Lee@doj.ca.gov

9  Attorneys for Respondent

10           IN THE UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

13

14  **ANGEL JESUS ALVAREZ,**                    C 06-05027 MJJ

                                    Petitioner,
15

16         **v.**

17  **ROBERT AYERS, JR., Warden,**

                                    Respondent.
18

19
   **REPLY TO OPPOSITION TO MOTION TO DISMISS PETITION FOR WRIT OF**
20                        **HABEAS CORPUS**

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2
**Page**

3    A.    Equitable Tolling Doctrine    1

4    B.    Alvarez Is Not Entitled To Equitable Tolling Based On Attorney
         Misconduct    3

5

6         1.    Background    3

         2.    Discussion    7
7
    C.    Alvarez Is Not Entitled To Equitable Tolling Based On Actual
8         Innocence    9

9 CONCLUSION    11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2
                                                                                    **Page**

3 **Cases**

4

5 *Coleman v. Thompson*
501 U.S. 722 (1991)                                                                   2

6 *Fail v. Hubbard*
315 F.3d 1059 (9th Cir. 2002)                                                         1

7

8 *Frye v. Hickman*
273 F.3d 1144 (9th Cir. 2001)                                                      2, 8, 9

9 *Green v. White*
223 F.3d 1001 (9th Cir. 2000)                                                        2, 9

10

11 *In re Clark*
5 Cal.4th 750 (1993)                                                                 4, 7

12 *Majoy v. Roe*
296 F.3d 770 (9th Cir. 2002)                                                           9

13

14 *Miles v. Prunty*
187 F.3d 1104 (9th Cir. 1999)                                                          3

15 *Miranda v. Castro*
292 F.3d 1063 (9th Cir. 2002)                                                        2, 9

16

17 *Palladino v. Perlman*
269 F. Supp. 2d 36 (E.D. N.Y. 2003)                                                  2, 8

18 *Pina v. McGrath*
2005 U.S. Dist. LEXIS 16928, *20-24 (N.D. Cal. 2005)                                   8

19

20 *Schlup v. Delo*
513 U.S. 298 (1995)                                                                 9, 11

21 *Spitsyn v. Moore*
345 F. 3d 796 (9th Cir. 2003)                                                      2, 3, 8

22

23 *United States v. Pollard*
290 F. Supp. 2d 153 (D.D.C. 2003)                                                      3

24

25

26

27

28

**TABLE OF AUTHORITIES  (continued)**

1

**Page**

2

3    **Statutes**

4

5    Antiterrorism Effective Death Penalty Act                          2, 9

6    Title 28 United States Code
         § 2244(d)                                                       1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  VIOLET M. LEE, State Bar No. 77144
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5896
    Fax:  (415) 703-1234
8   Email:  Violet.Lee@doj.ca.gov

9  Attorneys for Respondent

10           IN THE UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

13

14  ANGEL JESUS ALVAREZ,                    C 06-05027 MJJ

15                          Petitioner,     **REPLY TO OPPOSITION TO
                                            MOTION TO DISMISS
16      v.                                  PETITION FOR WRIT OF
                                            HABEAS CORPUS**
    ROBERT AYERS, JR., Warden,
17
                            Respondent.
18

19

20         Respondent has moved to dismiss petitioner's habeas corpus petition because it was filed

21  more than two years after the statute of limitations expired.  *See* 28 U.S.C. § 2244(d).  Alvarez

22  opposed the motion, contending he is entitled to equitable tolling.  For the reasons that follow, in

23  addition to the reasons already set forth in our motion to dismiss, the petition should be dismissed

24  as untimely.

25      **A.    Equitable Tolling Doctrine**

26         "In this circuit, equitable tolling is warranted only by extraordinary circumstances beyond

27  the petitioner's control which made it impossible to file a timely federal habeas petition."  *Fail v.*

28  *Hubbard*, 315 F.3d 1059, 1061-1062 (9th Cir. 2002).  The petitioner bears the burden of showing

1   that equitable tolling is warranted in the particular circumstances of his case. *Miranda v. Castro*,

2   292 F.3d 1063, 1065 (9th Cir. 2002). " '[T]he threshold necessary to trigger equitable tolling is very

3   high, lest the exceptions swallow the rule.' " *Id.* at 1066 (citation omitted).

4          The Ninth Circuit has repeatedly held that mere attorney error does not justify equitable

5   tolling. *Miranda v. Castro*, 292 F.3d at 1066-67 (no tolling where attorney wrote letter to petitioner

6   stating wrong due date for federal habeas petition); *Frye v. Hickman*, 273 F.3d 1144, 1146 (9th Cir.

7   2001) (no tolling where attorney miscalculated deadline for statute of limitations); *Green v. White*,

8   223 F.3d 1001, 1003 (9th Cir. 2000) (no tolling where counsel relied on inapplicable case).

9   Furthermore, because a federal habeas petitioner has "no right to the assistance of his appointed

10  appellate counsel regarding post-conviction relief, it follows that he did not have the right to that

11  attorney's 'effective' assistance, either." *Miranda*, 292 F.3d at 1068. Accordingly, the Ninth Circuit

12  has rejected the argument that when counsel undertakes to advise a federal habeas petitioner, that

13  advice must be accurate, and that the failure to give accurate advice requires equitable tolling. *Id.*;

14  *see Frye*, 273 F.3d at 1146.

15         Nor does a defendant have a right to either the assistance of counsel or the effective

16  assistance of counsel for purposes of a state habeas proceeding. *Coleman v. Thompson*, 501 U.S.

17  722, 752 (1991) (precluding claim of ineffective assistance unless defendant has constitutional right

18  to counsel at the proceeding at issue). Thus, whether a defendant had effective assistance of counsel

19  in state habeas proceedings is not relevant to the question of tolling the AEDPA's statute of

20  limitations. "Retained counsel's failure to expeditiously file a state court collateral motion is

21  decidedly not grounds for equitably tolling the AEDPA limitations period." *Palladino v. Perlman*,

22  269 F. Supp. 2d 36, 39 (E.D. N.Y. 2003).

