1

2          **E-Filed 9/30/08**

3

4

5

6

7

8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

           **SAN JOSE DIVISION**

10

11

12    ANGEL JESUS ALVAREZ,                    Case No. C 06-5027 JF (PVT)

13                        Petitioner,          ORDER[1] DISMISSING PETITION FOR
                                               WRIT OF HABEAS CORPUS AS
14         v.                                  UNTIMELY

15    ROBERT AYERS, JR., Warden,               [Re: docket no. 8]

16                        Respondent.

17

18

19

20

21         Petitioner Angel Jesus Alvarez ("Alvarez") was convicted in 2000 of aggravated sexual

22    assault of a child, two counts of corporal injury of a child, and two counts of misdemeanor child

23    endangerment.  On May 26, 2000, the Santa Clara Superior Court sentenced Alvarez to a term of

24    imprisonment of seventeen years to life.  The California Court of Appeal affirmed the conviction

25    on October 25, 2002.  The California Supreme Court denied Alvarez's petition for review on

26    January 15, 2003. Subsequently, Alvarez filed unsuccessful petitions for a writ of habeas corpus

27    _____

28         [1] This disposition is not designated for publication in the official reports.

Case No. C 06-5027 JF (PVT)
ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS AS UNTIMELY
(JFEX2)

1   in the, Santa Clara Superior Court, the California Court of Appeal and the California Supreme

2   Court.  On August 21, 2006, Alvarez filed the instant federal habeas petition. Respondent Robert

3   Ayers, Jr. ("Ayers") moves to dismiss the petition as untimely.  The Court has considered the

4   briefing submitted by the parties and the applicable law.  For the reasons discussed below, the

5   motion will be granted.

6                                   **I. BACKGROUND**

7          After his conviction, Alvarez was represented by court-appointed counsel in his

8   direct appeal to the California Court of Appeal and to the California Supreme Court. Resp.'s

9   Rep. Opp. To Mot. to Dismiss ("Resp.'s Br.") at 3.   On January 15, 2003, the California

10  Supreme Court denied Alvarez's petition for review. Ex. A. 4. Because Alvarez did not file a

11  petition for writ of certiorari in the United States Supreme Court, his conviction became final on

12  April 15, 2003, which gave him until April 15, 2004 to file a timely habeas corpus petition in this

13  Court. *See* 28 U.S.C. § 2244(d).

14         In December 2002, before his conviction became final, Alvarez wrote to several attorneys

15  whom he considered retaining for future litigation, including Frank Prantil ("Prantil") and Gary

16  Diamond ("Diamond"). In February 2003, Alvarez received a letter from Prantil, in which Prantil

17  urged Alvarez to retain him immediately because a state habeas petition needed to be filed before

18  March 15th. Ex. A.[2] 4. However, Prantil sent Alvarez a second letter in April 2003 stating that he

19  had been mistaken about the filing deadline and that Alvarez would have until April 11, 2004 to

20  file a petition. Ex. A 11-12. In June 2003, Alvarez retained Diamond (Ex. A 18)  and Prantil to

21  file petitions for writ of habeas corpus "through the three levels of the state courts."[3]  Ex. A. 24.

22  Prior to being officially retained,  Prantil and Diamond had agreed to work together on Alvarez's

23  behalf.  Ex. A 15-16. Prantil also agreed not to file any papers before Alvarez was able to read

24  _____

25         [2]"Ex. A. refers to evidence contained in Exhibit A, attached to the Petitioner's Response
26  to the Motion to Dismiss.

27         [3]This language appears in the retainer agreement with Prantil.  Ex. A 24. Diamond's
    retainer agreement provides that he will "file a Writ of Habeas Corpus through the state courts."
28  Ex. A. 18.

                                          2

1    them. Ex. A 87.

2        From June through September 2003, Prantil and Diamond did not communicate with each

3    other effectively. Petr.'s Resp. to Mot. to Dismiss ("Petr.'s Br.") at 5; Ex. A 32-33. On

4    September 11, 2003, Prantil sent Alvarez a letter, asserting that he wanted to file the state

5    petition in the superior court "very soon," and stating that he preferred to draft the petition

6    himself rather than have Diamond do it. Ex. A 32.  He also discussed his litigation strategy, and

7    predicted that a citation to *In re Clark* would not result in a procedural bar because "the rule is

8    not consistently applied."  5 Cal. 4th 750 (1993); *see* Ex. A 32.