23         One Ninth Circuit panel has held that where counsel's misconduct goes beyond "ordinary

24  attorney negligence" and is "sufficiently egregious," it may constitute an extraordinary circumstance

25  warranting equitable tolling. In *Spitsyn v. Moore*, 345 F. 3d 796 (9th Cir. 2003), the attorney was

26  hired to file a federal habeas petition but "completely failed to prepare and file a petition." *Id*. at

27  801. Repeated efforts by Spitsyn and his mother to contact the attorney by telephone and in writing

28  proved fruitless. *Id*. Furthermore, despite Spitsyn's request that the attorney return Spitsyn's file,

Reply to Opp. To Mot. to Dismiss Pet. for Writ of HC As Untimely -*Alvarez v. Ayers, Jr.* - C 06-05027 MJJ

the attorney retained it for the duration of the limitations period and more than two months beyond. *Id.* The attorney's retention of Spitsyn's file effectively prevented Spitsyn from preparing and filing a meaningful petition on his own with the limitations period. *Id.* The Ninth Circuit found the attorney's conduct "so deficient as to distinguish it from the merely negligent performance of counsel. . . ." *Id.*

"Determining whether equitable tolling is warranted is a 'fact-specific inquiry.'" *Id.* at 799. Equitable tolling is unavailable in most cases (*Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir. 1999)) and justified in few cases. *Spitsyn v. Moore*, 345 F.3d at 799. Equitable tolling is not justified unless the attorney effectively abandoned the defendant. *United States v. Pollard*, 290 F. Supp. 2d 153, 162 (D.D.C. 2003).

### B.    Alvarez Is Not Entitled To Equitable Tolling Based On Attorney Misconduct

Alvarez contends that he is entitled to equitable tolling of the statute of limitations because of alleged misconduct by attorneys he retained for the purpose of pursuing habeas corpus relief in the state courts. In support of his argument, Alvarez has submitted voluminous exhibits, mostly consisting of correspondence between himself and his retained counsel and private investigator.

#### 1.    Background

Alvarez was represented by court-appointed counsel in his direct appeal to the California Court of Appeal and to the California Supreme Court. Pet'r Decl. at 1. On January 15, 2003, the California Supreme Court denied Alvarez's petition for review. Exh. 4.[1]/ Because Alvarez did not file a petition for writ of certiorari, his case became final on April 15, 2003, giving him until April 15, 2004, absent tolling, to file a timely federal habeas corpus petition.

In December 2002, before his judgment was final, Alvarez wrote to several attorneys inquiring about their fees. Pet'r Decl. at 2. In June 2003, Alvarez retained attorney Gary Diamond

---

1. "Exh." refers to the exhibits respondent filed with his motion to dismiss the habeas corpus petition as untimely.

to "file a Writ of Habeas Corpus through the state courts." A18.[2/]  In June 2003, Alvarez retained a second attorney, Frank Prantil, to file petitions for writ of habeas corpus "through the three levels of the state courts." A24.  Alvarez advised Diamond and Prantil that they would be working together on his behalf. A15-A16.  Prantil agreed not to file anything before Alvarez had a chance to read it. A87.

On April 1, 2003, Prantil advised Alvarez that a state habeas corpus petition must be filed by April 11, 2004, in order to stop "the AEDPA clock" from running. A4, A11.  On September 11, 2003, Prantil advised Alvarez that a petition should be filed "very soon" with the superior court and that he preferred to draft the petition himself rather than have Diamond do so. A32.  In his letter to Alvarez, Prantil predicted that a citation to *In re Clark*, 5 Cal.4th 750 (1993) by a state court would not likely result in a procedural bar because "the rule is not consistently applied." A32.  Prantil also discussed his strategy of not raising "crucial issues" in the superior court. A32-A33.

In October 2003, Alvarez hired Kenneth Addison, a private investigator, who would work with Prantil on Alvarez's behalf. A34.  Between April 2004 and March 2005, Addison prepared numerous letters and reports on Alvarez's behalf. A42-A59, A69, A72-A76, A80-A85.

On October 29, 2003, Diamond informed Alvarez that he and Prantil would have a draft of a superior court habeas corpus petition forwarded to Alvarez in another week. A35.

On December 17, 2003, a petition for writ of habeas corpus was filed on Alvarez's behalf in the Santa Clara County Superior Court. Pet.'s "Attachment Re: Section B" at 2. On January 14, 2004, the Santa Clara County Superior Court denied the petition. *Id*. During the pendency of this petition, the statute of limitations was tolled for 28 days, which extended the deadline to May 13, 2004, to file a timely federal habeas petition.

On January 22, 2004, Prantil notified Alvarez that the superior court had summarily denied his petition for writ of habeas corpus. A36.  Prantil said the next step would be for Diamond to file a petition in the state court of appeal on Alvarez's behalf. A36.

In February 2004, Diamond arranged to meet personally with Alvarez, who was

---

2. "A" exhibits refer to those accompanying Alvarez's opposition to our motion to dismiss.

1    incarcerated in High Desert State Prison.  A37.

2         On May 13, 2004, the deadline to file a timely federal habeas petition expired.

3         On July 6, 2004, in a letter to Alvarez, Prantil said he just learned from Addison that
4    Alvarez had fired Diamond, a decision that Prantil applauded.  A61.  However, Prantil did not agree
5    with Alvarez's intention to "seek[] the assistance of another attorney, one from SF," which Prantil
6    considered unnecessary and wasteful.  A61-A62.  Prantil warned that a state court of appeal habeas
7    petition must be filed "very soon."  A61.  Prantil urged that "the investigation must be completed
8    quickly" or else the federal courts may find Alvarez had "not been diligent in conducting the
9    investigation and thus dismiss your case without addressing the merits of your claims."  A61.  In
10   fact, Prantil anticipated that Alvarez's federal habeas claim may be untimely filed and suggested a
11   strategy to "defeat a motion to dismiss" in federal district court.  A62.  Prantil told Alvarez to "keep
12   on [Kenneth] Addison to complete the investigation.  Keep all copies of correspondence to him or
13   Gary [Diamond], because they may help defeat a motion to dismiss, if one is filed at the district
14   court level."  A62.

15        Diamond apparently continued to represent Alvarez.  On August 26, 2004, Diamond
16   informed Alvarez that he was waiting to hear from the investigator before sending Alvarez a draft
17   of his pleading.  A63.  Diamond promised to meet with Alvarez soon to "discuss our progress."
18   A63.

19        On August 31, 2004, Prantil told Alvarez that he heard Diamond had agreed to a six month
20   suspension of his State Bar license.  A67.  Prantil emphasized that "it is *imperative* to file the
21   petition with the court of appeal" or "when we get to federal court the AG may contend that we have
22   delayed filing and therefore we were not diligent and the case is time barred under AEDPA . . . ."
23   A67.  Prantil said he intended to file in the state court of appeal the same petition that had been filed
24   in the superior court.  A67.  Prantil urged Alvarez to "press" Addison to complete his investigation.
25   A67-A68.

26        On September 13, 2004, after Alvarez learned from Prantil about Diamond's six month
27   suspension, Alvarez fired Diamond.  A86.  Diamond resigned from the State Bar on November 2,
28   2004, effective February 5, 2005.  A99.

1   On September 30, 2004, Prantil agreed to work with Addison "to develop the claim of

2   actual innocence." A71.