9        In October 2003, on Prantil's recommendation, Alvarez hired private investigator

10   Kenneth Addison ("Addison") to work with Prantil and Diamond. Alvarez claims that in

11   November, the relationship between Prantil and Diamond deteriorated; Prantil told Alvarez that

12   he refused to draft a habeas petition unless Alvarez fired Diamond or convinced Diamond to

13   work with him. Petr.'s Br. at 5. On December 17, 2003, Prantil filed a petition for writ of habeas

14   corpus in the Santa Clara Superior Court. The court denied the petition on January 14, 2004, and

15   Prantil notified Alvarez one week later. Ex. A 36.  Prantil stated that the next step would be for

16   Diamond to file a petition in the state court of appeal on Alvarez's behalf. *Id.*

17       In February 2004, Diamond arranged to meet personally with Alvarez in prison.

18   However, Alvarez claims that both he and Addison had difficulty communicating with Diamond

19   from February through June 2004. Petr.'s Br. At 6; Ex. A 37.  Alvarez sought the assistance of

20   another attorney to complete the habeas petition to the state court of appeal.  Ex. A 61-62. In a

21   July 2004 letter to Alvarez, Prantil emphasized to Alvarez that it was "imperative to file the

22   petition with the court of appeal." Ex. A 67.  He urged Alvarez to complete the investigation with

23   Addison "quickly" so that the federal courts would not find that Alvarez had "not been diligent in

24   conducting investigation," and dismiss the case without addressing the merits of the claim. Ex. A

25   61. In August 2004, Diamond told Alvarez that he was waiting to hear from the investigator

26   before sending Alvarez a draft of his pleading, and agreed to meet with Alvarez soon to "discuss

27   our progress." Ex. A 63.

28       Alvarez learned from Prantil in September 2004 that Diamond had stipulated to a six-

3

1  month suspension of his bar license. Ex. A 67-68.  Shortly thereafter, Alvarez fired Diamond.

2  In October 2004, Prantil wrote to Alvarez stating that "this is not [his] case" and that he would

3  need additional payment to prepare a petition for the state court of appeal. Ex. A 71.

4  Subsequently, Alvarez retained attorney Kent Russell to prepare and file his habeas petition in

5  the state appellate court; that petition was filed on March 11, 2005 and was denied without

6  comment on March 23, 2005.

7      In April 2005, Prantil wrote to Alvarez, expressing dissatisfaction that Alvarez had "filed

8  with the court of appeal on [his] own and without [Prantil's] help." Ex. A 90.  He again urged

9  Alvarez to "get on" Addison to complete the investigation so that they could file in the State

10  Supreme Court. Ex. A 90.  The filing deadline for Alvarez's federal habeas petition had passed

11  nearly a year before (April 15, 2004); Prantil told Alvarez that Addison might need to show a

12  federal court that he had been diligent in investigating the case in order to explain the delayed

13  filing in the state supreme court. Ex. A 90.  That month, Prantil wrote to Addison, asking him to

14  be prepared to file a declaration describing his diligence in pursuing the investigation on

15  Alvarez's behalf. Ex. A 92.

16      On September 19, 2005, Prantil sent Alvarez a draft of the California Supreme Court

17  habeas petition, followed by a second draft on October 14, 2005. Ex. A 100, 108. On November

18  7, Prantil sent a letter containing his legal strategy, and on December 29, 2005, Prantil provided

19  Alvarez a fourth draft of the petition. Ex. A 149-51. The habeas petition finally was filed on

20  January 12, 2006 in the California Supreme Court.  On June 28, 2006, that court denied the

21  petition, citing *In re Clark.* 5 Cal.4th 750;  Ex. A 159.

22      On July 6, 2006, Alvarez received a letter from Prantil in which Prantil included a copy

23  of the California Supreme Court's denial. In that letter, Prantil asked if Alvarez wanted to retain

24  him for litigation at the federal district court level. Prantil stated that Alvarez would need to sign

25  a new retainer agreement and pay additional money. Ex. A 156. Prantil also informed Alvarez

26  that he was no longer eligible to eligible to practice law in the state courts as a result of a recent

27  decision by the State Bar Hearing Department, but that he was still eligible to practice law in

28  federal court. Ex. A 157.