3   In December 2004, Alvarez retained attorney Kent Russell of San Francisco to prepare

4   and file a habeas petition in the state court of appeal. Pet'r Decl. at 7. Russell sent drafts of the

5   petition to Alvarez for his review between January and February 2005. *Id.*

6   On March 11, 2005, Alvarez filed in the state court of appeal the habeas petition prepared

7   by Russell. *Id.*, Exh. 5. The petition was denied on March 23, 2005. Exh. 5.

8   On March 13, 2005, Alvarez wrote Prantil a letter complaining that Prantil, who had filed

9   only one petition, had not fulfilled his obligations under their contract, which obligated him to

10  litigate through all three levels of the state courts. A86. Alvarez said he was "forced to file a habeas

11  petition, in pro per, in the Court of Appeal." A87.

12  On March 17, 2005, Prantil told Alvarez he "will be glad to file at the court of appeal level

13  but upon further consideration, it may be best to wait until the investigation is completed." A88.

14  Prantil further stated, "When we get to federal court, we will need to explain to the court that we

15  have been diligent in completing the investigation, and that is where Addison will need to file a

16  declaration showing that he has been diligently pursuing the investigation." A88.

17  On April 4, 2005, Prantil expressed dissatisfaction that Alvarez had "filed with the court

18  of appeal on your own and without my help" and advised him against filing a petition in the

19  California Supreme Court. A90. Prantil urged Alvarez to "get on Addison to complete the

20  investigation so that we may file with the state supreme court." A90. Prantil again reminded

21  Alvarez that Addison may "need to show a federal court that he has been diligent in his investigation

22  and that was the reason for the delay in filing at the state supreme court." A90.

23  On April 4, 2005, Prantil wrote a letter to Addison asking him to be prepared to "file a

24  declaration showing your diligence in pursuing the investigation. We will probably need it when

25  we get to federal court." A92. Prantil said he "would like to file a petition with the state supreme

26  court with the new evidence that you have discovered within the next two months." A92.

27  On June 17, 2005, Addison signed a declaration describing the services he provided

28  Alvarez. A93-A96.

On July 21, 2005, Prantil forwarded to Alvarez a declaration from a forensics expert for his review. A100. On September 19, 2005, Prantil sent Alvarez a draft of the California Supreme Court habeas petition. A108. Prantil sent him another draft on October 14, 2005. A127. In that letter, Prantil promised to provide a declaration, if necessary, to show his own diligence. A127. On November 7, 2005, Prantil discussed legal strategy in a letter to Alvarez. A149-A150. On December 29, 2005, Prantil provided Alvarez a fourth draft of the California Supreme Court habeas petition. A151.

On January 12, 2006, Prantil filed in the California Supreme Court a habeas petition on Alvarez's behalf. Exh. 6. On June 28, 2006, the California Supreme Court denied the petition, citing *In re Clark*, 5 Cal.4th 750. A159, Exh. 6.

On July 6, 2006, Prantil notified Alvarez of the California Supreme Court's denial of his habeas petition. A156. Prantil observed that the court's citation to *In re Clark* "may result in the AG filing a motion to dismiss the petition as untimely" but Prantil believed that the motion would not be granted because the rule under *In re Clark* "is not clear not well-established, nor consistently applied." A156. Prantil said if Alvarez wanted to retain him for litigation at the federal district court level, Alvarez will need to sign a new retainer agreement and pay additional money. A156. Prantil informed Alvarez that he was no longer eligible to practice in the state courts because of a decision by the State Bar Hearing Department, but he was still eligible to practice in the federal courts. A157. On July 11, 2006, in a letter to Prantil, Alvarez expressed his anger over Prantil's failure to inform him that Prantil had been ineligible to practice law in the state courts since March 5, 2006. A160. Alvarez demanded an accounting. A160.

## 2. Discussion

In this case, Alvarez's state habeas counsel were at most negligent. None of his three retained attorneys abandoned him. Prantil and Diamond communicated regularly with Alvarez and discussed legal strategy with him. Diamond went to see him in prison. Prantil filed a superior court habeas corpus petition. Russell prepared and Alvarez filed a state court of appeal habeas corpus petition. Prantil filed a California Supreme Court habeas corpus petition. All three of the attorneys provided drafts of their pleadings to Alvarez at his insistence before filing them. A63, A87, A151,

1    Pet'r Decl. at 7. This case does not present the kind of egregious misconduct described in *Spitsyn*.

2         Significantly, Prantil's and Diamond's retainer agreements limited the attorneys'

3    representation of Alvarez to proceedings in the California courts. A18, A24. After the California

4    Supreme Court denied the habeas petition, Prantil informed Alvarez that Alvarez will need to sign

5    a new retainer agreement if he wanted Prantil to pursue habeas relief in the federal courts. A156.

6    Alvarez apparently did not sign a new agreement. Thus, unlike the attorney in *Spitsyn*, neither

7    Prantil, Diamond, nor Russell was retained to file a federal habeas petition. These three attorneys

8    did not abandon Alvarez; they performed as promised by filing in state court. In any event,

9    "[r]etained counsel's failure to expeditiously file a state court collateral motion is decidedly not

10   grounds for equitably tolling the AEDPA limitations period." *Palladino v. Perlman*, 269 F.Supp.2d

11   at 39.

12        Furthermore, much of the delay in filing the state habeas petitions was due to the wait for

13   Addison to complete his investigation. Equitable tolling is not justified simply because a petitioner

14   chooses to wait for further developments in his investigation. *Palladino v. Perlman*, 269 F.Supp.2d

15   at 39 (rejecting equitable tolling based on "delays in receiving affidavits and affirmations that

16   [petitioner] intended to use during his state collateral proceedings to prove his claim of ineffective

17   assistance of trial counsel"); *Pina v. McGrath*, 2005 U.S. Dist. LEXIS 16928, *20-24 (N.D. Cal.

18   2005) (no equitable tolling "while a prisoner goes in search of evidence to improve the quality of

19   the petition that he can and does file. . . . If all a prisoner had to do to obtain tolling was to say he

20   was in search of physical evidence to make his petition better or more persuasive—notwithstanding

21   his knowledge of the existence and contents of that evidence—the statute of limitations would be

22   eviscerated as almost any petitioner could make that argument to avoid the time limitation that

23   Congress imposed.").

24        Other delays in the state court proceedings resulted from Alvarez's insistence that his

25   attorneys not file anything until he had read it. A87. Based on Prantil's submission of *four* drafts

26   of his California Supreme Court pleading to Alvarez (A151), it appears that Alvarez demanded

27   absolute control over the final product. There were no "'extraordinary circumstances' beyond the

28   prisoner's control that made it impossible to file a petition on time." *Frye v. Hickman*, 273 F.3d at

Reply to Opp. To Mot. to Dismiss Pet. for Writ of HC As Untimely -*Alvarez v. Ayers, Jr.* - C 06-05027 MJJ

8

1  1146.