4

1

**II. DISCUSSION**

2

**A. Timeliness**

3

    **1. Statute of Limitations**

4

       The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a state

5

prisoner to seek federal habeas corpus relief within one year after the state conviction becomes

6

final. 28 U.S.C. § 2244(d). The limitations period commences on the date on which the

7

judgment became final by the conclusion of direct review or the expiration of the time for

8

seeking such review. 28 U.S.C. § 2244(d)(1)(A). The time for seeking direct review includes the

9

90-day period within which a petitioner may file a petition for a writ of certiorari in the United

10

States Supreme Court, even if the petitioner does not actually file such a petition. *Spitsyn v.*

11

*Moore*, 345 F.3d 796, 798 (9th Cir. 2003) (citing *Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir.

12

1999)).

13

       On January 15, 2003, the California Supreme Court denied Alvarez's petition for review.

14

Since Alvarez did not file a petition for certiorari, the state proceedings became final on April 15,

15

2003. Thus, the deadline for Alvarez to file a petition for a writ of habeas corpus in federal court

16

was April 15, 2004, one year later. Alvarez failed to file a federal habeas corpus petition by this

17

date.

18

    **2. Equitable Tolling**

19

       In certain circumstances, the one-year statute of limitations for filing a habeas petition

20

may be equitably tolled if "extraordinary circumstances beyond a prisoner's control make it

21

impossible to file a petition on time." *Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003);

22

*Bramble v. Duncans*, 330 F.3d 1197, 1201(9th Cir. 2003). Though an attorney's ordinary

23

negligence will not justify equitable tolling, an attorney's egregious misconduct may constitute

24

an "extraordinary circumstance" warranting equitable tolling of the statute of limitations. *Spitsyn*,

25

345 F.3d at 800. However, as the Ninth Circuit cautions in *Spitsyn*, equitable tolling is justified

26

in few cases. *Id.* at 799.

27

       Alvarez asserts that attorneys Prantil and Diamond engaged in egregious misconduct as

28

his representatives and that their failure to file timely petitions on Alvarez's behalf effectively

5

amounted to client abandonment. Alvarez relies heavily on *Spitsyn*, in which the Ninth Circuit allowed equitable tolling for extreme attorney misconduct. *Spitsyn*, 345 F.3d at 796. In that case, Spitsyn's mother retained an attorney to represent him in his federal writ proceedings nearly a year before the statute of limitations. The attorney never filed a federal petition. Weeks after the statute of limitations had expired, the attorney expressed regret for not following through with the case and returned Spitsyn's payment. However, he delayed an additional three months in returning Petitioner's file.  Spitsyn was forced to file his own habeas petition, proceeding pro se, 226 days after the statute of limitations had run.

Unlike the attorney in *Spitsyn*, none of the three attorneys retained by Alvarez abandoned him or refused to communicate with him during their employment. Prantil and Diamond, despite difficulty communicating with each other, communicated regularly with Alvarez, discussed legal strategy with him, and advised him on how to proceed.  Prantil filed a habeas corpus petition with the superior court. Russell prepared and Alvarez filed a habeas corpus petitio with the state court of appeal, and Prantil filed a petition in the California Supreme Court. Each of the attorneys submitted drafts of their pleadings to Alvarez before filing, pursuant to his direction. Prantil and Alvarez also discussed a strategy be prepared in the event an untimely federal habeas petition had to be filed.

It is clear from the record that Prantil and Diamond were negligent in their representation of Alvarez. However, this case does rise to the level of egregious misconduct described in *Spitsyn,* in which the attorney effectively abandoned his client and failed to provide the client with his file.  *Spitsyn*, 345 F.3d at 796. Even more serious instances of negligence and attorney error have been found not to constitute "exceptional circumstances" sufficient to warrant equitable tolling. *See Miranda v. Castro*, 292 F.3d 1063, 1066-67 (9th Cir. 2002) (no tolling where attorney wrote a letter to petitioner stating wrong due date for federal habeas petition); *Fry v. Hickman*, 273 F.3d 1144, 1146 (9th Cir. 2001) (no tolling where attorney miscalculated deadline for statute of limitations);  *Green v. White*, 223 F.3d 1001 (9th Cir. 2000) (no tolling where counsel relied on inapplicable case). Moreover, unlike the attorney in *Spitsyn*, Prantil, Diamond, and Russell were not retained to file a *federal* habeas petition; all of the retainer

6

agreements limited the attorneys' representation of Alvarez to state court proceedings. Ex. A 18, 24. Even in clear cases of negligence, "[r]etained counsel's failure to expeditiously file a state court collateral motion is decidedly not grounds for equitably tolling the AEDPA limitations period." *Palladino v. Perlman*, 269 F.Supp.2d 36 (E.D.N.Y. 2003).