2          Prantil was aware of the one-year deadline under the AEDPA for filing a federal habeas

3  petition, and urged Alvarez on several occasions to proceed in state court expeditiously.  However,

4  Prantil and Alvarez mapped a strategy in the event of an untimely federal habeas petition.  Alvarez

5  would argue that both Prantil and Addison exercised due diligence and, therefore, his failure to file

6  within the time limit should be excused.  Prantil was also confident that Alvarez would not be

7  procedurally barred in federal court because the timeliness rules in state court are not "consistently

8  applied."  A32.  Alvarez is not entitled to equitable tolling because of Prantil's mistaken belief that

9  "due diligence" will avoid a procedural bar.  Mere attorney error does not justify equitable tolling.

10  *Miranda v. Castro*, 292 F.3d at 1066-1067 (no tolling where attorney wrote letter to petitioner

11  stating wrong due date for federal habeas petition); *Frye v. Hickman*, 273 F.3d at 1146 (no tolling

12  where attorney miscalculated deadline for statute of limitations); *Green v. White*, 223 F.3d at 1003

13  (no tolling where counsel relied on inapplicable case).

14          **C.   Alvarez Is Not Entitled To Equitable Tolling Based On Actual Innocence**

15          Alvarez contends that he has made a "colorable showing of factual innocence sufficient

16  to excuse the procedural default sought by Respondent."  Pet'r Response at 9.  He argues that "the

17  fact-based issues raised in his writ support a colorable showing of factual innocence."  *Id*.  In

18  particular, he points to his arguments that (1) "The government's failure to disclose that the alleged

19  victim, Amanda, was infected with chlamydia until it was too late for Petitioner to be excluded as

20  the alleged perpetrator"; (2) "The government's failure to produce the test results of the red blanket

21  found in Petitioner's van"; (3) "Petitioner's penile swab exam of June 16, 1997 which was negative

22  for the detection of chlamydia"; and (4) "Statements obtained from various witnesses by Investigator

23  Ken Addison which support Petitioner's claim of factual innocence."  Pet'r Response at 9-10.

24          Neither the Supreme Court nor the Ninth Circuit has decided whether actual innocence

25  constitutes an exception to the statute of limitations.  *See Majoy v. Roe*, 296 F.3d 770 (9th Cir.

26  2002).  Even if it does, petitioner must establish that "it is more likely than not that no reasonable

27  juror would have found petitioner guilty beyond a reasonable doubt."  *Schlup v. Delo*, 513 U.S. 298,

28  327 (1995).  "To be credible, such a claim requires petitioner to support his allegations of

Reply to Opp. To Mot. to Dismiss Pet. for Writ of HC As Untimely *-Alvarez v. Ayers, Jr. -* C 06-05027 MJJ

1   constitutional error with new reliable evidence—whether it be exculpatory scientific evidence,

2   trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id*.

3   at 324. Alvarez's arguments do not constitute credible, new, reliable evidence that exculpates him.

4   Alvarez argues that the government's failure to disclose sooner that Amanda, the victim,

5   was infected with chlamydia denied him "the opportunity to prove he did not have chlamydia at the

6   time of the alleged criminal conduct." Pet. at 9. This claim is meritless. At trial, the defense

7   presented an expert in sexually transmitted diseases who testified that Alvarez was examined for

8   chlamydia and based on the results, she surmised that he had had chlamydia but could not say which

9   type he had had. Attachment A at 6.[3/]

10   Alvarez argues that if the red blanket taken from his van had been tested, and if the test

11   result "was negative for petitioner's semen, that result would have served to materially corroborate

12   petitioner's claim of innocence." Pet. at 10. At trial, the "parties stipulated that the police seized

13   various items from defendant's van. These items included underwear and a sleeping bag which

14   tested negative for the presence of semen." Attachment A at 6. A negative test result on the red

15   blanket, by the same token, would not have demonstrated Alvarez's innocence.

16   Alvarez argues that evidence of his negative penile swab culture test for chlamydia

17   demonstrates his innocence. This issue was raised on appeal and rejected by the California Court

18   of Appeal, which stated,

19   It is unlikely that evidence that defendant tested negative for chlamydia on June 18, 1997,
     would have convinced the jury that defendant did not have chlamydia in November 1996.

20   This is especially true given that evidence was introduced, via a blood analysis, that
     defendant *had* had chlamydia in the past, either chlamydia trachomatis, which is what

21   Amanda had, or chlamydia pneumoniae. Given the other evidence of defendant's guilt,
     including Amanda's and Anthony's testimony, it is not reasonably probable that the jury

22   would have reached a different result had they considered the results of defendant's June
     18, 1997 penile swab test.

23

24   Attachment A at 12, footnote omitted.

25   Alvarez argues that statements obtained from various witnesses by investigator Ken

26   Addison support his claim of factual innocence. His claim lacks merit. These new witnesses have

27   _____

28   3. "Attachment" refers to documents attached to this pleading.

Reply to Opp. To Mot. to Dismiss Pet. for Writ of HC As Untimely -*Alvarez v. Ayers, Jr.* - C 06-05027 MJJ

1 | little to add, except to say that Alvarez had a "genuine caring influence" on the victims' lives, that

2 | he "compassionately cared" for the victims, and that the children's mother was unfit and vindictive.

3 | Pet. at 24-25.

4 |      Alvarez's arguments contain no new evidence showing "it is more likely than not that no

5 | reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*,

6 | 513 U.S. at 327.

7 | **CONCLUSION**

8 |      Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

9 | be dismissed for failure to comply with the statute of limitations set forth in 28 U.S.C. § 2244(d).

10 |      Dated: January 11, 2008

11 |      Respectfully submitted,

12 |      EDMUND G. BROWN JR.
     Attorney General of the State of California

13 |      DANE R. GILLETTE
     Chief Assistant Attorney General

14 |      GERALD A. ENGLER

15 |      Senior Assistant Attorney General

16 |      GREGORY A. OTT
     Deputy Attorney General

17 |

18 |      /s/ Violet M. Lee

19 |      VIOLET M. LEE
     Deputy Attorney General

20 |      Attorneys for Respondent

21 | 40203902.wpd

22 | SF2007401783

Reply to Opp. To Mot. to Dismiss Pet. for Writ of HC As Untimely -*Alvarez v. Ayers, Jr.* - C 06-05027 MJJ

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  VIOLET M. LEE, State Bar No. 77144
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone: (415) 703-5896
    Fax: (415) 703-1234
8   Email: Violet.Lee@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                    SAN FRANCISCO DIVISION

14
   **ANGEL JESUS ALVAREZ,**                    C 06-05027 MJJ
15
                                Petitioner,    **ATTACHMENT A**
16
             **v.**
17
   **ROBERT AYERS, JR., Warden,**
18
                                Respondent.
19

20

21

22

23

24

25

26

27

28

Attachment A                                  Alvarez v. Ayers, Jr.
                                              C 06-05027 MJJ

SEE CONCURRING OPINION

COPY

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b).  This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT



THE PEOPLE,

    Plaintiff and Respondent,

       v.