**C. Merits[4]**

**1. Petitioner's Factual Assertions**

Ruby Rubio is the mother of the alleged victims, Amanda, age eight, and Anthony, age seven. Prior to the crime, Ruby was in a romantic relationship with Alvarez.  Ruby occasionally allowed Alvarez to care for her children, and sometimes the children stayed with Alvarez overnight. In November 1996, Alvarez agreed to care for the children for several nights. When Alvarez returned the children to Ruby on November 19, 1996, Ruby noticed that Anthony's eyes were irritated. That night, when Ruby bathed the children, Ruby discovered bruises**.**  Amanda complained of burning and irritation in her private areas. Later that night, Amanda told Ruby that when Alvarez gave her a bath or shower, he sometimes stuck his finger inside her.

Ruby called the police. Amanda was examined at the Santa Clara Valley Medical Center. According to the nurse practitioner who examined Amanda, the bruises, abrasions on Amanda's face, legs, and the front area of her body were not consistent with normal childhood play.  When Amanda was interviewed the next day, Amanda said that Alvarez had put chili in Anthony's eyes.  She also stated that Alvarez had put his "pee-pee" in her mouth while she was lying down in Alvarez's van, that "nasty milk" came out, and that petitioner had given her "milk" from his "pee-pee" before.  Amanda also stated that on the same occasion, Alvarez had touched his "pee-pee" to her "pee" and that he had touched her "pee" with his finger.  Amanda told Ruby that she had not said anything before because she was scared; Alvarez had said that if she told anyone about the "spanking" it would be her fault if she and Anthony were taken away from their mother. Amanda also said that Alvarez threatened to hurt her and to hit her.

---

[4] Although it has determined that the petition subject to dismissal is untimely, in the interest of completeness, the Court also considers the legal sufficiency of Petitioner's claim of factual innocence.

7

1   On December 5, 1996, Amanda returned to the hospital for additional photographs and

2   testing. Ruby reported that Amanda had developed a vaginal discharge.  When doctors cultured

3   the discharge, they determined that Amanda had chlamydia organism growing in her vagina, and

4   that based on the known incubation period for chlamydia, Amanda had been infected less than

5   three days before November 20, 2006.

6   At trial, Anthony testified that Alvarez had put chili in his eyes and had done so more

7   than once. Anthony also said that Alvarez had put chili on his penis. Amanda confirmed all of

8   her statements from the interview.  She also stated that Alvarez  had made her drink his "milk"

9   several times and that these acts took place in Alvarez's van and in the house.

10   Alvarez testified and denied committing the charged crimes.  He argued that during that

11   weekend, he had purchased fresh Serrano chilies at the grocery store and that Anthony had found

12   the chilies and put them in his pocket. Later, when Anthony rubbed his eyes, they became

13   irritated, and Anthony complained of pain. Alvarez also claimed that Ruby had told him to

14   "whup their asses" if Amanda and Anthony got out of control; he testified that over the weekend,

15   he had used his belt to spank Amanda once and Anthony twice. Alvarez additionally testified that

16   he had never experienced symptoms of chlamydia.  He stated that he normally had severe

17   bronchitis once a year and that it was sometimes treated with antibiotics**.** An expert in sexually

18   transmitted diseases testified that Alvarez had had chlamydia, but could not determine whether

19   he had chlamydia trachomatis, a sexually transmitted disease, or chlamydia pneumoniae, a

20   respiratory infection that causes pneumonia and bronchitis.

21   **2.  Actual Innocence Doctrine**

22   Alvarez asserts that he has made a colorable showing of factual innocence sufficient to

23   excuse any procedural default.  In particular, Alvarez argues that his claim of actual innocence is

24   supported by (1) the government's failure to disclose that the alleged victim, Amanda, was

25   infected with chlamydia until it was too late for him to be excluded as the alleged perpetrator; (2)

26   the government's failure to produce the test results of the red blanket found in his van; (3) his

27   penile swab exam of June 16, 2997 was negative for the detection of chlamydia; and (4)

28   statements obtained from various witnesses by Addision.  Petr.'s Br. At 9-10.

8

1    The United States Supreme Court has held that a petitioner's "otherwise-[time] barred

2    claims [may be] considered on the merits ... if his claim of actual innocence is sufficient to bring

3    him within the 'narrow class of cases ... implicating a fundamental miscarriage of justice.'"