ANGEL JESUS ALVAREZ,

    Defendant and Appellant.

H021626
(Santa Clara County
Super. Ct. No. 198084)

DOCKETED
SAN FRANCISCO
OCT 28 2002
By    D. VELASCO
No. SF 2002 DA 1154

In re ANGEL JESUS ALVAREZ,

    on Habeas Corpus.

H024639
(Santa Clara County
Super. Ct. No. 198084)

DOCKETED
SAN FRANCISCO
OCT 28 2002
By    D. VELASCO
No. SF 2002 SH 0014

    Angel Jesus Alvarez was convicted of aggravated sexual assault of a child (Pen.

Code, § 269), two counts of corporal injury or punishment of a child (Pen. Code, § 273d,

subd. (a)), and two counts of misdemeanor child endangerment.  (Pen. Code, § 273a,

subd. (b).)[1]  On appeal, Alvarez argues (1) the evidence was insufficient to support his

aggravated sexual assault conviction; (2) he was improperly prohibited from exploring

whether the victim had been molested by a third party; (3) the trial court erred in

excluding evidence of his penile swab test for chlamydia; (4) cumulative error warrants

---

[1]  All further unspecified statutory references are to the Penal Code.

reversal; (5) the jury was improperly instructed that duress includes "hardship" and (6) his concurrent terms must be stayed under section 654. We will affirm.

Alvarez has also filed a petition for a writ of habeas corpus in which he contends that his counsel was ineffective. Having previously ordered the petition considered with the appeal, we will deny Alvarez's petition for a writ of habeas corpus.

## FACTS AND PROCEDURAL BACKGROUND

Ruby was the mother of Amanda and Anthony. She became acquainted with defendant and sometimes allowed him to care for Amanda and Anthony. Defendant occasionally kept Amanda and Anthony overnight. They either stayed at a friend's house or at a motel.

In November 1996, defendant agreed to care for the children and ended up caring for them for several nights. When defendant returned the children to Ruby, she noticed that Anthony's eyes were irritated. Anthony said that defendant had put chili in his eyes. That evening, while Ruby bathed the children, she noticed bruises. When Ruby told Amanda to wash her private area, Amanda complained that it burned and irritated her. Amanda told Ruby that when defendant gave her a bath or a shower, he sometimes stuck his finger inside her. Ruby called the police.

After talking to the children, the police officer left and Ruby got the children ready for bed. She asked them why they had not previously told her what defendant had done. Amanda said that she was scared. She said that defendant had warned her that if she told anyone about the spanking "or anything," it would be her fault if she and Anthony were taken away from their mother. Amanda told Ruby that there was something that she had not revealed, saying that defendant had made her drink his "pee-pee milk." When Ruby did not understand, Amanda said, "you know, that it's the white stuff that comes out of his pee pee."

Ruby again called the police. They arrived and spoke with the children. At around 2:00 or 3:00 a.m., Amanda was examined at Santa Clara Valley Medical Center.

2

Amanda, who weighed 56 pounds and was 47 inches tall, had bruises and abrasions on her face, legs, and the front area of her body. According to the nurse practitioner who examined Amanda, these injuries were not consistent with normal childhood play. Amanda's genital examination was relatively normal. Anthony, who weighed 44 pounds and was 41 inches tall, was also examined. He also had bruises and abrasions and a cut on his penis.

Amanda and Anthony were interviewed the next day, November 20, 1996. Amanda said that defendant put chili in Anthony's eyes. She said defendant put his "pee-pee" in her mouth while she was lying down in defendant's van, that "nasty milk" came out, and that she threw up because of the "nasty milk." She said that defendant became angry when she threw up. She also said that defendant had given her "milk" from his "pee-pee" before. She said on that same occasion defendant had touched his "pee-pee" to her "pee" and had touched her "pee" with his finger. She said defendant had threatened to hurt her and to hit her.

Anthony was interviewed. He said that defendant had put chili in Anthony's eyes, pretended to cut off his "pee-pee" with scissors, pulled his "pee-pee" back too much and had hit Anthony.

On December 5, 1996, Amanda returned to the hospital to have additional photographs taken. Ruby reported that Amanda had developed a vaginal discharge. The discharge was cultured and the results demonstrated that Amanda had chlamydia organism growing in her vagina. The November 20, 1996 baseline culture had been negative. Based upon this information, and the known incubation period for chlamydia, the physician's assistant opined that Amanda had been infected seven to 14 days before December 5, 1996, and less than three days before November 20, 1996.

Defendant was charged with the following counts: (1) continual sexual abuse (§ 288.5, subd. (a)); (2) aggravated sexual assault of a child; (3) forcible lewd or lascivious act upon a child (§ 288, subd. (b)(1)); (4) child endangerment ; (5) corporal

punishment or injury of a child (§ 273d, subd. (a)); (6) corporal punishment of a child; and (7) child endangerment.

At trial, Anthony testified that he was seven years old and in the first grade. He told the jury that defendant put chili in his eyes, and that defendant had done that more than once. Anthony said that defendant spanked Amanda with his shoe. Anthony also said that defendant put chili on Anthony's penis.

Amanda testified that she was eight years old and in the third grade. She said that defendant had put his "private" into her mouth, and that something "like water" came out of defendant's "private" and went into her mouth. This happened several times and took place in defendant's van and in the house. She said that defendant put his "private" near her "private," put his tongue on her "private," and put his finger in her "private." She said that defendant told her she would get into trouble if she told her mother.

DEFENSE

Defendant testified and denied committing the charged crimes. Testifying about his activities the weekend before his arrest, defendant stated that he had purchased some items at the grocery store, including fresh serrano chilis and green and yellow gummy worms. While he was driving in the van with the children, he heard the grocery bag rustling. As they were preparing to go to lunch, defendant discovered that Anthony had been hiding the chilis in his pocket. Inside the restaurant, Anthony kept rubbing his eyes and complaining of pain. Defendant took him to the restroom and splashed water into his eyes. Anthony continued to rub his eyes. Defendant believed that the chilis had caused the problem with Anthony's eyes.