4    *Majoy v. Roe*, 296 F.3d 770, 775 (9th Cir. 2002) (quoting *Schlup v. Delo*, 513 U.S. 298, (1995)).

5    Application of this exception is "not itself a constitutional claim, but instead a gateway through

6    which a habeas petitioner must pass to have his otherwise barred constitutional claim considered

7    on the merits." *Schlup*, 513 U.S. at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

8    In order to pass through this gateway, a petitioner must show that, in light of all the evidence,

9    including evidence not introduced at trial, "it is more likely than not that no reasonable juror

10   would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. The

11   petitioner must support his allegations of constitutional error with "new reliable evidence-

12   whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

13   physical evidence- that was not presented at trial." *Id.* at 324.

14        Alvarez has failed to present evidence sufficient to implicate a "fundamental miscarriage

15   of justice." Alvarez claims that the government's failure to disclose Amanda's chlamydia

16   infection sooner denied him "the opportunity to prove that he did not have chlamydia at the time

17   of the alleged criminal conduct." Petr.'s Br. At 9. However, at trial an expert in sexually

18   transmitted disease testified that Alvarez "had had chlamydia but could not say what type [he]

19   had had." Pet. for Writ of Habeas Corpus ("Writ of H.C."). Alvarez also claims that if the

20   blanket taken from his van had been tested, and if the test was negative for his semen, "that result

21   would have served to materially corroborate [his] claim of innocence." Petr.'s Br. at 10. At trial,

22   the parties stipulated that the police seized various items from Alvarez's van, including a

23   sleeping bag and a pair of underwear, which tested negative for the presence of semen. Writ of

24   H.C. at 7. A negative test result on the red blanket thus would not provide additional proof of

25   Alvarez's innocence.

26        Alvarez next argues that evidence of his negative penile swab culture test for chlamydia

27   demonstrates his innocence. This argument was raised on appeal to the California Court of

28

9

1   Appeal and rejected.[5]  Attachment A at 12[6]; Resp.'s Br. at 10.  Finally, Alvarez claims that

2   statements obtained from various witnesses support his claim of factual innocence.  Those

3   statements assert that Alvarez "compassionately cared" for the victims, and "loved the children

4   as if they were his own." Writ of H.C. at 2; Writ of H.C., Ex. L. Additional statements opine that

5   the victims' mother was "unfit," and "vindictive," and that she "turned on [Alvarez]." Writ of

6   H.C. at 24-26.  Such statements do not constitute "credible . . . new, reliable" evidence sufficient

7   to support Alvarez's claim of factual innocence. *See Schlup*, 513 U.S. at 324.

## IV. ORDER

9        Respondent's motion to dismiss Alvarez's petition for Writ of Habeas Corpus is

10  GRANTED.  The clerk of the Court shall enter judgment and close the file.

11

12  Dated: September 30, 2008

13

14

15                                                    JEREMY FOGEL
                                                      United States District Judge

16

17

18

19

20

21

22      [5]The Court stated, "it is unlikely that evidence that defendant tested negative for
    chlamydia on June 18, 1997, would have convinced the jury that defendant did not have chlamydia
23  in November 1996.  This is especially true given that evidence was introduced, via a blood
    analysis, that defendant *had* had chlamydia in the past, either chlamydia trachomatis, which is
24  what Amanda had, or chlamydia pneumonia. Given the other evidence of defendant's guilt,
    including Amanda and Anthony's testimony, it is not reasonably probable that the jury would
25  have reached a different result had they considered the results of defendant's June 18, 1997
    penile swab test." *People v. Alvarez,* Santa Clara Super. Ct. No. 198084 (Oct. 28, 2002);
26  Attachment A

27

28      [6]"Attachment" refers to documents attached to the Respondent's Brief.

Case No. C 06-5027 JF (PVT)
ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS AS UNTIMELY
(JFEX2)

1    This Order has been served upon the following persons:

2

3    Violet May Lee violet.lee@doj.ca.gov, beverly.wong@doj.ca.gov,
4    docketingSFAWT@doj.ca.gov, ECFcoordinator@doj.ca.gov

5    Scott L. Tedmon tedmonlaw@comcast.net, tedmonlaw@earthlink.net

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 06-5027 JF (PVT)
ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS AS UNTIMELY
(JFEX2)