Defendant testified that Ruby had told him to use his belt to "whup their asses" if Amanda and Anthony got out of control. Defendant used his belt to spank Amanda for spitting in her soup. Defendant spanked Anthony twice that weekend for playing with scissors. Anthony was using scissors to cut threads from his jeans, and defendant said, "You want to cut yourself down there?"

Defendant and the children spent Saturday night in the van. Defendant said that there was an unrefrigerated carton of milk in the van. Defendant testified that he and the children spent Sunday at his friend's flower shop. Anthony's eyes were red and the skin had broken. Defendant applied hydrogen peroxide under Anthony's eyes, not realizing that hydrogen peroxide should not be used near the eyes. Anthony felt a stinging sensation and said, "Don't put chili in my eyes." Defendant told him it was not chili.

Defendant spent Sunday night in the van with the children. During the middle of the night, defendant saw Amanda drinking the unrefrigerated milk. Amanda threw up in the middle of the night. When she threw up, she said the milk smelled like "pee-pee."

Defendant spent Monday night with the children at a Motel 6. Defendant delivered the children to Ruby at about 8:20 a.m. on Tuesday morning. Defendant argued with Ruby, saying that he had been forced to miss a class because he had to care for Ruby's children. He told Ruby that he spanked the children, that Anthony grabbed some chili and touched his eyes, and that defendant had tried to wash out Anthony's eyes.

Fifteen hours after he dropped off the children, defendant was arrested. According to defendant, he told the police that he had not molested Amanda, and had not put chilis in Anthony's eyes or on his penis. Defendant said that while he was in jail he spoke with Ruby. When he asked why she was making the accusations, she responded, "You shouldn't have fucked with me, this is what you get for fucking with me."

Defendant testified that he had never experienced symptoms of chlamydia. He normally had severe bronchitis once a year and that was sometimes treated with antibiotics. When arrested, police used a swab to wipe the outside of his penis and he independently took a test in which the inside of his urethra was tested.

Ramon Quintanilla testified that defendant lived in his house while defendant was going to school. Quintanilla said that defendant brought Amanda and Anthony to the house every other weekend. An employee of a restaurant testified that he recalled an occasion where one of the children with defendant got something in his eye and was

rubbing it and crying. The employee did not see how the irritant got in the child's eye. Leslie Hernandez testified that she had helped defendant watch the children during the weekend before defendant's arrest. Ejaz Anam testified that on the Monday before defendant's arrest, Anam had loaned defendant money to pay for a motel.

Amy Portmore, qualified as an expert in sexually transmitted diseases, testified about chlamydia. She stated that two categories of chlamydia were pertinent. These were (1) chlamydia trachomatis, which is a sexually transmitted disease; and (2) chlamydia pneumoniae, which is a respiratory infection that causes pneumonia and bronchitis. Dr. Portmore examined a blood analysis performed on defendant for chlamydia. Based upon the results, she surmised that defendant had had chlamydia but she could not say which type that he had had. She stated that there was very little data on whether chlamydia could be transmitted by digital penetration but stated that such transmission was possible. She estimated that up to 5 percent of cases were transmitted this way. Dr. Portmore testified that the incubation period for chlamydia is one to three weeks for genital transmission.

The parties stipulated that while defendant was in jail he was seen by the jail medical staff nine times. The medical reports contain no indication that defendant had physical symptoms of any kind. The parties also stipulated that the police seized various items from defendant's van. These items included underwear and a sleeping bag which tested negative for the presence of semen.

Defendant was convicted of aggravated sexual assault and two counts of corporal injury of a child. He was convicted of the lesser included offense, misdemeanor child endangerment, in counts 4 and 7. The jury found defendant not guilty of counts one and three.

Defendant was sentenced to 15 years to life for aggravated sexual assault. He was sentenced to two years on count 5 and a concurrent term of two years on count 6. He received concurrent jail terms for the two misdemeanors.

DISCUSSION

A. *Sufficiency of the Evidence of Aggravated Sexual Assault*

Defendant contends that there was insufficient evidence that he committed the oral copulation by means of force, violence, duress, or fear of immediate and unlawful bodily injury. This argument is without merit.

Section 269 is violated when the defendant commits certain acts upon a child who is under 14 years of age and 10 or more years younger than the defendant. Among the included acts is "(4) Oral copulation, in violation of section 288a, when committed by force, violence, *duress*, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (§ 269, subd. (a)(4), italics added.)

Duress means "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary sensibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*People v. Pittmon* (1985) 170 Cal.App.3d 38, 50; see *also People v. Schulz* (1992) 2 Cal.App.4th 999, 1005; *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1319-1320.)

Duress involves psychological coercion but psychological coercion, without more, may not be sufficient. (*People v. Hecker* (1990) 219 Cal.App.3d 1238, 1250-1251.) When considering whether duress exists, we examine the totality of the circumstances, including the age of the victim and her relationship to the defendant. (*People v. Pittmon, supra*, 170 Cal.App.3d at p. 51.) A defendant's position of dominance and authority are relevant. (*People v. Schultz, supra*, 2 Cal.App.4th at p. 1005.) In deciding whether there was duress, it is also useful to consider the nature of the act. For example, the prohibited conduct may greatly exceed the minimum touching necessary and may include conduct that is vile, disgusting or unnatural to the victim. We may also examine the nature of the act in view of the age and maturity of the victim. Some children approaching 14 years of age may be maturing sexually and willing to acquiesce or perform a wider range of

conduct than a younger child. In sum, there is sufficient evidence of duress if the totality of the circumstances supports an inference that the victim's participation was at least partly the result of an implied threat. (*People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1578-1579; *People v. Espinoza, supra,* 95 Cal.App.4th at p. 1321.)

In this case, there was sufficient evidence to warrant an inference that Amanda's participation in the act of oral copulation was at least partly the result of an implied threat. At the time of the offense, Amanda was five years old. The act of molestation was not a mild act of touching. Defendant committed acts of oral copulation upon Amanda, ejaculating in her mouth, and causing her to throw up. Defendant was in a position of authority, being Amanda's longtime babysitter. Amanda testified that defendant told her to keep their sexual activity secret and said that if she told her mother she would get into trouble. Amanda told her mother that defendant had said she and Anthony would be taken away from their mother if they ever revealed that they were spanked "or anything." Amanda testified that defendant spanked her, and that he had hit her with a shoe when he was mad. Defendant admitted spanking Amanda.

Defendant contends that this evidence is insufficient because it is not clear that the implied threats preceded the molestations. But Amanda testified to multiple acts of molestation. She stated that defendant had orally copulated her more than two times that weekend, and that he had committed other sexual acts with her. By defendant's own account, he spanked Amanda relatively early on during the weekend encounter. Defendant's claim that the evidence is "hopelessly unclear" on the timing of the threats overlooks our task as a reviewing court. "This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755; see also *People v. Johnson,* (1980) 26 Cal.3d 557, 576-577.) "Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no

hypothesis whatever is there sufficient substantial evidence to support it. [Citation.]"
(*People v. Redmond, supra,* 71 Cal.2d at p. 755; see also *People v. Johnson, supra,*
26 Cal.3d at pp. 576-577.) Viewing the evidence under these standards, there was
substantial evidence of duress.

## B. *Evidence of Molestation by Third Party*

Relying upon Evidence Code section 782, defendant argues that the trial court
abused its discretion because it failed to hold a hearing so that Amanda could be
questioned about whether her biological father, Ivan, had molested her and whether she
had witnessed Ivan and Rubio having sex. We disagree.

Evidence Code section 782 restricts a defendant's ability in a sexual offense case
to present evidence of the victim's sexual conduct to attack the victim's credibility.[2] The
statute mandates that a certain procedure be followed before the evidence may be
admitted.

Evidence Code section 782 does not apply here. The proffered evidence was not
the type of evidence governed by Evidence Code section 782. According to defendant's
offer of proof, Amanda told defendant in October 1996, that Ivan had touched her "down
there." Defendant also claimed that sometime in late summer of 1996 Amanda confided
in defendant that she had seen her mother and father kissing each other and "doing nasty
things."

---

[2] Under Evidence Code section 782, the defendant must (1) make a written
motion "stating that the defense has an offer of proof of the relevancy of evidence of the
sexual conduct of the complaining witness proposed to be presented and its relevancy in
attacking the credibility of the complaining witness. . . ." and (2) accompany the motion
with an affidavit stating the offer of proof. If the court finds the offer of proof sufficient,
the court "shall order a hearing out of the presence of the jury, if any, and at the hearing
allow the questioning of the complaining witness regarding the offer of proof made by
the defendant." At the end of the hearing, if the court finds that the evidence "is relevant
pursuant to Section 780, and is not inadmissible pursuant to Section 352 of this code, the
court may make an order stating what evidence may be introduced . . . ." (Evid. Code,
§ 782.)

With respect to Amanda's statement that her father touched her "down there," Evidence Code section 782 was inapplicable because the statement was not being offered to attack Amanda's credibility or to show the basis of her sexual knowledge. Evidence Code section 782 concerns the introduction of evidence to attack the victim's credibility. In seeking to introduce Amanda's statement that her father touched her "down there," defendant does not argue that Amanda's statement was false. This is therefore not a situation where a prior false accusation of molestation is relevant to the issue of the victim's credibility. (See *People v. Franklin* (1994) 25 Cal.App.4th 328, 335.)

Relying upon *People v. Daggett* (1990) 225 Cal.App.3d 751, defendant contends the evidence was admissible to establish a basis for Amanda's sexual knowledge apart from defendant's acts. However, in defendant's offer of proof, this evidence was not offered for that purpose. Rather, the evidence that Amanda said her father touched her "down there" was offered because defendant claimed that Amanda's statement was true and that it was therefore relevant to show that Amanda may have contracted chlamydia from someone other than defendant.

Evidence Code section 782 also does not apply to Amanda's statement that she saw her mother and father doing "nasty things." As noted, Evidence Code section 782 concerns the sexual conduct of the complaining witness, in this case Amanda. Amanda's statement that she saw her mother and father doing "nasty things" does not implicate sexual conduct by Amanda. In *People v. Casas* (1986) 181 Cal.App.3d 889, 895, the court indicated that sexual conduct, as used in Evidence Code section 782, encompassed behavior that shows the actor's or speaker's willingness to engage in sexual activity. (See also *People v. Franklin, supra*, 25 Cal.App.4th at p. 334.) Amanda's observation of her parents does not fall within this definition.

For these reasons, we conclude that Evidence Code section 782 does not apply. As a result, we necessarily reject defendant's claim that the trial court abused its discretion in failing to hold a hearing under Evidence Code section 782.

We also conclude that the exclusion of the evidence does not warrant reversal. With respect to touching by Ivan, the trial court did not abuse its discretion in excluding the evidence because it was not especially probative on the issue of the source of Amanda's infection. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201 [appellate court reviews trial court's ruling as to admissibility of evidence for abuse of discretion].) First, the testimony indicated that it was highly unlikely, if not impossible, for chlamydia to be transmitted digitally. Second, any touching by Ivan had to have occurred prior to October 6, 1996, yet there was no evidence that Amanda had any symptoms prior to November 20, 1996, and Amanda's November 20, 1996 baseline culture was negative. The evidence disclosed that the normal incubation period for chlamydia is seven to 14 days, and possibly three weeks. Both experts agreed that it was unlikely for symptoms to appear after this period. Accordingly, the trial court could properly conclude that the evidence that Amanda told defendant that Ivan touched her "down there" was not probative on the issue of the source of Amanda's chlamydia infection.

The trial court also did not abuse its discretion in excluding the evidence that Amanda saw her parents doing "nasty things." It was within the trial court's discretion to decide the evidence was not probative on the issue of Amanda's ability to describe sexual actions. Amanda testified that defendant put his penis in her mouth, that liquid came out, and that it made her throw up. She told her mother that defendant made her drink his "pee-pee milk" and that "white stuff" came out of his "pee pee." The detail and specificity of Amanda's description of orally copulating defendant is in stark contrast to her comment about "nasty things." However, even if the trial court did err in excluding the evidence, the exclusion certainly did not result in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, § 354.) The link between Amanda's statement in late summer 1996 that she saw her parents doing "nasty things" and her specific description of acts she claimed defendant committed in November 1996 was too weak for it to be reasonably probable that the exclusion affected the verdict.

## C. *Penile Swab Evidence*

Defendant argues that evidence of a penile swab test performed on defendant on June 18, 1997, was improperly excluded. We conclude that reversal is not required. At trial, defendant sought to introduce evidence of the results of defendant's penile swab test (which were presumably negative). Defense counsel recognized that there was a significant intervening time between Amanda's December 1996 infection and defendant's June 18, 1997 test. As justification for the test delay, counsel said that he had not received notice of Amanda's positive chlamydia test "until quite late."

Although we believe that the trial court should have allowed defendant to introduce this evidence, we conclude that the error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) It is unlikely that evidence that defendant tested negative for chlamydia on June 18, 1997, would have convinced the jury that defendant did not have chlamydia in November 1996. This is especially true given that evidence was introduced, via a blood analysis, that defendant *had* had chlamydia in the past, either chlamydia trachomatis, which is what Amanda had, or chlamydia pneumoniae. Given the other evidence of defendant's guilt, including Amanda and Anthony's testimony, it is not reasonably probable that the jury would have reached a different result had they considered the results of defendant's June 18, 1997 penile swab test.[3]

## D. *Instruction Defining Duress*

---

[3] Defendant also argues that cumulative error requires reversal. This argument is without merit. (See *People v. Kelly* (1990) 51 Cal.3d 931, 970.)

Defendant contends that his aggravated sexual assault conviction must be reversed because the jury was improperly instructed on the definition of duress. We conclude that reversal is not required.

The trial court instructed the jury under CALJIC No. 10.42, which defined duress.[4] Among other things, it stated that the definition of duress meant a "direct or implied threat of . . . *hardship* . . . ." (CALJIC No. 10.42, italics added.)

In 1993, the Legislature deleted the term "hardship" from the rape and spousal rape statute, sections 261 and 262. *People v. Valentine* (2001) 93 Cal.App.4th 1241 held that the California Legislature intended to exclude "hardship" from the list of threatened harms that qualify as forcible oral copulation (§ 288a) or forcible penetration with a foreign object (§ 289, subd. (a)) because it removed "hardship" from the definition of "duress" for purposes of rape and spousal rape.

Relying upon *Valentine*, defendant says that "hardship" must also necessarily be removed as a basis for finding duress under section 269, concerning aggravated sexual assault. Since the trial court's instruction did not delete the term "hardship," defendant contends his aggravated sexual assault conviction must be reversed.

However, as already discussed, in this case there was evidence of duress in the form of direct or implied threats of force, violence, danger or retribution. Unlike *Valentine*, the theory of hardship as the source of the duress was not a theory emphasized

---

[4] Defendant was convicted in count two of aggravated sexual assault under section 269. Under section 269, the crime of aggravated sexual assault includes, "Oral copulation, in violation of Section 288a, when committed by force, violence, duress, menace, or fear of immediate or unlawful bodily injury on the victim or another person." The court instructed the jury on the elements of aggravated sexual assault by giving CALJIC No. 10.55, which did not define duress. CALJIC No. 10.42, pertaining to count three, lewd and lascivious conduct upon a child under 14 by means of force, violence, duress, etc., did define duress. The jury was informed that counts one, two and three were alternative charges for the same criminal conduct and that it could convict defendant of no more than one of these offenses.

here. Accordingly, it is not reasonably probable that a different result would have occurred had the jury considered the instruction with the word "hardship" omitted. (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

## E. *Section 654*

Defendant contends the trial court should have stayed sentence on the misdemeanor child endangerment counts. We disagree.

Section 654 provides, in pertinent part, "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654 has been interpreted to permit multiple convictions stemming from a single act or omission but to bar multiple punishment for those convictions. (*People v. Siko* (1988) 45 Cal.3d 820, 823.) The purpose of section 654 is to ensure that a defendant's punishment is commensurate with his culpability. (*People v. Norrell* (1996) 13 Cal.4th 1, 8.)

Section 654 was not violated here. The two corporal punishment counts were supported by evidence that defendant beat Amanda and Anthony with such severity that he left bruises on their bodies. Defendant admitted spanking the children with his belt. The count 7 verdict, for misdemeanor child endangerment as to Anthony, was supported by evidence that defendant put chili in Anthony's eyes. The verdict in count 4, misdemeanor child endangerment as to Amanda, was supported by evidence that defendant molested Amanda in ways besides forcing her to orally copulate him (the basis for the count 2 verdict). Thus, the two convictions for misdemeanor child endangerment were based upon conduct separate from the conduct giving rise to the other counts, and were not part of a continuous course of conduct.

Finally, defendant's argument that he is entitled under *Apprendi v. New Jersey* (2000) 530 U.S. 466 to a jury trial on "factual determinations concerning the defendant's mental state at the time of his or her crimes under Penal Code section 654" is without

merit.  A similar argument was rejected in *People v. Cleveland* (2001) 87 Cal.App.4th 263, 265-266, with which we agree.  (See also *People v. Solis* (2001) 90 Cal.App.4th 1002, 1022.)

## DISPOSITION

The judgment is affirmed.  The petition for a writ of habeas corpus is denied.

_____
                 RUSHING, J.


WE CONCUR:


_____
BAMATTRE-MANOUKIAN, ACTING P.J.


_____
      MIHARA, J.


*People v. Alvarez.*
H021626

RUSHING, J., Concurring

I concur in the judgment because I believe that defendant's conviction should be affirmed. However, I concur specially because I disagree with the holding in *People v. Valentine* (2001) 93 Cal.App.4th 1241.

*Valentine* relies upon the Legislature's action under Penal Code sections 261 and 262 to claim the Legislature meant to take similar action under other statutes.[1] In this respect, *Valentine* ignores the plain wording of sections 261 and 262. Section 261, subdivision (b), states that, "*As used in this section*, 'duress' means . . . ." (Italics added.) Section 262, subdivision (c), similarly states that, "*As used in this section*, 'duress' means . . . ." (Italics added.) These plain words limit those definitions of duress to sections 261 and 262. "When a statute is unambiguous, its language cannot 'be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process. [Citation.]' [Citation.]" (*Shah v. Glendale Federal Bank* (1996) 44 Cal.App.4th 1371, 1374.) Case law defining duress defines the term to include "hardship." (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 50.) And repeals by implication are not favored. (*Scott Co. v. Workers' Comp. Appeals Bd.* (1983) 139 Cal.App.3d 98, 105.) We must therefore assume that when the Legislature amended the definitions of "duress" for purposes of sections 261 and 262 it was aware of the existing case law that defined "duress" differently for other purposes and chose to leave those definitions untouched. (*Ibid.*)

*Valentine's* contrary conclusion ignores fundamental rules of statutory construction. As we have mentioned, the rape statutes define "duress" for purposes of those statutes only and case law has defined "duress" for other purposes. There is no ambiguity, doubt, or uncertainty here. There is simply nothing to interpret or construe

---

[1] All further unspecified statutory references are to the Penal Code.

such that legislative history must be consulted.  Moreover, there is nothing absurd about the differing definitions of "duress" as the *Valentine* concurring opinion acknowledges. The *Valentine* concurring opinion noted that the Legislature may have had good reason to retain "hardship" under other Penal Code sections and noted that the majority's contrary conclusion was "close to engaging in judicial legislation." (*Valentine, supra*, 93 Cal.App.4th at p. 1255 (conc. opn. of Woods, J.).)

For these reasons, I disagree with *Valentine* and believe that the instruction given by the trial court was not improper.

_____
                                       RUSHING, J.

*People v. Alvarez*
H021626